1  DAVID A. STEINBERG (SBN 130593)
     das@msk.com
2  GABRIELLA N. ISMAJ (SBN 301594)
     gan@msk.com
3  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18th Floor
4  Los Angeles, CA  90067-3120
   Telephone: (310) 312-2000
5  Facsimile: (310) 312-3100

6  CHRISTINE LEPERA (*pro hac vice*)
     ctl@msk.com
7  JEFFREY M. MOVIT (*pro hac vice*)
     jmm@msk.com
8  437 Madison Avenue, 25th Floor
   New York, New York 10022
9  Telephone: (212) 509-3900
   Facsimile: (212) 509-7239

10

11 *Attorneys for Defendants*
   *Austin Richard Post p/k/a Post Malone*
   *Adam King Feeney p/k/a Frank Dukes*
12

13           UNITED STATES DISTRICT COURT

14           CENTRAL DISTRICT OF CALIFORNIA

15                WESTERN DIVISION

16 | TYLER ARMES, | Case No. 2:20-cv-03212 ODW (SKx) |
   |              | *Consolidated with 2:20-cv-10205* |
17 |     Plaintiff |                              |
   |               | Hon. Otis D. Wright II        |
18 |     v.        |                              |
   |               | **DECLARATION OF DAVID A.**   |
19 | AUSTIN RICHARD POST, publicly | **STEINBERG IN SUPPORT OF** |
   | known as POST MALONE, an | **DEFENDANTS' MOTION FOR** |
20 | individual; ADAM KING FEENEY | **SUMMARY JUDGMENT** |
   | publicly known as FRANK DUKES, an |                |
21 | individual; UNIVERSAL MUSIC | Date:  April 4, 2022 |
   | GROUP, INC., a Delaware corporation; | Time:  1:30 p.m. |
22 | DOES 1 through 10, inclusive, | Ctrm:  5D (First Street |
   |                |         Courthouse) |
23 |     Defendants |                |
   |                | Filed:  April 7, 2020 |
24 |                | Trial:  May 17, 2022 |

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

## DECLARATION OF DAVID A. STEINBERG

I, DAVID A. STEINBERG, declare:

1.     I am an attorney at law duly licensed to practice law in the State of California and before this Court.  I am, through my professional corporation, a partner in the law firm of Mitchell Silberberg & Knupp LLP ("MSK"), attorneys of record for Defendants Austin Richard Post, professionally known as Post Malone ("Post") and Adam King Feeney, professionally known as Frank Dukes ("Dukes") (together, "Defendants").  Unless otherwise stated, I have personal knowledge of the following facts, and if called and sworn as a witness, could and would competently testify thereto.

2.     I submit this declaration in support of Defendants' Motion for Summary Judgment ("Motion").

3.     Attached hereto as **Exhibit A** is a true and correct copy of a letter, dated February 11, 2022, which, pursuant to L.R. 7-3, sets forth the bases for the Motion and requests to conduct a conference with plaintiff Tyler Armes's ("Armes") counsel prior to Defendants' filing of the Motion (the "L.R. 7-3 Conference").

4.     The L.R. 7-3 Conference took place on February 17, 2022 via Zoom, with Allison Hart, counsel for Armes, participating.   The parties were unable to reach a resolution to eliminate the necessity of a hearing.

5.     Attached hereto as **Exhibit B** are true and correct copies of relevant portions from the transcript of the deposition of Armes, taken on February 2, 2022 (the "Transcript").  While Defendants' counsel initially designated the Transcript as CONFIDENTIAL pursuant to the parties' protective order (ECF No. 57), that designation is hereby withdrawn by Defendants.

6.     Attached hereto as **Exhibit C** is a true and correct copy of the Declaration of Kaan Gunesberk, executed in May of 2020, which was produced by Defendants to Armes during discovery in this action, and filed in this action (ECF No. 28-1, Ex. 2), as well as in the related, consolidated action initiated by Defendants

in the United States District Court for the Southern District of New York, captioned *Post v. Armes*, Case No. 1:20-CV-02877-ALC (the "New York Action"). *See* New York Action, ECF No. 26-4.[1]

7. Attached hereto as **Exhibit D** is a true and correct copy of the Declaration of Billy Walsh, executed on May 19, 2020, which was produced by Defendants to Armes during discovery in this action, and filed in this action (ECF No. 28-1, Ex. 3), as well as in the New York Action (at ECF No. 26-7).

8. Attached hereto as **Exhibit E** is a true and correct copy of the Declaration of Louis Bell, executed on May 14, 2020, which was produced by Defendants to Armes during discovery in this action, and filed in this action (ECF No. 28-1, Ex. 1), as well as in the New York Action (at ECF No. 26-6).

9. Attached hereto as **Exhibit F** is a true and correct scan of the front and back covers of the compact disc of Post Malone's "*Hollywood's Bleeding*" album (the "Album CD"), which was scanned at my direction by an employee in my office on February 26, 2022. The bottom left portion of the Album CD contains the following text: "For complete album credits go to postmalone.com/credits."

10. Attached hereto as **Exhibit G** is a true and correct scan of the booklet inserted in the front cover of the Album CD jewel case, which was scanned at my direction by an employee in my office on February 26, 2022. The booklet primarily consists of photographs, but the back page contains the following text: "FOR COMPLETE ALBUM CREDITS GO TO POSTMALONE.COM/CREDITS." (Capital letters in original).

11. Attached hereto as **Exhibit H** is a true and correct screen capture of the website located at the URL postmalone.com/credits (the "Liner Notes"), which was taken at my direction by an employee in my office on February 16, 2022.

---

[1] As noted by this Court in its opinion on Defendants' motion to dismiss (ECF. No. 32, n.2), the Court may also "take judicial notice" of the documents filed in the New York Action.

Mitchell Silberberg & Knupp LLP

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

2    laws of the United States of America that the foregoing is true and correct.

3

4    Executed on this 28th day of February, 2022, in Los Angeles, California.

5

6                                                    /s/ David A. Steinberg
                                                  DAVID A. STEINBERG

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



## MITCHELL SILBERBERG & KNUPP LLP
### A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Gabriella Nourafchan Ismaj
Attorney-at-Law
(310) 312-3290 Phone
(310) 231-8438 Fax
gan@msk.com

February 11, 2022

**VIA E-MAIL ONLY**

Allison S. Hart, Esq.
Lavely & Singer PC
2049 Century Park East, Suite 2400
Los Angeles, California 90067

**Re:**     _**Armes v. Post et al., Case No. 2:20-cv-03212-ODW-SK (C.D. Cal.)**_

Counsel:

        As you are likely aware, Defendant-Consolidated Plaintiff Austin R. Post p/k/a Post Malone ("Post Malone") and Defendant Adam King Feeney p/k/a Frank Dukes ("Dukes") (collectively, "Defendants") intend to move under Federal Rule of Civil Procedure 56 for summary judgment as to Plaintiff-Consolidated Defendant Tyler Armes' ("Armes") claims for a declaratory judgment, an accounting, and a constructive trust, as well as to Defendants' claim for a declaratory judgment.  We assume that Armes intends to oppose this motion.  Nonetheless, we write in an effort to resolve these issues, pursuant to Local Rule 7-3.  We are available to meet and confer regarding our grounds for the motion on February 17, 2022 between 9 am and 12 pm PST.  Please let us know what time during that window works for you.

                            *                    *                    *

        In order to establish his claim for a declaration that he is a joint author and co-owner of the "Circles" musical composition (the "Circles Composition"), Armes must prove: (1) that he made an "independently copyrightable contribution" to the Circles Composition; _**and**_ (2) that the other authors intended for Armes to be a joint author of the Circles Composition.  _Aalmuhammed v. Lee_, 202 F.3d 1227, 1231 (9th Cir. 2000).   Since it is clear that Armes cannot satisfy his burden as to either element, this claim must be dismissed.  Because Armes' remaining claims for an accounting and constructive trust are dependent on his failing co-authorship claims, summary judgment must be granted in Defendants' favor on all claims.

### Armes Did Not Make an "Independently Copyrightable Contribution" to the Circles Composition

        As a threshold matter, to state a claim for co-authorship (and thus, co-ownership) of a joint work, a plaintiff must allege sufficient facts to be deemed an "author" of the work and to show he made an "independently copyrightable contribution" thereto.  _Aalmuhammed_, 202 F.3d at 1231 (granting summary judgment and dismissing plaintiff's co-authorship claims); _see also Childress v. Taylor_, 945 F.2d 500, 507 (2d Cir. 1991) (same); _Armes v. Post_, 2020 WL 6135068,

2049 Century Park East, 18th Floor, Los Angeles, California 90067-3120
Phone:  (310) 312-2000  Fax:  (310) 312-3100  Website:  www.msk.com

Exhibit A
Page 6



at *7 (C.D. Cal. Oct. 19, 2020) (dismissing Armes' claims relating to the recording of "Circles" because he failed to allege making "an independently copyrightable contribution to the Recording").

Under the Copyright Act, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression[.]" 17 U.S.C. § 102(a).  That fixation must be done "by or under the authority of the author." 17 U.S.C. § 101.  According to the Supreme Court, "the author is the party who actually creates the work, that is, the person who translates an idea into a *fixed, tangible expression* entitled to copyright protection." *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 737 (1989) (emphasis added).  Armes—who merely attended a single studio session with the Defendants—did nothing of the sort here.

Among other admissions fatal to his claims, Armes conceded during his deposition that he does not have any recording of himself performing anything in connection with the Circles Composition, he wrote none of the vocals or lyrics, and that any purported contributions were commonplace and limited to suggestions and advice, which are insufficient to establish an "independently copyrightable contribution" under the law.  *See, e.g.*, *BTE v. Bonnecaze*, 43 F. Supp. 2d 619, 626 (E.D. La. 1999) ("In other words, helpful guidance, ideas, and contributions to a work are insufficient under this test, unless, among other requirements, those things have been fixed in a tangible form of expression.").  The same analysis undertaken by Judge Wright in dismissing Armes' claims relating to his alleged co-authorship of the recording of "Circles" applies here: "Armes only alleges that he supplied direction and ideas . . . [s]uch allegations do not show that Armes made an independently copyrightable contribution[.]"  *Armes*, 2020 WL 6135068, at *7.

Because Armes cannot possibly prove that he made an independently copyrightable contribution to the Circles Composition, his co-authorship claim must be dismissed on that basis alone.

### Armes Cannot Establish Any of the Other Requisite Elements for Joint Authorship of the Circles Composition

While lack of independent copyrightable contribution alone is sufficient to grant summary judgment in Defendants' favor, summary judgment is appropriate for the additional reasons that Armes cannot establish that: (1) he "superintend[ed]" the "whole work" by "exercising control;" (2) the actual co-authors of the Circles Composition made "objective manifestations of a shared intent to be coauthors" of the work; and (3) the "the audience appeal of the work turns on both contributions and the share of each in its success cannot be appraised." *Aalmuhammed*, 202 F.3d at 1234 (internal quotation marks and citations omitted).

The "most important factor" in determining joint authorship is "control."  *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008); *accord Aalmuhammed*, 202 F.3d at 1235 (the "absence of control is strong evidence of the absence of co-authorship").  The Ninth Circuit has made clear that a putative author's control over his own contributions is not tantamount to "control" for authorship purposes, which must extend to the



Allison S. Hart, Esq.
February 11, 2022
Page 3

"whole work." *Id.*; *see also Richlin*, 531 F.3d at 970 (no "control" for authorship purposes where plaintiff wrote the screenplay and "may have had control over [it] as originally written, [but] had no control over how [it was] incorporated into [the film]"); *Heger*, 2017 WL 5714517, at *5 (no "control" where plaintiff alleged "creative control over separate and indispensable elements of the completed [film]" but no "supervisory powers over the [whole film]").

Here, Armes admits, *inter alia*, that he had no control over the Circles Composition, no decision-making authority, no supervisory authority, and that Defendants were free to take or leave his suggestions.   He was not even present—and had no knowledge of—two entire studio sessions that took place to create the Circles Composition.  Armes cannot possibly demonstrate that he had any control over the Circles Composition—"the whole work" or otherwise.  *See, e.g.*, *Ford v. Ray*, 130 F. Supp. 3d 1358, 1363 (W.D. Wash. 2015) (no "control" where plaintiff had "control over his contribution to [the song]," but the "decision as to how or whether to incorporate [his] creations was left to defendant"); *Thomson v. Larson*, 147 F.3d 195, 203 (2d Cir. 1998) ("An important indicator of authorship is a contributor's decision-making authority over what changes are made and what is included in a work.").

Similarly, Armes cannot show that the putative co-authors made "objective manifestations of a shared intent to be coauthors" of the work.  *Aalmuhammed*, 202 F.3d at 1234.   The law requires a manifestation of a "shared intent to be coauthors" of a specific work "at the time [the] contribution [was] composed."  *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 993-94 (C.D. Cal. 2015); *see also Zenix Indus. USA, Inc. v. King Hwa Indus. Co.*, 920 F.2d 937, at *4 (9th Cir. 1990) ("an author who intends to create a joint work must clearly demonstrate his or her intent in that regard").   After two years of this litigation, Armes has not proffered a single piece of evidence showing that any of the co-authors intended that he be a co-author of the Circles Composition; indeed, they all vehemently deny it.  Armes' self-serving (and unsubstantiated) allegation that Defendants purportedly said "Let's write a tune!" does not suffice.

Lastly, despite *pleading* that the "audience appeal" of the Circles Composition turned on his contributions, Armes has both failed to prove that he made any such contributions, and failed to prove that the "audience appeal" the Circles Composition turned on such purported contributions.   Regardless, courts routinely dismiss co-authorship claims without regard to "audience appeal" where, as here, the putative co-author's allegations of "control" and "shared intent" are insufficient.  *Aalmuhammed*, 202 F.3d at 1234-35 (finding no co-authorship without considering "audience appeal" factor).

*          *          *

Because Armes cannot prove any element required in order to establish his purported co-authorship of the Circles Composition, summary judgment should be granted in Defendants' favor.



Allison S. Hart, Esq.
February 11, 2022
Page 4

Please note that nothing contained in (or omitted from) this letter is nor should it be construed as an admission of any fact. Defendants hereby expressly reserve all rights, remedies, and positions.

Sincerely,

Gabriella Nourafchan Ismaj
Attorney-at-Law for
MITCHELL SILBERBERG & KNUPP LLP

GAN/szm

cc:     Kelsey J. Leeker, Esq. (kleeker@lavelysinger.com)
        Christine Lepera, Esq. (ctl@msk.com)
        Jeffrey M. Movit, Esq. (jmm@msk.com)
        David A. Steinberg, Esq. (das@msk.com)

# EXHIBIT B

CONFIDENTIAL PROCEEDING

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3
    TYLER ARMES,                )
 4                              )
            Plaintiff,          ) CASE NO.
 5                              ) 2:20-cv-03212-
                                ) ODW(SKx)
 6  vs.                         )
                                ) CONSOLIDATED WITH:
 7                              ) 2:20-cv-10205
    AUSTIN RICHARD POST,        )
 8  publicly known as POST      )
    MALONE, an individual,      )
 9  et al.,                     )
                                )
10          Defendants.         )
    _____ )
11

12

13           **CONFIDENTIAL PROCEEDING**

14

15       REMOTE DEPOSITION OF TYLER ARMES

16          WEDNESDAY, FEBRUARY 2, 2022

17                  9:57 A.M.

18

19

20

21

22

23

24  REPORTED BY:  KATHERINE FERGUSON, CSR NO. 12332

25  JOB NO. 205992
```

CONFIDENTIAL PROCEEDING

Page 2

```
 1

 2

 3

 4

 5                   February 2, 2022

 6                    9:57 a.m.

 7

 8

 9     Deposition of TYLER ARMES, held remotely, before

10  Katherine Ferguson, Certified Shorthand Reporter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL PROCEEDING

```
 1   APPEARANCES:

 2

 3    FOR PLAINTIFF:

 4        LAVELY & SINGER

 5        BY:  ALLISON HART, ESQ.

 6             2049 Century Park East

 7             Los Angeles, CA 90067

 8

 9
     FOR DEFENDANT:
10

11        MITCHELL SILBERBERG & KNUPP LLP

12        BY:  CHRISTINE LEPERA, ESQ.

13             437 Madison Avenue

14             New York, NY 10022

15

16   ALSO PRESENT:

17        Gabriella Ismaj - MSK

18        Brent Jordan - Videographer

19

20

21

22

23

24

25
```

**Exhibit B**
**Page 13**

CONFIDENTIAL PROCEEDING

Page 22

```
 1        Q    Did they ultimately get utilized in the
 2   training process?
 3        A    That's correct.
 4        Q    How long were you training on the upright
 5   bass?
 6        A    Maybe a few months.
 7        Q    One teacher?  Multiple teachers?
 8        A    One teacher in that training, yeah.  I
 9   think I came to the conclusion that the genre of
10   music I was writing and producing, that it didn't
11   really have a home.  And at one point I certainly was
12   more interested in jazz music, and as I got older
13   into my late teens it was much more pop music
14   focused, rock focussed, hip-hop focussed, so I felt
15   like it wasn't time ultimately.
16        Q    Okay.  So would you say it's fair to say
17   that your primary instrument starting in your late
18   teens to present is the electric bass?
19        A    Yep.  Yes, it is.
20        Q    And you mentioned the band, I think you
21   mentioned Motown, but you didn't mention the name of
22   the band.
23        A    The band is called Down With Webster.
24        Q    And when was that formed?
25        A    That was formed May 1998 for my grade A
```

CONFIDENTIAL PROCEEDING

Page 23

1  talent show.

2      Q   And how long did -- it's continuing to

3  date, correct?

4      A   We don't tour anymore.  We put out our last

5  record through Universal I believe a year and a half

6  ago or two years ago.  I think we have five albums

7  out in total through Universal.  And that band was

8  signed April 16th, 2009 and toured through 2016

9  roughly.

10     Q   So would you say it is no longer in

11  operation?

12     A   Yes, correct.

13     Q   Okay.

14     A   It's no longer in operation.

15     Q   As of 2016-ish?

16     A   Yep.  Correct.

17     Q   And was your role in that band bass

18  playing?

19     A   In that band my role was bass, keyboards,

20  producer, songwriter, bandleader and I did, like, all

21  the show running, like running all the different

22  equipment for the show, which is part of bandleader,

23  musical director.

24     Q   So there was no separate keyboard player,

25  you played both?

CONFIDENTIAL PROCEEDING

Page 26

1    couldn't.  I don't claim to be able to read music the

2    kind of way you have to do to be a gigging musician

3    or a jazz musician.

4        Q    Okay.  So depending on the complexity of

5    the --

6        A    Depending on the complexity, yes, correct.

7        Q    All right.  And you mentioned that you're a

8    producer -- let me ask you about -- so Down With

9    Webster, no pun intended, was down as of 2016 and you

10   started and worked in another band; is that right?

11       A    Yeah, me and the core members from Down

12   With Webster started a new band called Honors,

13   H-O-N-O-R-S.

14       Q    Okay.  And that was about the same time?

15       A    So that would have been -- it was like a

16   transition between the two, so I would say that some

17   of the beginning music for Honors would have started

18   to have been written probably 2016, 2017, to the best

19   of my knowledge.

20       Q    Is that band still active?

21       A    That band decided to call it a day and

22   stopped touring on a phone call that I had with them,

23   and let's make sure I get my date right here --

24       Q    Approximation is fine.

25       A    Approximation is fine.  It would have been

CONFIDENTIAL PROCEEDING

Page 27

```
1   very early 2019 after a grueling tour that we were

2   on.  We got on the phone and said let's take a break

3   from this.
```

4        Q    Pre COVID?

5        A    Pre COVID.  Certainly pre COVID.  Early

6   2019.

7        Q    Okay.  So since then, what have you been

8   occupied in --

9             Let me ask you this:  Do you have any other

10  profession or have you had any other profession or

11  occupation in your adult life other than as a

12  musician?

13       A    No.  Everything I've done is in music.

14       Q    That's how you've made your living?

15       A    Certainly, yeah.

16       Q    Okay.  And your brother, Ryan Armes, who

17  you said was your manager, has he been your manager

18  throughout your adult life up to the point in time

19  you signed, not an official written agreement yet,

20  with Mr. Litwin?

21       A    Kind of a two-part question.  Can you try

22  again?

23       Q    Has he been your manager, your brother,

24  Ryan Armes --

25       A    My brother quit the job --

CONFIDENTIAL PROCEEDING

Page 50

1  some of the language it says keyboard and guitar and

2  then some of the paragraphs it said keyboard.  It's

3  keyboard and guitar.

4       Q   Let's start with the first phrase.  "Armes

5  and Dukes co-wrote the chords."

6           And now you're saying on the keyboard it

7  should be slash guitar?

8       A   Because sometimes when we were looking at

9  the chords it was on the guitar as the instrument of

10  reference and sometimes it was in front of a

11  keyboard.

12      Q   Okay.  So now in the studio, and we'll get

13  into more specifics, as I said, the chronology and

14  the timeframe.

15          In the studio, what instruments did you

16  ever have in your hand?

17      A   Did I?

18      Q   Correct.

19      A   A bass.

20      Q   Yes.

21      A   A keyboard.

22      Q   And how many -- was there only one bass

23  that you used?

24      A   Yes.

25      Q   Was it yours?

CONFIDENTIAL PROCEEDING

Page 53

```
1        Q    Okay.  And so when you're standing next to
2   each other -- and I want to understand the difference
3   between your addition of the word "guitar," the
4   "keyboard/guitar," right -- yeah, right, you say that
5   you co-wrote the chords on the keyboard/guitar.
6             So what came first?
7        A    My -- my addition was on a keyboard.  Frank
8   was playing both.  Like I said, I only played
9   keyboard and a bass.  I never played the guitar.  But
10  Frank was using both instruments as vehicles for him
11  to write.
12       Q    At the same time?
13       A    No, certainly not.
14       Q    Okay.  So what was the chronology of how --
15  when you say "chords," you mean chords for the intro,
16  the entire song, and I'm not talking about what
17  ultimately became released; what chords are you
18  talking about?
19       A    The same loop that basically makes up the
20  entirety of the whole song.
21       Q    As in the commercial release?
22       A    Yeah.
23       Q    Okay.  So those chords that you say
24  ultimately are in the release of Circles --
25       A    To the best of my recollection, to answer
```

CONFIDENTIAL PROCEEDING

Page 54

1  your question, I believe they were started on a

2  guitar first and then a keyboard second.

3       Q   By Frank?

4       A   Yes.

5       Q   Which you didn't play guitar?

6       A   Yes.

7       Q   So they're started by Dukes playing a

8  guitar and then you're in that room and then you say

9  -- what did you do; while he's playing the guitar,

10  you moved over to the piano?

11      A   At that point the guitar would have already

12  been put down.

13      Q   Why is that?

14      A   What do you mean why is that?

15      Q   You mean because he would have moved over

16  to the keyboard?

17      A   Because when you write a song, there's so

18  many little breaks between moments.  When you're

19  writing a song you collaborate with people.  You

20  don't write a song and go from one thing, one thing,

21  one thing.  Someone plays a guitar for a bit, they

22  stop, they might go get a glass of water.

23      Q   I'm asking you to describe the process of

24  the creation of the chords, which you say is for the

25  entire song, and you've now said it started with the

CONFIDENTIAL PROCEEDING

Page 55

1   guitar.

2        A    The first chords that Frank played would

3   have been on a guitar is what I said.

4        Q    And what were those first chords?

5        A    They were something between the 1 and 4

6   chord.  I remember it was C to F.

7        Q    So the 1 and the 4 chord and something

8   between the 1 and the 4?

9        A    I didn't say that.  You said that.

10       Q    I'm asking you -- well, say it again.

11            What did Frank play on the guitar?

12       A    The first things I remember him playing

13   were 1 and 4 because I was on the bass beside him

14   playing a similar thing.

15       Q    In what key?

16       A    C, C major.

17       Q    So he's playing the C and an F, correct?

18       A    As far as I recall, yes.

19       Q    Okay.  And do you know whether that was the

20   precise trajectory, from C to F, or was there a chord

21   in between?

22       A    Eventually there's a passing chord, there's

23   a B that's introduced, but it wasn't there to begin

24   with.

25       Q    Passing chord.

CONFIDENTIAL PROCEEDING

Page 56

1          And what is the next chord after the 4?

2     A    After the 4?

3     Q    Yeah.

4     A    Well, the progression changes a couple of

5  different times.

6     Q    Very first iteration of any progression,

7  chord progression, what's the chord after --

8     A    Oh, the 5 chord.  I didn't know I was

9  getting a music theory test right now.  I didn't

10  understand the context of your question.

11     Q    No problem.  It's all about music theory,

12  isn't it?

13     A    Yeah, the best place to go from 5 is 1.

14     Q    And how common is a 1-4-5 progression?

15     A    Extremely.

16     Q    Thank you.  Okay.

17          And this -- now, the next part of the

18  keyboard coming in on the creation of chords, in your

19  paragraph 16, you're both standing over the keyboard

20  together with the chords precisely?

21     A    I mean, the process of creating a chord

22  progression involves adding new chords, deleting

23  chords, trying things a different way, moving things

24  around a little bit.  Specifically, my involvement at

25  the keyboards was making the F major into an F minor

CONFIDENTIAL PROCEEDING

Page 57

1   in the way that it turned around.

2        Q    Okay.

3        A    Because it had a Beetles tonality to it.  I

4   love the Beetles.  It's something that I like to do.

5   And when I listened to the 1-4 originally, it

6   reminded me of Imagine because of the suspended chord

7   that was being played.  So it already had something

8   that was Beetlesesque to me.

9        Q    So is it your testimony it's an F minor?

10       A    It's an F major and then -- it's an F major

11   and then it goes to the F minor.

12       Q    When?

13       A    I'd have to look at some sheet music and

14   listen to the song to tell you exactly when.  I don't

15   have that in front of me at the moment.

16       Q    What sheet music would you have to look at?

17       A    Whoever wrote sheet music for the song.

18       Q    How do you know it's accurate?  Who wrote

19   sheet music for the song?  I'm asking you.  You wrote

20   it.

21       A    So what are you asking me?

22       Q    Where is the F minor?

23       A    Are you asking me in terms of --

24            MS. HART:  Asked and answered.

25   BY MS. LEPERA:

**Exhibit B**
**Page 23**

CONFIDENTIAL PROCEEDING

Page 58

1      Q    Where is the F minor in the chord

2   progression?

3      A    The F minor is after the F major.

4      Q    In the first four bars?

5      A    I couldn't confirm how it was arranged

6   after that.  I'd have to listen to the recording and

7   then I could tell you exactly when it was.

8      Q    When you say you can't confirm whether it

9   was after, you can't confirm how it was arranged; is

10  that what you're saying?

11     A    Well, yeah, your client cut me out of the

12  process in how things were arranged, so I can't

13  confirm.

14     Q    Okay.  So when you're saying -- and again,

15  we'll get back into it, but after August 7th or 8th,

16  whenever that is, until the song Circles was

17  commercially released, approximately one year --

18     A    Yeah.

19     Q    -- other things were done to it, which

20  you've now called an arrangement or something, that

21  you were not privy to, correct?

22     A    Well, a lot of things were done that I

23  wasn't privy to because I wasn't privy to it.

24     Q    Okay.

25     A    A lot of things -- most things stayed

CONFIDENTIAL PROCEEDING

Page 59

1  exactly the same.

2      Q    But you don't know whether the F minor

3  chord did?

4      A    The F minor chord is certainly in the demo

5  that I have on my nine-minute voice note and it's

6  certainly in the final recording as well.

7      Q    But you can't tell me where?

8      A    At the end of certain measures.

9      Q    There's obviously an intro, there's verses,

10 there's choruses.

11     A    I'll have to pull the song up and I'll

12 happily point it out to you when it happens.

13     Q    But sitting here you can't remember?

14     A    No.

15     Q    Okay.  So just so I'm clear, the chords we

16 talked about relative to the first paragraph -- first

17 sentence in paragraph 16 is a 1 and a 4 and a 5 --

18     A    Uh-huh.

19     Q    -- a passing B flat and then you say --

20     A    A B, not a B flat.

21     Q    A B.

22          You didn't say B flat?

23     A    No.

24     Q    B.  Okay.

25          Major or minor?

CONFIDENTIAL PROCEEDING

Page 60

1      A    It would be minor.

2      Q    Okay.  But your contribution was the F

3   minor?

4      A    On the keyboard, yes.

5      Q    Well, you didn't do the guitar, correct?

6      A    Yes, but the guitar is also based off of

7   what a bassline is doing.

8      Q    Okay.  Right.

9           Playing an essentially 1-4-5 progression?

10     A    Yeah.

11     Q    Which is one of the most common

12   progressions in the history of music, correct?

13     A    I mean, there's a lot of them, but it's one

14   of them.

15     Q    Okay.  Now, the next is the phrase -- I

16   might come back to this because -- well, let me ask

17   you now.

18          Are there any other chord progressions in

19   Circles other than what we just discussed, and I

20   won't go through them again, that you can identify?

21     A    No.  The progression is basically the same

22   progression, it's just there's some slight

23   alterations to it.  The chord progression remains the

24   same.

25     Q    And it's what we just discussed, correct?

CONFIDENTIAL PROCEEDING

Page 62

```
 1      A    I'm not aware of where you're showing right
 2   now.
 3      Q    It's the same paragraph 16.  You see Gabby
 4   just put it in yellow?  We stopped after -- I went
 5   through the first half of 16, first sentence, where
 6   you asked (inaudible) keyboard to be and we
 7   discussed --
 8      A    Correct.
 9      Q    Now I'm focussing on the next phrase.
10      A    Got it.
11      Q    "Armes co-wrote and had significant input
12   in the bassline."
13      A    Correct.
14      Q    Is there only one bassline?
15      A    Yeah, pretty much.
16      Q    Pretty much?
17      A    In the months following me being cut out of
18   the song, there's a moment where I believe the bass
19   is played in like driving eighth notes when following
20   the same progression.  It wasn't present that night.
21   I don't remember it being played that night.  But
22   yes, 90 percent of it, 99 percent of it is the same.
23   It's the same bass part.
24      Q    Okay.  When you say "following the same
25   progression," you're saying chord progression,
```

CONFIDENTIAL PROCEEDING

Page 64

```
 1   F, F, F, G, G.  I think I got one eighth note wrong

 2   because I'm air jazzing it for you, but that's the

 3   gist of it.  If you gave me a bass guitar in my hand,

 4   I could certainly do it more accurately.

 5        Q    Okay.  Well, the court reporter has the

 6   notes down.

 7             MS. LEPERA:  So did you got them down,

 8   Ms. Ferguson?

 9             THE REPORTER:  I got them.

10   BY MS. LEPERA:

11        Q    Now, that was written on a bass?

12        A    Correct.

13        Q    Whose bass?

14        A    The bass that was in the studio.  Don't

15   know whose bass it is.

16        Q    Okay.  And there was only one bass?

17        A    Can't confirm.

18        Q    Was anybody playing -- were people

19   playing -- were two bases being played at the same

20   time at any point?

21        A    No, not that I'm aware of.

22        Q    Okay.  And with respect to the final sound

23   recording of Circles as released, who is playing the

24   bass?

25        A    Well, I can't confirm that because I wasn't
```

CONFIDENTIAL PROCEEDING

Page 65

1  part of the process.  How can I confirm that?

2       Q    It wasn't you, was it?

3       A    No.

4       Q    There's no bass part on which you perform

5  that's in the Circles sound recording, correct?

6            MS. HART:  Calls for speculation.  Object

7  to that last question, calls for speculation.

8            MS. LEPERA:  He already answered it.

9            MS. HART:  Well, I'm stating my objection

10  for the record.

11            MS. LEPERA:  That's fine.

12  BY MS. LEPERA:

13       Q    There's -- you are not playing the bass,

14  there's no performance by you on any bass instrument

15  that is included in the sound recording of Circles,

16  correct?

17       A    To my understanding, correct.

18       Q    Okay.  And we're going to talk about it in

19  a minute, but you mentioned -- let's call it --

20            MS. LEPERA:  Gabby, what is the number, the

21  Bates stamp on the audio recording they produced?

22            MS. ISMAJ:  P00001.

23            MS. LEPERA:  P00001.

24  BY MS. LEPERA:

25       Q    Okay.  Your counsel gave us an audio which

Page 68

1   hand if it's going to be as accurate as possible.

2        Q    Okay.  So -- but I want to go back and I

3   want to focus on the final sound recording of Circles

4   which you've already testified you did not -- you

5   were -- from August of 2018 until that period of time

6   you had no involvement, correct?

7        A    I want to make sure I'm understanding your

8   question correctly.  I was not brought into

9   subsequent sessions of Circles after the one in

10  Toronto.

11       Q    Right.

12            And you didn't have any conversations with

13  anyone about what was going on with those sessions or

14  any --

15       A    Unfortunately not.

16       Q    -- or any input on them, correct?

17       A    My input was from the night we wrote the

18  song together.

19       Q    Right.

20            So it's fair to just say that is the only

21  night or evening or morning, whatever the period of

22  time is we want to call it, in which you had

23  involvement, correct?

24       A    Correct.

25       Q    Okay.  Now, going back to the bassline, is

CONFIDENTIAL PROCEEDING

Page 70

1      Q    Correct.

2      A    Yes.

3      Q    And obviously one can have input by

4  expressing, you know, positivity, negativity,

5  anything associated with a communication about a

6  piece of work that could ultimately have input?

7      A    There's certainly the ability to reaffirm

8  good ideas.

9      Q    Right.

10     A    In this case this is not what was

11 happening.

12     Q    Okay.  So in this case, when you use the

13 phrase "significant input," you mean more along the

14 lines of I either created it or -- let me just back

15 up.

16          We can agree that there's compositional

17 components of music which include rhythm, harmony,

18 pitch, structure and the like, correct?

19     A    Correct.

20     Q    When you use the phrase "significant

21 input," you mean in one -- with respect to one of

22 those compositional elements?

23     A    That's correct.

24     Q    All right.  So we've gone now through the

25 chords and we're now in the middle of the bassline.

CONFIDENTIAL PROCEEDING

Page 71

1    I think I asked you this, but I want to make sure.  I

2    apologize if I'm repeating myself.

3           The actual sound recording of -- the

4    commercially-released sound recording of Circles does

5    not contain your bass performance, correct?

6        A    Not that I'm aware of, no.

7        Q    And --

8        A    I don't control those master sessions,

9    though, right, so in the spirit of not speculating,

10   I'm not in a position to really say, am I, because I

11   wasn't there at the end when the files got

12   transferred to a guy in LA when the song was

13   published.

14       Q    And you don't control any of the sessions

15   that were during the time period between the night in

16   question and the commercial release certainly, right?

17       A    Certainly not.

18       Q    Right.

19           And is it fair to say that with respect to

20   the mixing board on the night in question, you never

21   touched that, right?

22       A    No one touches a mixing board.

23       Q    No one touches a mixing board?  You mean

24   engineers?

25       A    It's very sad.  No.  People touch laptops

CONFIDENTIAL PROCEEDING

Page 72

1  now, that night included.

2       Q    Forgive me.  I understand.

3            You didn't touch the laptop?

4       A    No, Frank was controlling the laptop.  It

5  was his laptop, his session.

6            Q    Right.

7            And if you had asked to take over the

8  laptop, would you have been able to do that?

9       A    I mean, that's very speculative, you know.

10  Anybody who has been in sessions and does this

11  professionally knows there's some very real power

12  dynamics that take place with people's egos, their

13  feelings.  So certainly it's something that I'm aware

14  of when I'm in a session as to not step on anyone's

15  toes, especially in a session where you have Frank

16  and Post that have a long history of working together

17  and I'm clearly the new guy that comes from a

18  different walk of life, I'm not going to come in

19  there and ask somebody if I can man their personal

20  computer.

21       Q    Right.

22            So you had no control over what was put

23  into it, taken out of it or the ultimate use of any

24  of the materials?

25       A    Well, I gave verbal cues as to things that

CONFIDENTIAL PROCEEDING

1  to understand, all I meant by your playing ultimately

2  when you get to the point where you're talking about

3  the stuff in 16, that's what I want to know what

4  comes first.  The chords we talked about earlier, the

5  actual efforts at a bassline for Circles, and then

6  we'll get to the guitar part.

7          So a minute ago, correct me if I'm wrong,

8  you said bass efforts came first before the chords.

9      A   When we were jamming initially over the

10  drum groove, that is, the groove of Circles, yes, it

11  was bass and drums first.

12      Q   Okay.  And so in your sense of it,

13  there's -- there's no chord structure to that bass

14  part?

15      A   The only chord structure is that of what's

16  been playing on the bass.  There's no guitar chord

17  structure, no.

18      Q   Got it.  We're on the same page.  Now,

19  let's get back to that bass part.  Do you have any --

20          Let me ask you this:  You tape or recorded

21  on your iPhone at the end of the night --

22      A   Yeah.

23      Q   -- right?

24      A   Correct.

25      Q   You guys were talking --

CONFIDENTIAL PROCEEDING

Page 78

1    A    At the very end of it we were talking.

2  There was some talking throughout as well, kind of

3  remarking about the parts as we listen back.  But

4  yes.

5    Q    You interrupted me so let me finish the

6  question.

7        You recorded on your phone, right, a

8  playback of a mix that was done at that point in the

9  night and you guys are talking behind it, either some

10  points through it or at the end or whatever, but

11  nobody was playing.  That was not playing.  That was

12  a recording that you did on your iPhone of a

13  playback, correct?

14    A    Correct.

15    Q    Okay.  From Frank's computer, not the

16  mixing board, computer with the files, correct?

17    A    Correct.

18    Q    Okay.  Was your bass part where you were

19  performing the bass in that mix?

20    A    The bass part that had my ideas in it, but

21  not me playing.

22    Q    Okay.  Thank you.  Let's be clear.

23        So your performance was not in there?

24    A    Correct.

25    Q    Okay.  Who was playing the bass in that

CONFIDENTIAL PROCEEDING

Page 79

```
1   mix?

2       A   As far as I remember, Frank was.

3       Q   Okay.  And you were playing no instrument

4   in that mix, correct?

5       A   Correct.

6       Q   Okay.  And you were not in charge deciding

7   what -- what files to put in that current mix,

8   correct?

9           MS. HART:  Objection, vague and ambiguous.

10          THE WITNESS:  I need you to rephrase the

11  question.

12          MS. HART:  Assumes facts.  Assumes that

13  someone was in charge.

14          MS. LEPERA:  Again, don't coach.

15          MS. HART:  No, it's a vague question.

16          MS. LEPERA:  No, it's not a vague question.

17          THE WITNESS:  Could I ask you to repeat it

18  or rephrase?

19          MS. LEPERA:  Can I have the question read

20  back.

21          (The requested portion of the record was

22  read by the reporter at 11:51 a.m.)

23          MS. LEPERA:  Right.

24          THE WITNESS:  I guess I don't understand

25  the context of the question.
```

CONFIDENTIAL PROCEEDING

Page 87

```
 1              MS. LEPERA:  I just did.

 2              MS. HART:  Read back the question.

 3              MS. LEPERA:  Okay.

 4   BY MS. LEPERA:

 5       Q    There were a number of digital files that

 6   were included in the playback that was heard from

 7   Frank's laptop that you recorded, correct?

 8       A    Are you asking me a question again now?

 9       Q    There was a bass part, there was --

10       A    I thought you were speaking to my lawyer.

11       Q    No, I'm asking you a question.  Is that one

12   difficult too?

13       A    Hey now.  Repeat the question.

14       Q    Why did you fail to disclose that you were

15   taping everybody that night?

16       A    Why did I fail to disclose?

17       Q    Uh-huh.

18       A    I'm in sessions all the time.  People take

19   sessions all the time.

20       Q    Did you tell them you were taping them?

21       A    Did not feel the need to.

22       Q    You felt it was appropriate that you could

23   tape them without their knowledge?

24       A    Tape the playback of the song, absolutely.

25       Q    You thought that was okay?
```

**Exhibit B**
**Page 37**

CONFIDENTIAL PROCEEDING

Page 92

```
 1  do it or not, I'm asking if you did.
 2          Did you ask them for permission?
 3          MS. HART:  Asked and answered.
 4          MS. LEPERA:  I'm not clear if he said he
 5  remembered or not.  He's vacillating all over the
 6  place.
 7          THE WITNESS:  What?
 8  BY MS. LEPERA:
 9      Q   Did you ask them for permission or not?
10      A   I'm what all over the place?
11      Q   Yes, no or I don't remember.
12      A   I don't believe so.
13      Q   Thank you.
14      A   How's that for an answer.
15      Q   Now, let's go back to what's actually heard
16  on your phone recording which is the mix of various
17  digital files, playback -- if you don't want to call
18  it a mix, playback of various digital files that was
19  on Frank's laptop.
20          Were any of those files that were on the
21  laptop, were any of them on that by virtue of you
22  having instructed Frank to put them there?
23          MS. HART:  Asked and answered.
24          THE WITNESS:  I'm still honestly not sure
25  what this means.  When you ask me that, I can give
```

CONFIDENTIAL PROCEEDING

Page 98

1  you can, just as you were able to give me the pitches

2  on the actual bass part, I want you to give me the

3  pitches of the one you played.

4       A    It's rhythmic stuff that I would start with

5  first and foremost.

6       Q    Well, you have to have a note.

7       A    Of course there's a note.

8       Q    What's the note?

9       A    C to F.

10      Q    What else?

11      A    C, C -- so it's basically C, F to G was my

12  original bassline.  It was a 1-4-5.

13      Q    A 1-4-5 playing the root note of that

14  chord; is that what you did?

15      A    What do you mean playing the root note?

16  The root notes are the root notes of the 1, 4 and 5.

17  The root note is C, and then there would be F, and

18  then it would be G.

19      Q    Right.

20      A    The sequence of what that bassline sounds

21  like, if you give me a bass, I'll happily show you.

22      Q    I don't need it anymore.  Thank you.

23      A    Well, you do because I haven't sung you the

24  part yet.

25      Q    Pardon me?

CONFIDENTIAL PROCEEDING

Page 99

1      A    You do need me to show you on a bass

2  because I haven't sung you my bass part yet.

3      Q    What you've told me that what you played on

4  the bass --

5      A    Yes.

6      Q    -- B note?

7      A    The C -- yeah, the bassline -- the original

8  bassline that I was playing with Post contains the

9  note C, F and G.

10     Q    Correct.

11     A    Correct.

12     Q    Right.

13          And no other notes?

14     A    Not that I can recall in terms of the ones

15 that I'm talking about, no.  To show you the rhythm

16 of it, I would need to have an instrument in my hand

17 to do that.

18     Q    Well, guess what.  Maybe we can do

19 something easier.

20          MS. LEPERA:  Let's pull up as Armes -- we

21 have to go back to this document in the

22 interrogatories.  Gabby, let's pull up Ferrara's

23 expert report.

24          MS. ISMAJ:  One second.

25          (Exhibit 2 was marked for identification.)

CONFIDENTIAL PROCEEDING

Page 103

```
 1      A    It sounds much closer to the final version

 2   of Circles.

 3      Q    Who played it?

 4      A    Who played that?

 5      Q    Yeah.

 6      A    I don't know.

 7      Q    Not you?

 8      A    I don't think so, no.

 9      Q    Okay.  So do you have any recording or any

10   other documentation in which what you played that

11   night on the bass was actually fixed in something

12   that we can listen to?

13      A    No.  Much of what happens in these sessions

14   is out in the air.  We're playing not pressing the

15   record button and singing in the room back to each

16   other.  That's how writing sessions work.

17      Q    Again, you don't need to educate me, but I

18   appreciate it.

19            The issue with respect to your, as you say

20   in paragraph 16 of the complaint, co-writing the

21   bassline, and you testified a few minutes ago,

22   correct me if I'm wrong, you said you played a 1, a 4

23   and a 5, right?

24      A    Those were the key chord roots of the bass

25   part, correct.
```

CONFIDENTIAL PROCEEDING

Page 104

1      Q    And you played those notes.  But we don't

2    have your performance in any --

3      A    There were so many notes played throughout

4    the night, Christine, because we're playing a lot of

5    parts over the course of a lot of hours.  But those

6    were the key changes, yes, that I was playing.

7      Q    1-4-5?

8      A    Uh-huh.

9      Q    Let me ask you to be clear for the record.

10         You had your iPhone, you obviously recorded

11   this thing at the end.

12     A    Yeah.

13     Q    Did you record yourself playing any bass

14   part?

15     A    No.

16     Q    Do you have any other source of a recording

17   of demonstrating what you performed on the bass at

18   any point during this night?

19     A    We've given you all of the recordings that

20   we have.  You have them.

21     Q    You gave me one.

22     A    That's it.  That's the recording that --

23     Q    That's not what I'm asking.  You're not on

24   that.

25         I'm asking you whether you have any

CONFIDENTIAL PROCEEDING

Page 105

1    recording or other documentation which shows what you

2    played that night on the bass that you claimed you

3    contributed to the bassline?

4        A    There's no documentation.  None.

5        Q    Okay.  Now, you said the only instruments

6    you played that night were bass and keyboard, right?

7        A    Yeah, those were the only ones I had in my

8    hand.

9        Q    And you never played any guitar?

10       A    No.  I sang guitar chords, didn't play them

11   with my hand.

12       Q    You sang guitar chords.  Let's go back to

13   16.

14       A    Yep.

15       Q    Exhibit 1, paragraph 16.

16           MS. LEPERA:  Take your time, Gabby.  I

17   don't know if you need to refresh it.

18           MS. ISMAJ:  I've got it.

19   BY MS. LEPERA:

20       Q    All right.

21       A    Uh-huh.

22       Q    "Armes also" -- we're going down to the

23   second full sentence.  "Armes also had input on the

24   guitar parts in the song" --

25       A    Yeah, that's the one.

CONFIDENTIAL PROCEEDING

Page 109

1  chord changes that I was involved in like the F major

2  to F minor chord.  So technically speaking, yes, the

3  answer is yes.

4       Q    The answer is yes what?  You wrote all the

5  guitar parts?

6       A    Well, it's just your language "wrote all

7  the guitar parts" --

8       Q    All right.  Co-wrote.

9       A    Co-wrote, yes.  That works much better.

10      Q    Okay.

11      A    There's only two guitar parts going on in

12 the song.  There's one playing the chord progression

13 and there's one playing this little melody that

14 Post sings along that gets repeated a few times.

15      Q    Got it.

16      A    I had input on both of those and co-wrote

17 both of those.

18      Q    So everything we talked about earlier today

19 about the chord progressions is all you're talking

20 about, right, for the guitar parts?

21      A    Well, we're about to talk about the second

22 guitar part right now.

23      Q    I know that.  Other than that.

24      A    There's no other guitar parts to talk

25 about.

CONFIDENTIAL PROCEEDING

1    Q    Okay.  So everything we spoke about earlier

2  today about the chord progressions is what you're

3  referring to when you say you had input on the guitar

4  parts in the song other than the melody and the --

5    A    I think I'm understanding you right, but

6  it's --

7    Q    Okay.  So the answer is --

8    A    You're sort of speaking in tongues.  I'm

9  not quite understanding you.

10    Q    I'm not speaking in tongues, Mr. Armes.

11    A    Yeah, but you're speaking in lawyer talk

12  and you know you are.  I'm really trying to work with

13  you, so maybe try to simplify it a bit for me and I

14  can get this.  It's not as easy as you think the way

15  you're explaining this.

16    Q    I'm speaking in music theater.

17    A    You're not.

18    Q    You have no idea, but I am.

19         MS. HART:  What is the question that's

20  pending?

21  BY MS. LEPERA:

22    Q    The question is, just trying to get clear,

23  when he said he had input on the guitar parts in the

24  song, other than the intro, which he called the

25  guitar melody he's referring to, is the chord

CONFIDENTIAL PROCEEDING

Page 111

1   progressions we discussed earlier today?

2          MS. HART:  Asked and answered.

3   BY MS. LEPERA:

4      Q   1-4-5, with the B minor in between the 1

5   and the 4, remember that --

6      A   That progression, yes.

7      Q   Thank you.

8          And that's all you're referring to when you

9   say you had input on the guitar parts?

10     A   No, there' the second one that I'm talking

11  about.

12     Q   Excluding the melody in the intro,

13  excluding that part.  We're going to get to that in a

14  minute.

15         Do you understand what I'm asking you?

16     A   I wish I did.

17     Q   Well, you seemed to understand a minute ago

18  when I asked you what you meant when you had input on

19  the guitar parts in the song.  We discussed --

20     A   The harmonic content within the guitar

21  part; that's what we're talking about?

22     Q   The chord progressions that we talked about

23  earlier.

24     A   Yes, we discussed that.  That's asked and

25  answered.

CONFIDENTIAL PROCEEDING

Page 113

```
 1                Now, what's the guitar melody we're talking
 2  about that you claim you co-wrote?
 3       A    This is really how we have to do this?
 4  There's not a better way to do this?  Do you have the
 5  audio file we can pull up right now since you're
 6  deposing me?  I can't imagine when you depose people
 7  you expect them to sing karaoke for you for seven
 8  hours.  You must have access to the audio file.
 9       Q    You can't tell me what the guitar melody
10  is?
11       A    Of course I can.  It just seems weird.  Why
12  can't you pull the song up right now?
13       Q    I can.  I can.
14       A    I can give you the exact time markers.  We
15  can listen to the whole thing.  We can pinpoint every
16  time it happens.
17       Q    I don't need that because ultimately it's a
18  repeat.  I just need you to tell me what it is and
19  how many notes it is and what the notes are.
20                Can you do that without hearing it since
21  you wrote it?
22       A    Can you please play the song?
23       Q    No, I'm allowed to test your -- your, you
24  know, claim of authorship and if you can't tell me
25  what the -- what the -- you can sing it for me if you
```

Exhibit B
Page 47

CONFIDENTIAL PROCEEDING

Page 114

1   want.

2       A    That's how I wrote it by singing it to Post

3   sitting beside him in a chair.

4       Q    You wrote it singing it?

5       A    Yeah.

6       Q    What -- you don't have any phone recording

7   or any documentation or file, digital file that shows

8   you singing it, right?

9            MS. HART:  Asked and answered.

10           THE WITNESS:  No.

11  BY MS. LEPERA:

12      Q    Thank you.  Okay.

13           So can you tell me without singing it what

14  the actual notes are at least, or no?

15      A    Yeah, if I had a piano in front of me, for

16  sure.  I don't claim to have perfect pitch, so I

17  can't just automatically visually see a staff in my

18  head and know what the right pitch is.

19      Q    There's nothing wrong with saying you can't

20  do it.

21      A    So why can't we play the recording then?

22      Q    How about this, can you tell me how many

23  notes it is?

24      A    Yeah, for sure.

25      Q    How many?

CONFIDENTIAL PROCEEDING

Page 114

1    want.

2         A    That's how I wrote it by singing it to Post

3    sitting beside him in a chair.

4         Q    You wrote it singing it?

5         A    Yeah.

6         Q    What -- you don't have any phone recording

7    or any documentation or file, digital file that shows

8    you singing it, right?

9              MS. HART:  Asked and answered.

10             THE WITNESS:  No.

11   BY MS. LEPERA:

12        Q    Thank you.  Okay.

13             So can you tell me without singing it what

14   the actual notes are at least, or no?

15        A    Yeah, if I had a piano in front of me, for

16   sure.  I don't claim to have perfect pitch, so I

17   can't just automatically visually see a staff in my

18   head and know what the right pitch is.

19        Q    There's nothing wrong with saying you can't

20   do it.

21        A    So why can't we play the recording then?

22        Q    How about this, can you tell me how many

23   notes it is?

24        A    Yeah, for sure.

25        Q    How many?

CONFIDENTIAL PROCEEDING

Page 115

1      A    Post wrote the initial melody of the intro

2   melody, 1, 2, 3, 4.  He wrote the four notes and then

3   on the second time around, the phrase, when it

4   extends, is what I sang to him to play.

5      Q    The end of play?

6      A    So the line repeats twice.  Can we play it?

7      Q    I'm just -- say what you said again.  I

8   just didn't hear you.

9      A    So the four notes that Post wrote on the

10  guitar was a very reverb of guitar, ba ba ba da,

11  da da da da, right, those four notes, all of the

12  notes that precede that in the melody rhythmically

13  and melodically is what I sang to him.  Da da da da,

14  da da, da da, da da, da da.  Those notes.

15     Q    Okay.  Hold on.  I want to look at

16  something.  Just one more second.  We'll probably

17  play it.

18          Just so I'm clear, though, there's a lead

19  guitar and a rhythm guitar, right?

20     A    Yeah, the rhythm guitar is playing the

21  chords, the lead's playing this melody that he ended

22  up doubling with his voice and became like a hook of

23  the song.

24     Q    Are you saying the lead guitar is the one

25  you're contributing to?

CONFIDENTIAL PROCEEDING

Page 118

```
 1              (Whereupon, Audio Track 1 was played.)

 2              MS. LEPERA:  Okay, stop.

 3   BY MS. LEPERA:

 4        Q    Underneath his four notes --

 5        A    It's not underneath it.  It's one

 6   continuous part.  It's all using guitar bends and

 7   slides.  It's not a layer.

 8        Q    Spontaneously played.  How's that?

 9        A    It's one guitar part.

10              MS. LEPERA:  Go back.

11              MS. ISMAJ:  Play it again?

12              MS. LEPERA:  Please.

13              (Whereupon, Audio Track 1 was played.)

14   BY MS. LEPERA:

15        Q    So it comes a little bit after.  I hear

16   you.  I understand what you're saying.

17              And Post is playing that, right?

18        A    Correct.

19        Q    You you're saying you told him to play that

20   or suggested to play it?

21        A    I sang the melody to him on how to include

22   and resolve the melody nicely and he did it exactly

23   as I sang it and there it is on the master recording,

24   yes.

25        Q    Okie-dokie.  So it's not those four notes
```

CONFIDENTIAL PROCEEDING

Page 119

```
 1   that we hear?

 2       A    The four notes is what Post wrote which are

 3   also on the master recording.

 4       Q    Right.

 5            How many times -- so that downward

 6   declining --

 7       A    That's a fair way of saying it, yeah.

 8   Descending is the word we used for that.  Just being

 9   funny.

10       Q    All right.  Okay.  Got it.

11            Now, is there anything other than what you

12   say is you singing it to him?

13       A    Not on the guitar part.  That's it.

14       Q    No, no, no.

15            Is there anything other than you saying

16   that you sang that to him and he then played it, you

17   saying that, is there anything --

18       A    No, of course not.  We're in a session.

19   We're not recording the entire session.

20       Q    Well, you played bass.

21       A    Uh-huh.

22       Q    You sang.

23       A    Yeah.

24       Q    We don't have anything to demonstrate --

25       A    That's how sessions work.  Unfortunately
```

**Exhibit B
Page 52**

CONFIDENTIAL PROCEEDING

1  only about one percent of sessions are recorded.

2      Q   Again, I don't really need to have --

3      A   Then don't act surprised as to why you

4  don't have it.  You're dealing with the one percent

5  here.

6      Q   I'm not acting surprised.

7      A   We don't have any documents of me singing

8  it to him.

9      Q   I'm confirming it doesn't exist.

10     A   Understood.

11         MS. HART:  Asked and answered.

12  BY MS. LEPERA:

13     Q   And I'm also confirming that you were able

14  to record with your phone --

15     A   Sure.  That was just once at the very end

16  of the playback.

17     Q   Which you say is common to do?

18     A   Absolutely.

19     Q   Okay.  So now, I think we've gone -- come

20  back to the complaint.

21         Have we covered everything you claim you

22  co-authored; guitar part, bass part, chords, anything

23  else?

24     A   There's lots more that I did in terms of my

25  involvement in the song, but it's a very vague way of

CONFIDENTIAL PROCEEDING

Page 121

1   asking it.

2        Q    I'm asking with respect to the specific

3   elements and instruments.  There's a guitar part, a

4   bass part, there's a drum part, there's an organ

5   part, all the instruments that play various parts in

6   the song.

7             With all of that concrete musical

8   information, have you now told me everything you

9   contributed to any of those instrumentations?

10       A    Well, we haven't gone through the bass part

11  in specifics yet.

12       Q    Well, you told me your bass --

13       A    Yeah, I haven't given you the rhythmic

14  version of it.  I haven't given you notation of how

15  that would actually sound like.  I just told you some

16  of the chords that the bass part highlighted in the

17  bassline.  We haven't gone through the bassline yet.

18       Q    You told me there was a C an F and a G.

19       A    Yeah, those are the main chords that are

20  outlined in the bassline that I was playing prior to

21  Frank playing the bassline.

22       Q    And then you played notes, the C and -- you

23  played a C note, an F note --

24       A    I guess I'm going to have to play the bass

25  for you and show you what I played.

CONFIDENTIAL PROCEEDING

Page 124

```
 1  those.

 2      A    There's only three of them, so I can't

 3  speculate who exactly it was.

 4      Q    Well, Post played the bass too?

 5      A    Everyone at some point had a bass in the --

 6  yeah.

 7      Q    Okay.  All right.  Now, you also say

 8  that -- let's move to paragraph 19.

 9          MS. ISMAJ:  Let me pull it up.

10  BY MS. LEPERA:

11      Q    Do you see where it says, "the lyrics have

12  not yet been completed other than the main lyric and

13  title of the song Circles," right?

14      A    Uh-huh.

15      Q    And do you claim that you co-authored

16  Circles, that lyric, the title?

17      A    Do I claim that I co-authored it?

18      Q    Right.

19      A    No.  Post is the one who came up with the

20  word "Circles."  I definitely mentioned to him that I

21  thought it was a great song title and I told him that

22  I had a song called Circles that I released on

23  Universal Records, but I didn't author it, no.

24      Q    Okay.  Do I need to go through with you any

25  of the lyrics in the song, verse, chorus; you didn't
```

CONFIDENTIAL PROCEEDING

Page 125

1    contribute to any of those lyrics, correct?

2        A    You don't need to do that.

3        Q    So the answer is you didn't contribute to

4    any --

5        A    I did not contribute to those.  Never

6    claimed that I did.

7        Q    Okay.  In 19, it says that all

8    instrumentation and vocal melodies in the song are

9    note for note rhythmically and melodically identical

10    to the song.

11            Do you have any musicological support for

12    that contention?

13        A    You'd like me to hire -- we do have a

14    musicologist.  Maybe my lawyer could explain that.

15        Q    Do you know whether or not your

16    musicologist actually provided any opinion to that

17    effect?

18        A    Have you read the report that they did?

19        Q    I'm just asking you whether or not you

20    know.

21        A    Well, I trust myself and I trust my ears

22    and I know that instrumentally, it's almost a mirror

23    image on the masters what's going on there.  There's

24    some very slight changes and, yeah, a musicologist

25    would certainly be the person to be able to specify

CONFIDENTIAL PROCEEDING

Page 132

```
 1      A    Copy.

 2      Q    Do you have any third-party person, not a

 3 party to this litigation, who can support or who

 4 witnessed, I should say precisely, witnessed what you

 5 say are your contributions to Circles?

 6      A    The only person that could potentially

 7 would be Brandon Leger, Leger, not sure if he's

 8 French or not, but obviously can't say for certain

 9 because he wasn't in the room the entire night.  He

10 wasn't operating like a standard engineer who sits

11 there and does everything that needs to be done.

12 Frank was really engineering the session.  This guy

13 was much more his beck and call to run a cable if

14 need be or do a small job.  I can't confirm at what

15 points he would be in and out of the room.

16      Q    And he came in and out of the room when

17 Frank asked him to only?

18      A    Um, that's kind of what it felt like to me.

19 I obviously remember seeing him there, but it wasn't

20 the type of engineer who was, like, the full-time

21 session engineer that some studios have employed for

22 the evening.

23      Q    Okay.  Have you spoken to him?

24      A    Not ever.

25      Q    Not ever?
```

CONFIDENTIAL PROCEEDING

Page 136

```
 1       A    I'm not sure if you're referring to the

 2  voice note or the actual master composition of

 3  Circles?

 4            MS. LEPERA:  Let's call this -- what is it

 5  Armes 4?

 6            MS. ISMAJ:  Exhibit 8.

 7            MS. LEPERA:  We're up to eight exhibits,

 8  all right.  Oh, because the marked the audio track

 9  separately.  Okay, Exhibit 8.

10            (Exhibit 8 was marked for identification.)

11  BY MS. LEPERA:

12       Q    This is -- let's just play a little of it

13  so you can identify precisely on the record.

14            (Whereupon, audio was played.)

15            MS. LEPERA:  Go the end of it.  It's seven

16  minutes.  I don't think we need to play the whole

17  seven minutes 33 seconds.  Go to the end of it.

18  There's some vocal discussion so he can be sure which

19  this is.

20            (Whereupon, audio was played.)

21            MS. LEPERA:  Stop.

22  BY MS. LEPERA:

23       Q    So Mr. Armes, this is audio that you

24  produced which reflects the phone recording you made

25  in the studio on August 7th or 8th where the track
```

CONFIDENTIAL PROCEEDING

Page 137

1  was played and there were some vocal comments by the

2  individuals?

3      A   Yes.

4      Q   Yes.  Okay.

5          Other than this recording, Bates stamped by

6  your counsel as identified earlier we've marked as

7  Exhibit 8, are there any other recordings that you

8  have either with your cellphone or any other source

9  reflecting any activity whatsoever that occurred that

10  night?

11      A   No.

12          MS. LEPERA:  Okay.  That's fine, Gabby.

13  You can take that down.  Let's pull up the

14  interrogatories now.  Let's turn to Interrogatory

15  Number 4.  Last paragraph, please.

16  BY MS. LEPERA:

17      Q   Do you see at the bottom of the last

18  paragraph -- or second to last paragraph of

19  Interrogatory Number 4, which is right above

20  Interrogatory Number 5, there's a bold section where

21  someone's quoted as "Dukes exclaimed," et cetera, et

22  cetera?

23      A   Yes.

24      Q   You see that?

25          Is that something that came from the

CONFIDENTIAL PROCEEDING

Page 141

1    A    It's not the opposite.  It's missing one

2  name in one of them.

3    Q    Which one is that?

4    A    It's not the opposite.

5    Q    So explain what you mean.

6    A    Post did play guitar parts and Dukes did

7  play bass parts, but in the other one it said Post

8  played bass parts and it should have also included

9  Dukes.

10    Q    So it should be Post and Dukes playing the

11  bass parts --

12    A    With regarding party, myself.

13    Q    No, co-written -- this is on Exhibit 8, the

14  audio.

15    A    Yeah.

16    Q    You're not playing anything on that.

17    A    Co-written.

18    Q    That's what this says, correct.

19       So what I'm trying to understand is on that

20  audio, based on your sworn interrogatory answer, who

21  played the bass and who played the guitar?

22    A    On the voice note?

23    Q    You call it the voice note.  Let's be sure

24  terminology is the same thing.

25    A    Exhibit 8.

CONFIDENTIAL PROCEEDING

Page 142

1    Q    Thank you.

2    A    Yes.  This here that's highlighted, Dukes

3  playing the bass part is correct.  Post played the

4  intro guitar part that I sang the ending of and Frank

5  played the chords.  Because there's two guitar parts.

6  So Frank played the chords on the guitar and Post

7  played the intro guitar part, like the musical head,

8  if you will, the singable melody that's like a

9  nursery rhyme.

10    Q    Dukes is the only one that should be listed

11  as playing the bass part?

12    A    On the voice note recording, yes.

13    Q    Correct.

14         Post and Dukes should be listed as the ones

15  playing the guitar parts?

16    A    Correct.

17    Q    Okay.  And when you said you sang, it's not

18  on the recording?

19    A    Come again.  I don't understand that last

20  part.

21    Q    You said you sang --

22    A    No, I sang, you know, many minutes or well

23  before that is when we're writing the thing.  This is

24  just the recording of playback.

25    Q    In which you're not singing?

CONFIDENTIAL PROCEEDING

Page 143

1    A    Correct.

2    Q    Okay.  So what you would do is you would

3  change both of these interrogatory answers to include

4  Dukes as playing guitar as well as Post --

5    A    Correct.

6    Q    -- period.  That's all you would change; is

7  that right?

8    A    Correct, from what has just been shown to

9  me, yes.

10    Q    All right.

11         MS. LEPERA:  You can pull that down, Gabby.

12         MS. ISMAJ:  Okay.

13         MS. LEPERA:  Now let's move to -- I want to

14  mark the texts.  Let's mark as exhibit --

15         MS. ISMAJ:  Nine.

16         MS. LEPERA:  9, 10 and 11 in sequence.

17  Whichever one you want to give me first, just give it

18  to me.

19         (Exhibit 9 was marked for identification)

20         MS. ISMAJ:  This one is going to be P00007

21  to P00009 and P000013 to P000014, the combined --

22  Christine, do you want me to put them all in the chat

23  now or wait until we get through each one?

24         MS. LEPERA:  I want to do them one by one,

25  please.  It would be too confusing to put them all up

CONFIDENTIAL PROCEEDING

Page 161

```
 1  get back in the car?

 2      A    To the best of my recollection, yes.

 3      Q    And there's five of you in the car, right?

 4      A    It's a huge Escalade, yeah.

 5      Q    Is it just the five of you?

 6      A    I can't remember.

 7      Q    Any conversation whatsoever happen in that

 8  car?

 9      A    No.

10      Q    Not a single nothing?

11      A    It's not memorable, no.

12      Q    Okay.  So --

13      A    It was approximately a six-minute drive

14  from venue to studio.  It literally could not be

15  closer.  It's very close.  A short drive.

16      Q    Now, so then you get to the studio, right?

17      A    Uh-huh.

18      Q    And you mentioned there were these other

19  people there earlier.

20           Were they there already?

21      A    There was a waiting period in front of the

22  studio to kind of wait for all parties to show up

23  before entering, unlocking the door and walking up

24  the stairs.  So there was no one waiting in the

25  studio when I got there because I remember we had to
```

CONFIDENTIAL PROCEEDING

Page 161

```
 1   get back in the car?

 2        A    To the best of my recollection, yes.

 3        Q    And there's five of you in the car, right?

 4        A    It's a huge Escalade, yeah.

 5        Q    Is it just the five of you?

 6        A    I can't remember.

 7        Q    Any conversation whatsoever happen in that

 8   car?

 9        A    No.

10        Q    Not a single nothing?

11        A    It's not memorable, no.

12        Q    Okay.  So --

13        A    It was approximately a six-minute drive

14   from venue to studio.  It literally could not be

15   closer.  It's very close.  A short drive.

16        Q    Now, so then you get to the studio, right?

17        A    Uh-huh.

18        Q    And you mentioned there were these other

19   people there earlier.

20             Were they there already?

21        A    There was a waiting period in front of the

22   studio to kind of wait for all parties to show up

23   before entering, unlocking the door and walking up

24   the stairs.  So there was no one waiting in the

25   studio when I got there because I remember we had to
```

CONFIDENTIAL PROCEEDING

1  spend some time waiting in front of it for everybody

2  to show up.

3      Q    Who is "we" had to be standing outside and

4  waiting?

5      A    Whoever I was in the car with which was

6  likely me, Austin, Frank, Post, his security.  It was

7  like there was probably a second car showing up.  I

8  mentioned Matte Babel was driving a Porsche.  So we

9  were either waiting for Matte to show up in his

10 Porsche or there was a second black car of a few of

11 the other people.

12     Q    And so basically -- even Frank didn't go

13 in, he was waiting for the --

14     A    I can't recall if he went up there first or

15 not.

16     Q    It's his studio, right?

17     A    It's a shared studio apparently, but yes.

18     Q    Who does he share it with, do you know?

19     A    It used to be somebody naked Doc McKinney.

20 I don't know if they currently have it anymore.

21     Q    So while you're waiting, do you recall any

22 conversation that transpired whatsoever?

23     A    While we're waiting?

24     Q    Uh-huh.

25     A    No.

CONFIDENTIAL PROCEEDING

Page 164

```
 1   BY MS. LEPERA:

 2       Q    Songwriting.

 3       A    The first time that I had a conversation

 4   with Post was when Dre said to Post, Hey, we're going

 5   to go make some music tonight.

 6       Q    Let me ask you that since I've asked you

 7   every conversation you've had with Mr. Malone up

 8   until this moment before the studio.

 9       A    Yeah.

10       Q    When was that?

11       A    That was in the Green Room with me, Dre and

12   Post while Dre was trying to get Post out of the

13   Green Room.

14       Q    The night before or the night --

15       A    The night after he met the band.  He was

16   like Postie, we're going to get time in the studio,

17   he's an awesome musician, it's going to be fire,

18   something along those lines.

19       Q    And this is what Dre says?

20       A    This is what Dre said, yeah.

21       Q    Okay.  And that's it?

22       A    Yep.  It's Dre telling Post, like, this is

23   the guy I've been telling you about, he's fire, he's

24   going to go back to the studio.

25       Q    Okay.  And that's the full extent of that
```

CONFIDENTIAL PROCEEDING

Page 165

1   conversation --

2       A    Yeah.  Post remarks, like, Awesome, man,

3   let's write a tune, awesome, fuck yeah, that kind of

4   thing.

5       Q    Okay.  Anything beyond that?

6       A    No, not that I remember.

7       Q    Okay.  Now -- so is there anything else

8   that you can now remember that either Mr. Malone or

9   Mr. Feeney said regarding any composition or

10  songwriting before you enter the studio?

11      A    No.

12      Q    Okay.  Mr. Dukes didn't say I'm writing a

13  song with you or anything like that?

14      A    No, nor would he.

15      Q    Excuse me?

16      A    I said nor would he.

17      Q    How do you know what he would say or not

18  say?

19      A    It's not something someone would say to

20  somebody, I'm writing a song with you.

21      Q    I guess you know what everybody says.

22           Now we move into the studio and we're in

23  the room where there's just, as you put it,

24  musicians?

25      A    No.

CONFIDENTIAL PROCEEDING

Page 167

1      Q    About an hour?

2      A    I mean, likely less.  I feel like an hour

3   would be a long time to be doing that for.

4      Q    All right.  So roughly 3:00, 3:30,

5   something like that?  What time did you leave the

6   studio?

7      A    In the morning?

8      Q    Yes.

9      A    Like time to go home?

10     Q    What time did you leave the studio?

11     A    The sun had been up for a long time.  My

12   best guess would be around 9:00 a.m.

13     Q    Okay.  And so roughly between 3:00 and 9:00

14   a.m., the only people that you engaged with were

15   Mr. Malone and Mr. Feeney and perhaps Mr. Leger to

16   the extent he went in and out?

17     A    That's correct, yeah.

18     Q    Okay.  And tell me if there's any

19   conversations that you recall in which either

20   Mr. Dukes and/or Mr. Malone made any agreement with

21   you with respect to anything having to do with any

22   song or any --

23     A    There were no agreements made ever.

24     Q    Okay.  And -- okay.

25          Did they ask you any questions about your

CONFIDENTIAL PROCEEDING

Page 169

```
 1      Q    I understand.

 2           There's a bass part on the recording,

 3   right, that you're not playing?

 4      A    Uh-huh.

 5           MS. HART:  Which recording are you

 6   referring to?

 7           MS. LEPERA:  Any of them.

 8           MS. HART:  Well, we don't know which

 9   recordings exist on Frank's computer.

10           MS. LEPERA:  Well, we do know that there's

11   a final and then there's a mix and ultimately he's

12   not on either.

13           MS. HART:  What are you referring to when

14   you say "the mix."

15           MS. LEPERA:  Surreptitiously recorded.

16           MS. HART:  You're talking about the voice

17   memo recording that was marked as Exhibit 6?

18           MS. LEPERA:  Exhibit 8 I believe.

19           MS. HART:  I thought that was --

20           MS. LEPERA:  I think that's Exhibit 8.  All

21   right.  Let's move on.

22   BY MS. LEPERA:

23      Q    Can you tell me of any other communications

24   that you recall transpiring between either of you

25   two -- excuse me, either of you three regarding any
```

CONFIDENTIAL PROCEEDING

Page 170

```
 1   rights or agreement with respect to Circles?

 2        A    Never spoken about.

 3        Q    Including in the studio that night?

 4        A    Including in the studio that night.

 5        Q    Okay.  And after -- after the studio, when

 6   you were done and you were -- did you leave at the

 7   same time or did they leave later?

 8        A    No, we all got ready.  They got

 9   obviously -- I think they got in cars to head to the

10   airport and I would have gotten an Uber to head to my

11   house.

12        Q    Okay.  And did you leave with any

13   communications as to contacts, phone; in other words,

14   did you have their phone, did they have your phone,

15   anything like that?

16        A    At that point I had Dre as a contact, so I

17   didn't feel like it was necessary to ask the other

18   guys for theirs.  When you're dealing with, like, an

19   ultra celebrity like Post, which I have dealt with in

20   the past, it's generally frowned upon to, like, push

21   them for those kind of contacts because they're often

22   pretty sacred about who they give their number to in

23   case it gets leaked and could cause a big headache to

24   them, so I felt no impetus to get connected with them

25   on the phone.  I have Dre's contact and he manages
```

CONFIDENTIAL PROCEEDING

Page 171

1  them.

2      Q   Okay.  So the answer is nobody exchanged

3  anything with you --

4      A   Not that I can remember, no.

5      Q   You didn't give them -- did they ask for

6  your information?

7      A   Did they ask for my information?

8      Q   Correct.

9      A   Not that I can remember.

10     Q   Contact information, okay.

11         Did you have any conversations at all in

12  departing?

13     A   I wished them well on the shows they were

14  going to do.  We talked about how awesome the song

15  was and how much fun it was and that was it, short

16  and sweet.

17     Q   All right.  Let's move on to Exhibit 9.

18         MS. ISMAJ:  Okay.  So this is Exhibit 9.

19         MS. LEPERA:  There's that weird stuff that

20  you're doing with the cursor, Gabby.  Get rid of

21  that.  It looks like a redaction.

22         MS. ISMAJ:  I don't know what it is.  On my

23  screen it looks normal.  Okay now?

24         MS. LEPERA:  Yeah.  Let's look at all the

25  pages on here.  Scroll just so we can -- it's P00007

CONFIDENTIAL PROCEEDING

Page 199

1              THE WITNESS:  Sure.  Right there is good.

2              MS. ISMAJ:  There's one more page.

3              THE WITNESS:  Okay.

4              MS. LEPERA:  Yeah, finish it off.

5              THE WITNESS:  Thank you.

6              MS. ISMAJ:  That's the end of it.

7              THE WITNESS:  Okay.

8               MS. LEPERA:  Let's go up now.  There's a

9    question I have on the second page.

10             MS. ISMAJ:  Let me know where you want --

11             MS. LEPERA:  There it is.

12   BY MS. LEPERA:

13       Q    The sentence that begins, "Even the word

14   "circles" in the song title theme that night"; do you

15   see that?

16       A    Yeah.

17       Q    You already established that was

18   Mr. Malone, correct?

19       A    Yes, he was the one that said the word

20   "Circles."

21       Q    Okay.  And then it says, quote, "and all of

22   the music in the song is present in a voice note

23   recording of the three of them playing together at

24   the session," close quote.

25             Exhibit 8 is the only recording we have

CONFIDENTIAL PROCEEDING

Page 200

1  from you.  Is there some other recording?

2       A    No.

3       Q    So he's incorrect because that is not a

4  recording of the three of you playing, correct?

5       A    It's a result of the three of us

6  collaborating.

7       Q    Okay.  Can I have an answer to my question

8  now?

9            MS. HART:  Asked and answered.  He's

10 already said that he wasn't playing any instruments

11 that were recorded.

12           MS. LEPERA:  That's an incorrect statement.

13           THE WITNESS:  But I was playing instruments

14 throughout the night and that lead to the writing of

15 some of the things you're hearing on the playing that

16 he's talking about, so I don't know.  To me they're

17 one and the same.

18 BY MS. LEPERA:

19      Q    It says, "there's a voice note recording of

20 the three of them playing together at the session."

21           Is that correct or incorrect?

22      A    We're not -- it's not a voice note

23 recording of the three of them playing live in that

24 moment, no.

25      Q    It's not a recording of them playing --

CONFIDENTIAL PROCEEDING

Page 202

1   personally, but I think there could have been better

2   wording.

3        Q    You're not playing live on the voice

4   recording, correct?

5        A    No, I am not playing live on the voice

6   recording.

7        Q    You're not even playing an instrument

8   recorded on the voice note recording, correct?

9        A    It's one and the same, but yes, you can

10  read it that way too.

11       Q    Well, no, in the background --

12       A    Anytime you're playing an instrument, it is

13  a live recording.  It's not dead, it's live.  So no,

14  I'm not playing any live recordings on the voice

15  note.

16       Q    There's a recording that is being recorded

17  by you and that is a recording of the digital file

18  that Frank put together for the song and you're not

19  on any of them either, correct?

20            MS. HART:  Vague and ambiguous.

21            THE WITNESS:  Yeah.  I'm sorry.

22            MS. HART:  Can you rephrase the question?

23  BY MS. LEPERA:

24       Q    There's not any performance, live or

25  recorded, by you, whatsoever, on Exhibit 8, correct?

CONFIDENTIAL PROCEEDING

Page 203

```
 1     A   Correct.  I answered that already.

 2     Q   Well then, I don't know why it's so

 3  difficult to --

 4         MS. HART:  He answered it before lunch a

 5  long time ago.  The way you worded it was very

 6  confusing.

 7         MS. LEPERA:  But this sentence at the end

 8  of this lawyer's letter is false in all premises.

 9         MS. HART:  Objection, misstates his

10  testimony.

11         MS. LEPERA:  I'm not saying it's his

12  testimony.  I'm saying this is a false letter.

13         MS. HART:  Is that a question?

14         MS. LEPERA:  Well, unless there's another

15  recording.

16  BY MS. LEPERA:

17     Q   "Our client is entitled to no less than an

18  undivided one-third interest in the song, including

19  one-third of the copyright and one-third of all

20  monies realized regarding the exploitation of the

21  song."

22         Did you see this before this went out, this

23  demand?

24     A   I can't recall if I've seen this exact

25  letter.
```

CONFIDENTIAL PROCEEDING

Page 205

1    second to last substantive paragraph.

2            MS. HART:  Which demand are you referring

3    to in that paragraph?

4            MS. LEPERA:  The stated one.

5            MS. HART:  Accordingly, we hereby demand

6    payment of $25,000?

7            MS. LEPERA:  Keep going.

8            MS. HART:  I just want to clarify, that's

9    what you're referring to, not the first sentence?

10            MS. LEPERA:  Every demand that's made in

11    this paragraph, did he authorize it.

12            THE WITNESS:  I'm reading through it again.

13    Sorry.  The two percent and one-half of the royalty

14    rate seems like the production that we spoke about

15    earlier that was dismissed, so I would say yes to

16    that part of it.  I don't recall the $25,000 figure.

17    I don't recall.

18            MS. LEPERA:  Okay.  We can take this down

19    now, Gabby.

20            MS. ISMAJ:  Okay.

21    BY MS. LEPERA:

22        Q    Do you think that -- and by the way, at

23    this point when you wrote this letter, were you aware

24    that there were three contributors to Circles other

25    than Mr. Dukes and Mr. Malone, including your friend

CONFIDENTIAL PROCEEDING

Page 206

```
 1   Mr. Bell?

 2        A    He's not my friend anymore.

 3        Q    Okay.  Including Mr. Bell?

 4        A    Thanks.  At this -- when that letter was

 5   drafted was I aware of the credits in the song, I

 6   imagine I was aware of the credits in the song the

 7   second the song was on Spotify because I would have

 8   checked the credits.  The answer is yes.

 9        Q    Okay.  And Billy Walsh wrote all the lyrics

10   obviously along with --

11        A    There's no obviously at this point because

12   I haven't had any information from these people one

13   on one.

14        Q    I was not I think in that context.  I

15   really was not interrupting my voice in any way,

16   shape or form.

17        A    Okay.  Okay.

18        Q    And I wasn't finished --

19        A    Go ahead.  You're right.

20        Q    Okay.  You think one-third of the

21   publishing in Circles is a minimal publishing slice?

22        A    I think you have to take into account

23   something where when you're using that word that

24   you've keyed in on "minimal" or "minor" was the other

25   one that you've highlighted, those words are
```

CONFIDENTIAL PROCEEDING

Page 215

```
 1   because I have no context as to what those people
 2   did, my only context of this song is the night that I
 3   was involved in with these other two individuals.  So
 4   it would seem odd for me to be including other people
 5   where I have no idea what they've done on this or if
 6   they're a party to it and under what context.
 7        Q   Okay.  So you're just speculating, you
 8   don't know who made that decision or why --
 9        A   To not include the other three writers?
10        Q   Yeah.
11        A   The only reason I can see it being done was
12   because one of the attorneys thought that's what
13   should be -- or how it should be done.  It was not my
14   idea if that's your question.
15        Q   Okay.  Do you see where it says on here
16   "Tyler Armes lyrics," that's not true, right?
17        A   I see "Frank lyrics," I see "Post lyrics."
18   It looks like everything has been written out full
19   swag on each people the same way.
20        Q   But I'm not asking about them, I'm asking
21   about you.  Because you don't know whether or not
22   either of them contributed to the final lyrics, do
23   you?
24        A   I see what you're saying.
25        Q   Well, I'm just asking a question.
```

Exhibit B
Page 78

CONFIDENTIAL PROCEEDING

Page 216

```
 1      A    I've never made a lyrical claim.

 2      Q    Yes, you have.  You filed it with the

 3  copyright office.

 4           MS. HART:  This is not what Tyler filed

 5  with the copyright office.  It was not what was filed

 6  on his behalf.  Don't misrepresent the document.  You

 7  stated this is something that you printed from the

 8  copyright office.

 9           MS. LEPERA:  Correct.

10  BY MS. LEPERA:

11      Q    There's no registration --

12      A    There were lyrics written at the session.

13           MS. HART:  The registration that you showed

14  us as a prior exhibit identified something different.

15           MS. LEPERA:  This is the same date,

16  11/25/2019, and obviously this was not filed by

17  anyone on my side of the fence because we don't have

18  Tyler Armes in anything.

19           MS. HART:  And what was filed on my

20  client's side of the fence is the last exhibit you

21  showed him which has different information on it.

22           MS. LEPERA:  Well, no.  You're going to

23  represent this was not filed by Mr. Armes?

24           MS. HART:  Well, you just said this is a

25  document you printed from the copyright registration
```

CONFIDENTIAL PROCEEDING

Page 267

1      A    No.

2      Q    Fair enough.

3      A    It's possible, like, as a reference, the

4  way I could reference a print sign could be, like, a

5  Circles style bassline, but it would never be in a

6  context of my involvement with it.  And I've never

7  talked about my relationship to the song publicly

8  whatsoever, especially --

9      Q    Well, you did post on Instagram.

10     A    That's different, yeah.

11     Q    And you guys posted, you and --

12     A    That was pre litigation though.

13     Q    And you and Murta Beatz posted on Billboard

14  100 and --

15     A    Like I said, all pre litigation.

16     Q    Okay.  So yeah, so pre litigation you were

17  out there?

18     A    I was out there, I would say, probably

19  somewhere between four and five social media posts to

20  my direct fan base, no outward press, no podcasts, no

21  trying to propel the story in that kind of a way, no.

22     Q    I think I asked you this before, but to

23  make sure and close the loop, between August 8th,

24  2018, when you left the studio and your texts with

25  Post and/or Dre and/or Frank Dukes that we've seen,

CONFIDENTIAL PROCEEDING

Page 268

1    did you have any communication with anyone involved

2    in the writing of Circles whatsoever, you did not?

3        A    No.

4        Q    And you didn't initiate any either?

5        A    Correct.

6        Q    Okay.  Who is Diego Sylvaria?  He's

7    somebody else I saw in one of the posts that you

8    produced.

9            Do you know who that is?

10       A    A post that I produced?

11       Q    A social media post that you produced.

12       A    Diego Sylvaria?

13       Q    I think he calls you --

14       A    Would you be able to throw it up on the

15   screen?

16       Q    Yes.  It could just be an arrant person.

17       A    I think that's what it's going to be.

18            MS. ISMAJ:  It's P00009.

19   BY MS. LEPERA:

20       Q    My brother, Tyler Armes.

21       A    This is the problem with posting on social

22   media is that the key function of social media is

23   repost.

24       Q    "Missed you and see you soon."  Three

25   hearts.

CONFIDENTIAL PROCEEDING

```
 1                       I N D E X

 2

 3   WITNESS         EXAMINATION                    PAGE

 4   Tyler Armes

 5                    By Ms. Lepera               6

 6

 7

 8                       E X H I B I T S
 9

10   NO.            PAGE       DESCRIPTION

11   Exhibit 1       30        First Amended Complaint

12   Exhibit 2       99        Ferrara Report

13   Exhibit 3      100        Ferrara Report, Audio Ex. 1,

14                             Track 2

15   Exhibit 4      102        Ferrara Report, Audio Ex. 1,

16                             Track 3

17   Exhibit 5      102        Ferrara Report, Audio Ex. 1,

18                             Track 4

19   Exhibit 6      116        Ferrara Report, Audio Ex. 1,

20                             Track 1

21   Exhibit 7      130        Armes' Responsesto First Set

22                             of Interrogatories

23   Exhibit 8      136        P000001

24   Exhibit 9      143        P000007 - 9, P000013 - 14,

25                             Combined
```

**Exhibit B**
**Page 82**

CONFIDENTIAL PROCEEDING

| | | | |
|---|---|---|---|
| 1 | Exhibit 10 | 186 | P000101, P000010 - 12, |
| 2 | | | Combined |
| 3 | Exhibit 11 | 196 | P000004 - 5 |
| 4 | Exhibit 12 | 197 | P000029 - 31 |
| 5 | Exhibit 13 | 208 | P000050 - 52 |
| 6 | Exhibit 14 | 213 | 2019_PA0002222378_Circles |
| 7 | Exhibit 15 | 220 | P000053 - 81 |
| 8 | Exhibit 16 | 223 | Print Center_Musicnotes |
| 9 | Exhibit 17 | 226 | P000102 - 124 |
| 10 | Exhibit 18 | 245 | P000002 |
| 11 | Exhibit 19 | 246 | P000003 |
| 12 | Exhibit 20 | 269 | P000090 |
| 13 | Exhibit 21 | 269 | P000089 |

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL PROCEEDING

Page 273

```
 1  STATE OF CALIFORNIA      )

 2                           ) ss

 3  COUNTY OF LOS ANGELES    )

 4

 5

 6

 7                   I, TYLER ARMES,

 8  hereby certify under penalty of perjury under the

 9  laws of the State of California that the foregoing is

10  true and correct.

11     Executed this    day of            ,2022

12  at                                        ,

13  California.

14

15

16

17

18

19          _____

20                    TYLER ARMES

21

22

23

24

25
```

CONFIDENTIAL PROCEEDING

Page 274

1   STATE OF CALIFORNIA       )

2                             ) ss

3   COUNTY OF LOS ANGELES     )

4        I, KATHERINE FERGUSON, Certified Shorthand

5   Reporter, for the State of California, do hereby

6   certify:

7        That prior to being examined, the witness named

8   in the foregoing deposition, was by me duly sworn to

9   testify the truth, the whole truth and nothing but

10  the truth;

11       That the testimony of the witness and all

12  objections made at the time of the examination were

13  recorded stenographically by me;

14       That the foregoing transcript is a true record

15  of the testimony and all objections made at the time

16  of the examination.

17       I hereby certify that I am not interested in the

18  event of the action.

19       IN WITNESS WHEREOF, I have subscribed my name

20  this 7th day of February, 2022.

21

22

23  _____

24           Katherine Ferguson

25           CSR No. 12332

**Exhibit B**
**Page 85**

CONFIDENTIAL PROCEEDING

Page 275

```
 1        ERRATA SHEET OF THE TRANSCRIPT OF:

 2   Case Name:          Tyle Armes V Austin Richard Post,

 3                        et al.

 4   Dep. Date:          February 2, 2022

 5   Deponent:           Tyle Armes

 6

 7                        CORRECTIONS:

 8

 9   Pg.   Ln.    Now Reads        Should Read    Reason
10   ____  ____   _____    _____  _____

11   ____  ____   _____    _____  _____

12   ____  ____   _____    _____  _____

13   ____  ____   _____    _____  _____

14   ____  ____   _____    _____  _____

15   ____  ____   _____    _____  _____

16   ____  ____   _____    _____  _____

17   ____  ____   _____    _____  _____

18   ____  ____   _____    _____  _____

19               _____
                 Signature of Deponent
20

21   SUBSCRIBED AND SWORN BEFORE ME

22   THIS____DAY OF_____, 2022.

23

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES: _____
```

# EXHIBIT C

Exhibit C
Page 87

Case 2:20-cv-03212-ODW-SK   Document 82-2   Filed 02/28/22   Page 88 of 128   Page
Case 2:20-cv-03212-ODW-SK   Document 28-1   Filed 06/03/20   Page 90 of 88   Page ID #:133
ID #:1152

DocuSign Envelope ID: 6BA43087-BC9C-408B-8A6E-A8225DB5A77A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AUSTIN R. POST, professionally known as
POST MALONE,

                Plaintiff,

     v.

TYLER ARMES,

                Defendant.

Case No. 1:20-CV-02877 (ALC)

**<u>DECLARATION OF KAAN
GUNESBERK</u>**

I, KAAN GUNESBERK, declare:

1.     I am songwriter and music producer.  I have personal knowledge of the facts set forth in this declaration and am competent to testify hereto.

2.     I am a joint author and credited co-writer of the musical composition entitled "Circles" (the "Circles Composition"), a recording of which is included in the album entitled *Hollywood's Bleeding* by the artist Austin R. Post, professionally known as "Post Malone."

3.     I am also a co-owner of the copyright in the Circles Composition.  Specifically, I own a percentage share of the copyright in the Circles Composition attributable to my authorship contribution and I receive a corresponding share of its profits.

4.     The other co-writers and co-owners of the copyright in the Circles Composition are:  Post Malone; Adam King Feeney, professionally known as Frank Dukes; Louis Bell; and Billy Walsh.

5.     I am a citizen of Canada and no other country.  I live and work in Toronto, Canada.

6.     I do not own any property or maintain a residence in California.  I do not own, operate or maintain any office or other place of business in California.

7.     In fact, I do not have these types of contacts anywhere in the United States.  I do not own property or maintain a residence anywhere in the United States.  I also do not own, operate or maintain any office or other place of business in the United States.

8.     All of my work on the Circles Composition was done in a recording studio in

**Exhibit C
Page 88**

DocuSign Envelope ID: 6BA43087-BC9C-408B-8A6E-A8225DB5A77A

Toronto, Canada.

9.      I had no dealings whatsoever with Tyler Armes in connection with the creation of the Circles Composition.  I have no knowledge that Mr. Armes contributed anything to the creation of Circles Composition.  I never had any intention for Mr. Armes to be a co-author or co-writer of Circles Composition.

10.      I understand that Mr. Armes has commenced an action entitled *Armes v. Post, et al.*, Case No. 2:20-CV-03212-ODW-PJW in the United States District Court for the Central District of California (the "California Action"), in which Mr. Armes has asserted a claim that he is a co-author and copyright owner of the Circles Composition.  I further understand that Post Malone has commenced the above-captioned action in the United States District Court for the Southern District of New York (the "New York Action"), in which he seeks a declaration that Mr. Armes is not a co-author or copyright owner of the Circles Composition.

11.      I do not consent to personal jurisdiction in California.  Nor do I consent to being a named as party to the California Action, or to being bound by any judgment in the California Action.  However, I agree to be bound by any judgment rendered in the New York Action as to: (a) whether Mr. Armes is a joint author of the Circles Composition; (b) whether Mr. Armes is entitled to a share of copyright authorship of the Circles Composition; and (c) whether Mr. Armes is entitled to a share of prospective and retroactive royalties and other money owed with respect to the exploitation of the Circles Composition.  I further agree to refrain from commencing duplicative litigation against any of the parties named in these actions regarding the Circles Composition and any other matter set forth in this declaration.

12.      I also agree to cooperate in discovery and sit for a deposition (preferably in Toronto, Canada) in the New York Action, if called upon to do so.

12095839.7

**Exhibit C**
**Page 89**

DocuSign Envelope ID: 6BA43087-BC9C-408B-8A6E-A8225DB5A77A

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on this ___ day of May, 2020.

DocuSigned by:

*Kaan Gunesberk*

—82A8A897DB50465... _____

KAAN GUNESBERK

12095839.7

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUSTIN R. POST, professionally known as POST MALONE, | Case No. 1:20-CV-02877 (ALC) |
| Plaintiff, | **<u>DECLARATION OF BILLY WALSH</u>** |
| v. | |
| TYLER ARMES, | |
| Defendant. | |

I, WILLIAM WALSH, declare:

1.     I am a songwriter.  I have personal knowledge of the facts set forth in this declaration and am competent to testify hereto.

2.     I wrote lyrics for, and I am therefore a credited co-writer of, the musical composition entitled "Circles" (the "Circles Composition"), a recording of which is included in the album entitled *Hollywood's Bleeding* by the artist Austin R. Post, professionally known as "Post Malone."

3.     As a result of writing lyrics, I am currently a co-owner of the copyright in the Circles Composition.

4.     The other co-owners of the copyright in the Circles Composition are:  Post Malone; Adam King Feeney, professionally known as Frank Dukes; Kaan Gunesberk; and Louis Bell.

5.     I had no dealings whatsoever with Tyler Armes in connection with the creation of the Circles Composition.  I have no knowledge that Mr. Armes contributed anything to the creation of Circles Composition.  I never had any intention for Mr. Armes to be a co-author or co-writer of Circles Composition.

12095830.3

FG:10976476.2

6.      I understand that Mr. Armes has commenced an action entitled *Armes v. Post, et al.*, Case No. 2:20-CV-03212-ODW-PJW in the United States District Court for the Central District of California (the "California Action"), in which Mr. Armes has asserted a claim that he is a co-author and copyright owner of the Circles Composition.  I further understand that Post Malone has commenced the above-captioned action in the United States District Court for the Southern District of New York (the "New York Action"), in which he seeks a declaration that Mr. Armes is not a co-author or copyright owner of the Circles Composition.

7.      I am not named as a party in the California Action, and would not consent to being named as a party to the California Action, or to being bound by any judgment in the California Action.  I agree to refrain from commencing duplicative litigation against any of the parties named in these actions regarding the Circles Composition and any other matter set forth in this declaration.

8.      I also agree to cooperate in discovery and sit for a deposition in the New York Action, if called upon to do so.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on this 19th day of May, 2020.


_____

WILLIAM WALSH

# EXHIBIT E

DocuSign Envelope ID: E653EBFF-0805-4C33-98E1-A39D7B8A71E3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUSTIN R. POST, professionally known as POST MALONE, | Case No. 1:20-CV-02877 (ALC) |
| Plaintiff, | |
| v. | **DECLARATION OF LOUIS BELL** |
| TYLER ARMES, | |
| Defendant. | |

I, LOUIS BELL, declare:

1.     I am songwriter and music producer. I have personal knowledge of the facts set forth in this declaration and am competent to testify hereto.

2.     I am a joint author and credited co-writer of the musical composition entitled "Circles" (the "Circles Composition"), a recording of which is included in the album entitled *Hollywood's Bleeding* by the artist Austin R. Post, professionally known as "Post Malone."

3.     I am also a co-owner of the copyright in the Circles Composition. Specifically, I own a percentage share of the copyright in the Circles Composition attributable to my authorship contribution and I receive a corresponding share of its profits.

4.     The other co-writers and co-owners of the copyright in the Circles Composition are: Post Malone; Adam King Feeney, professionally known as Frank Dukes; Kaan Gunesberk; and Billy Walsh.

5.     I had no dealings whatsoever with Tyler Armes in connection with the creation of the Circles Composition. I have no knowledge that Mr. Armes contributed anything to the creation of Circles Composition. I never had any intention for Mr. Armes to be a co-author or co-writer of

12095854.2

DocuSign Envelope ID: E653EBFF-0805-4C33-98E1-A39D7B8A71E3

Circles Composition.

6.      I understand that Mr. Armes has commenced an action entitled *Armes v. Post, et al.*, Case No. 2:20-CV-03212-ODW-PJW in the United States District Court for the Central District of California (the "California Action"), in which Mr. Armes has asserted a claim that he is a co-author and copyright owner of the Circles Composition.   I further understand that Post Malone has commenced the above-captioned action in the United States District Court for the Southern District of New York (the "New York Action"), in which he seeks a declaration that Mr. Armes is not a co-author or copyright owner of the Circles Composition.

7.      I do not consent to being a named as party to the California Action, or to being bound by any judgment in the California Action.  However, I agree to be bound by any judgment rendered in the New York Action as to:  (a) whether Mr. Armes is a joint author of the Circles Composition; (b) whether Mr. Armes is entitled to a share of copyright authorship of the Circles Composition; and (c) whether Mr. Armes is entitled to a share of prospective and retroactive royalties and other money owed with respect to the exploitation of the Circles Composition.  I further agree to refrain from commencing duplicative litigation against any of the parties named in these actions regarding the Circles Composition and any other matter set forth in this declaration.

8.      I also agree to cooperate in discovery and sit for a deposition in the New York Action, if called upon to do so.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on this 14 day of May, 2020.

LOUIS BELL

12095854.2

2

# EXHIBIT F





# EXHIBIT G





















# EXHIBIT H



# POST MALONE | ALBUM 03

## HOLLYWOOD'S BLEEDING

### PM-3 2019



**EXECUTIVE PRODUCERS**

Louis Bell, Dre London, & Austin Rosen

**A&R**

Tyler Arnold & Rob Stevenson

**LEGAL REPRESENTATION**

Theo Sedlmayr, Esq., Adeline Ferretti, Esq., and Sebastian Zar, Esq. for Sedlmayr & Associates, P.C.

**PRESS**

Matt Bernal & Beau Benton

**CREATIVE MANAGER**

Bobby Greenleaf

**ILLUSTRATION**

Eve Ventrue

**MANAGEMENT**

Dre London & Austin Rosen

**MARKETING**

Jim Roppo & Marleny Dominguez

**BUSINESS AFFAIRS**

Dan Getz, Antoinette Trotman, Ian Allen, Corey Williams & Jaime Sudhalter

**DIGITAL**

Tim Hrycyshyn

**CREATIVE DIRECTION**

Travis Brothers & Bryan Rivera

**PHOTOGRAPHY**

Brandon Bowen

H'S B 01

Cookie Consent

Exhibit H
DEF00006
Page 116



# HOLLYWOOD'S BLEEDING

PRODUCED BY

Louis Bell & Brian Lee

PUBLISHED BY

Posty Co LLC/UMPG (BMI), Posty Co LLC/UMPG (BMI), Sony/ATV (ASCAP), Songs of Universal, Inc. / Dong Hoe Music (BMI) o/b/o Brian D. Lee, Billy Walsh / WMMW (ASCAP), Warner Chappell (BMI)

PROGRAMMING AND ALL INSTRUMENTS BY

Louis Bell & Brian Lee

MASTERED BY

Mike Bozzi at Bernie Grundman Mastering, Los Angeles, CA

WRITTEN BY

Austin Post, Louis Bell, Brian Lee, Billy Walsh & Carter Lang

RECORDED BY

Louis Bell

RECORDED AT

Electric Feel Studios, West Hollywood, CA

VOCAL PRODUCTION BY

Louis Bell

MIXED BY

Manny Marroquin at Larrabee Studios (Universal City, CA), assisted by Chris Galland, Robin Florent, Scott Desmarais & Jeremie Inhaber

# H'S B 02

PRODUCED BY

Frank Dukes, Jahaan Akil Sweet & Wallis Lane

PUBLISHED BY

Posty Co LLC/UMPG (BMI), Sony/ATV, The Sweet Life, LLC (BMI), Administered by Songs of Kobalt Music Publishing (BMI), Wallis Lane Music/Warner-Tamerlane Publishing Corp (BMI)

WRITTEN BY

Austin Post, Adam Feeney, Jahaan Akil Sweet, Nima Jahanbin, Paimon Jahanbin, Louis Bell & Billy Walsh

RECORDED BY

Louis Bell

RECORDED AT

Electric Feel Studios, West Hollywood, CA

VOCAL PRODUCTION BY

# SAINT-TROPEZ

Cookie Consent

Exhibit H
Page 116
D05EA0005

(BMI), Wallis Lane
Music/Warner-Tamerlane
Publishing Corp.(BMI)
All rights administered
by Warner-Tamerlane
Publishing Corp,
Sony/ATV (ASCAP), Billy
Walsh / WMMW (ASCAP)

West Hollywood, CA

VOCAL PRODUCTION BY

Louis Bell

PROGRAMMING AND ALL
INSTRUMENTS BY

Frank Dukes, Jahaan Akil
Sweet & Wallis Lane

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

MASTERED BY

Mike Bozzi at Bernie
Grundam Mastering, Los
Angeles, CA



## H'S B 03

### ENEMIES

PRODUCED BY

Louis Bell

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
South Coast Music Group
LLC/Baby Jesus
Publishing (ASCAP),
Sony/ATV (ASCAP), Billy
Walsh / WMMW (ASCAP)

PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell

MASTERED BY

Mike Bozzi at Bernie
Grundam Mastering, Los
Angeles, CA

WRITTEN BY

Austin Post, Jonathan
Kirk, Louis Bell & Billy
Walsh

RECORDED BY

Louis Bell

RECORDED AT

Electric Feel Studios,
West Hollywood, CA

VOCAL PRODUCTION BY

Louis Bell

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

DaBaby appears courtesy
of Interscope Records

Cookie Consent

Exhibit H
DEF0000007
Page 117
Page 3 of 14

Grundam Mastering, Los
Angeles, CA

## H'S B 04

**PRODUCED BY**

Louis Bell & Brian Lee

**WRITTEN BY**

Austin Post, Louis Bell,
Brian Lee & Billy Walsh

**PUBLISHED BY**

Posty Co LLC/UMPG (BMI),
Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP), Songs
of Universal, Inc. /
Dong Hoe Music (BMI)
o/b/o Brian D. Lee,
Billy Walsh / WMMW
(ASCAP)

**RECORDED BY**

Louis Bell & Simon
Todkill

**RECORDED AT**

Electric Feel Studios,
West Hollywood, CA &
Miloco The Pool, UK

**VOCAL PRODUCTION BY**

Louis Bell

**PROGRAMMING AND ALL
INSTRUMENTS BY**

Louis Bell & Brian Lee

**MIXED BY**

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

**MASTERED BY**

Mike Bozzi at Bernie
Grundam Mastering, Los
Angeles, CA

## ALLERGIC



## H'S B 05

## A THOUSAND BAD TIMES

**PRODUCED BY**

Louis Bell & Frank Dukes

**WRITTEN BY**

Austin Post, Louis Bell,
Adam Feeney, Billy Walsh
& Kaan Gunesberk

**PUBLISHED BY**

Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP),

**RECORDED BY**

Louis Bell

RECORDED AT

Cookie Consent

**Exhibit H**
**Page 118**
D55000008

Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP),
Sony/ATV, Billy Walsh /
WMMW (ASCAP), Kaan
Gunesberk Publishing

Louis Bell

RECORDED AT

Electric Feel Studios,
West Hollywood, CA

VOCAL PRODUCTION BY

Louis Bell

PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell, Frank Dukes
& Kaan Gunesberk

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Innaber

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

H'S B 06

PRODUCED BY

Post Malone, Louis Bell
& Frank Dukes

WRITTEN BY

Austin Post, Louis Bell,
Adam Feeney, Billy Walsh
& Kaan Gunesberk

CIRCLES

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP),
Sony/ATV, Billy Walsh /
WMMW (ASCAP), Kaan
Gunesberk Publishing

RECORDED BY

Louis Bell

RECORDED AT

Electric Feel Studios,
West Hollywood, CA

VOCAL PRODUCTION BY

Louis Bell

PROGRAMMING AND ALL
INSTRUMENTS BY

Post Malone, Louis Bell,
Frank Dukes & Kaan
Gunesberk

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Innaber

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA



Cookie Consent

Jeremie Inhaber

# H'S B 07

## DIE FOR ME

PRODUCED BY

Andrew Watt, Louis Bell
& Happy Perez

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Irving Music
Inc./Nayvadius Maximus
Music (BMI), 17 Black
Music / Songs of
Universal, Inc. (BMI),
Sony/ATV (ASCAP), Andrew
Watt Music (BMI),
Administered by Songs of
Kobalt Music Publishing
(BMI), Polk St. Music
(BMI) / Songs of
Universal, Inc (BMI),
Billy Walsh / WMMW
(ASCAP)

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

WRITTEN BY

Austin Post, Nayvadius
Wilburn, Ashley
Frangipane, Louis Bell,
Andrew Watt, Happy Perez
& Billy Walsh

RECORDED BY

Louis Bell & Paul
LaMalfa

RECORDED AT

Electric Feel Studios,
West Hollywood, CA, Gold
Tooth Music, Beverly
Hills, CA & SARM
Studios, London, UK

VOCAL PRODUCTION BY

Louis Bell

PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell, Andrew Watt
& Happy Perez

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

Future appears courtesy
of Epic Records, a
Division of Sony Music
Entertainment

Halsey appears courtesy
of Astralwerks

# H'S B 08

## ON THE ROAD

PRODUCED BY

Louis Bell & Nick Mira

WRITTEN BY

Austin Post, Robert

Cookie Consent

## ON THE ROAD

**PRODUCED BY**

Louis Bell & Nick Mira

**WRITTEN BY**

Austin Post, Robert
Williams, Dominique
Jones, Louis Bell, Nick
Mira, Billy Walsh &
Tavoris Hollins, Jr.

**PUBLISHED BY**

Posty Co LLC/UMPG (BMI),
Forever Rich/ Music And
Dreams Publishing/ WB
music Corp (ASCAP), Four
Entertainment Music/Wolf
Pack Global Music
Publishing/Quality
Control QC Pro/Universal
Music Corporation,
Administered by
Universal Music
Corporation (ASCAP),
Sony/ATV (ASCAP), Nick
Mira Publishing /
Electric Feel / Songs of
Universal, Inc. (BMI),
Billy Walsh / WMMW
(ASCAP), Tavoris Hollins
Jr. Publishing Designee
(BMI)

**RECORDED BY**

Louis Bell & Anthony
Cruz

**RECORDED AT**

Electric Feel Studios,
West Hollywood, CA &
Jungle City Studios, New
York, NY

**VOCAL PRODUCTION BY**

Louis Bell

**PROGRAMMING AND ALL
INSTRUMENTS BY**

Louis Bell & Nick Mira

**MIXED BY**

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

**MASTERED BY**

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

Meek Mill appears
courtesy of Maybach
Music Group/Atlantic
Recording Corporation

Lil Baby appears
courtesy of Quality
Control Music and Motown
Records

## H'S B 09

## TAKE WHAT YOU WANT

**PRODUCED BY**

Andrew Watt & Louis Bell

**WRITTEN BY**

Austin Post, John
Osbourne, Jacques
Webster, Louis Bell,
Andrew Watt &
Walsh

Cookie Consent

**Exhibit H
Page 121**

D55000021

Page 7 of 14



Webster, Louis Bell,
Andrew Watt & Billy
Walsh

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Essex Music Int. Inc. /
Onward Music Ltd, Travis
Scott Music/UMPG (BMI),
Sony/ATV (ASCAP), Andrew
Watt Music (BMI),
Administered by Songs of
Kobalt Music Publishing
(BMI), Billy Walsh /
WMMW (ASCAP)

PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell & Andrew Watt

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

RECORDED BY

Louis Bell & Paul
LaMalfa

RECORDED AT

Electric Feel Studios,
West Hollywood, CA, Gold
Tooth Music, Beverly
Hills, CA & SARM
Studios, London, UK

VOCAL PRODUCTION BY

Louis Bell

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

Ozzy Osbourne & Travis
Scott appear courtesy of
Epic Records, a Division
of Sony Music
Entertainments

H'S B 10

I'M GONNA BE

PRODUCED BY

Louis Bell

WRITTEN BY

Austin Post, Louis Bell
& Billy Walsh

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP), Billy
Walsh / WMMW (ASCAP)

RECORDED BY

Louis Bell & Anthony
Cruz

RECORDED AT

Electric Feel Studios,
West Hollywood, CA &
Jungle City Studios, New
York, NY

VOCAL PRODUCTION BY

PROGRAMMING AND ALL
INSTRUMENTS BY



Cookie Consent

VOCAL PRODUCTION BY

Louis Bell

PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA



## H'S B 11

## STARING AT THE SUN

PRODUCED BY

Louis Bell, Frank Dukes
& Matt Tavares

WRITTEN BY

Austin Post, Solàna
Rowe, Louis Bell, Adam
Feeney, Billy Walsh,
Matt Tavares & Seth
Nyquist

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Songs Of Universal, Inc.
(BMI), Sony/ATV (ASCAP),
Sony/ATV, Billy Walsh /
WMMW (ASCAP), Third Side
Music, Seth Nyquist

RECORDED BY

Louis Bell

RECORDED AT

Electric Feel Studios,
West Hollywood, CA &
Jungle City Studios, New
York, NY

VOCAL PRODUCTION BY

Louis Bell

PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell, Frank Dukes
& Matt Tavares

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Deamarais &
Jeremie Inhaber

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

SZA appears courtesy of
Top Dawg
Entertainment/RCA
Records

H'S B 12

Cookie Consent

H'S B 12

## PRODUCED BY

Louis Bell & Carter Lang

## PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Warner Chappell (BMI),
Sony/ATV (ASCAP), Warner
Chappell (BMI), Billy
Walsh / WMMW (ASCAP)

## VOCAL PRODUCTION BY

Louis Bell

## MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaben

## WRITTEN BY

Austin Post, Khalif
Malikibnsham Brown,
Louis Bell, Carter Lang
& Billy Walsh

## RECORDED BY

Louis Bell

## RECORDED AT

Electric Feel Studios,
West Hollywood, CA &
Jungle City Studios, New
York, NY

## PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell & Carter Lang

## MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

Swae Lee appears
courtesy of Ear
Drumma/Interscope
Records

# SUNFLOWER



H'S B 13

# INTERNET

## PRODUCED BY

DJ Dahi, BloodPop® &
Louis Bell

## PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Please Gimme My
Publishing/EMI Blackwood
Music Inc. (BMI), Dahi
Productions/Sony/ATV
(SESAC), Michael Diamond
Music, Kobalt Songs
Music Publishing o/b/o

## WRITTEN BY

Austin Post, Kanye West,
Dacoury Dahi Natche,
Michael Tucker & Louis
Bell

## RECORDED BY

Louis Bell

## RECORDED AT

Electric Feel Studios,
West Hollywood, CA &
Jungle City S...
York, NY

Cookie Consent

[SESAC], Michael Diamond
Music, Kobalt Songs
Music Publishing o/b/o
OWSLA TRAX, These Are
Songs of Pulse [ASCAP],
Sony/ATV [ASCAP]

PROGRAMMING AND ALL
INSTRUMENTS BY

DJ Dahi, BloodPop™ &
Louis Bell

Jungle City Studios, New
York, NY

VOCAL PRODUCTION BY

Louis Bell

BACKGROUND VOCALS BY

BloodPop™

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

## H'S B 14

## GOODBYES

PRODUCED BY

Brian Lee & Louis Bell

WRITTEN BY

Austin Post, Jeffery
Williams, Brian Lee,
Louis Bell, Billy Walsh,
Val Blavatnik & Jessie
Lauryn Foutz

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Songs of YSL Music
Publishing (BMI), Songs
of Universal, Inc. /
Dong Hoe Music (BMI)
o/b/o Brian D. Lee,
Sony/ATV (ASCAP), Billy
Walsh / WMMW (ASCAP),
Val Blavatnik Pub
Designee (BMI) and
Warner-Tamerlane
Publishing Corp. (BMI),
Jessie Launyn Foutz
(BMI)

RECORDED BY

Louis Bell, A. Bainz &
Shaan Singh

RECORDED AT

Electric Feel Studios,
Hollywood, CA & Crosby
Recording Studio,
Burbank, CA

VOCAL PRODUCTION BY

Louis Bell

PROGRAMMING AND ALL
INSTRUMENTS BY

Brian Lee & Louis Bell





Brian Lee & Louis Bell

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

Young Thug appears
courtesy of 300 /
Atlantic Recording
Corporation

## H'S B 15

### MYSELF

PRODUCED BY

Louis Bell, Frank Dukes
& Emile Haynie

PUBLISHED BY

Posty Co LLC/UMPG (BMI),
Total Entertainment
Forever/Universal Music
Corporation (ASCAP),
Sony/ATV (ASCAP),
Sony/ATV, Heavycrate
Music (ASCAP) /
Universal Publishing
(ASCAP)

PROGRAMMING AND ALL
INSTRUMENTS BY

Louis Bell, Frank Dukes
& Emile Haynie

MASTERED BY

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

WRITTEN BY

Austin Post, Joshua
Tillman, Louis Bell,
Adam Feeney & Emile
Haynie

RECORDED BY

Louis Bell & Dave
Rowland

RECORDED AT

Electric Feel Studios,
West Hollywood, CA &
Germano Studios, New
York, NY

VOCAL PRODUCTION BY

Louis Bell

MIXED BY

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

H'S

Cookie Consent

## H'S B 16

**PRODUCED BY**

Louis Bell

**PUBLISHED BY**

Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP), Billy
Walsh / WMMW (ASCAP)

**VOCAL PRODUCTION BY**

Louis Bell

**MIXED BY**

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

**WRITTEN BY**

Austin Post, Louis Bell
& Billy Walsh

**RECORDED BY**

Louis Bell

**RECORDED AT**

Electric Feel Studios,
West Hollywood, CA

**PROGRAMMING AND ALL
INSTRUMENTS BY**

Louis Bell

**MASTERED BY**

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA



I KNOW

## H'S B 17

WOW

**PRODUCED BY**

Louis Bell & Frank Dukes

**PUBLISHED BY**

Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP),
Sony/ATV, Billy Walsh /
WMMW (ASCAP)

**VOCAL PRODUCTION BY**

Louis Bell

**PROGRAMMING AND ALL
INSTRUMENTS BY**

**WRITTEN BY**

Austin Post, Louis Bell,
Adam Feeney & Billy
Walsh

**RECORDED BY**

Louis Bell

**RECORDED AT**

Electric Feel Studios,
West Hollywood, CA

**BACKGROUND VOCALS**

Anthoine Walters

**MIXED BY**

Cookie Consent

**Exhibit H**
DEF000019



**MIXED BY**

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

**MASTERED BY**

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA

# H'S B 17

## WOW

**PRODUCED BY**

Louis Bell & Frank Dukes

**WRITTEN BY**

Austin Post, Louis Bell,
Adam Feeney & Billy
Walsh

**PUBLISHED BY**

Posty Co LLC/UMPG (BMI),
Sony/ATV (ASCAP),
Sony/ATV, Billy Walsh /
WMMW (ASCAP)

**RECORDED BY**

Louis Bell

**RECORDED AT**

Electric Feel Studios,
West Hollywood, CA

**VOCAL PRODUCTION BY**

Louis Bell

**PROGRAMMING AND ALL
INSTRUMENTS BY**

Louis Bell & Frank Dukes

**BACKGROUND VOCALS**

Anthoine Walters

**MIXED BY**

Manny Marroquin at
Larrabee Studios
(Universal City, CA),
assisted by Chris
Galland, Robin Florent,
Scott Desmarais &
Jeremie Inhaber

**MASTERED BY**

Mike Bozzi at Bernie
Grundman Mastering, Los
Angeles, CA



COPYRIGHT REPUBLIC RECORDS   PRIVACY POLICY   TERMS & CONDITIONS   DO NOT SELL MY PERSONAL INFORMATION

Cookie Consent