ALLISON S. HART (BAR NO. 190409)
*ahart@lavelysinger.com*
KELSEY J. LEEKER (BAR NO. 313437)
*kleeker@lavelysinger.com*
LAVELY & SINGER
PROFESSIONAL CORPORATION
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone:  (310) 556-3501
Facsimile:  (310) 556-3615

Attorneys for Plaintiff/Consolidated Defendant
TYLER ARMES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| TYLER ARMES,<br><br>                    Plaintiff,<br><br>        v.<br><br>AUSTIN RICHARD POST, publicly known as POST MALONE, an individual; ADAM KING FEENEY, publicly known as FRANK DUKES, an individual; UNIVERSAL MUSIC GROUP, INC., a Delaware corporation; DOES 1 through 10, inclusive,<br><br>                    Defendants. | CASE NO. 2:20-cv-03212-ODW(SKx)<br>*Consolidated with 2:20-cv-10205*<br><br>[Hon. Otis D. Wright, II – Crtrm 5D]<br><br>**DECLARATION OF ALLISON S. HART IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        April 4, 2022<br>Time:        1:30 p.m.<br>Ctrm:        5D (First Street Courthouse)<br><br>Filed:        April 7, 2020<br>Trial:        May 17, 2022 |

1

DECLARATION OF ALLISON S. HART IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>DECLARATION OF ALLISON S. HART</u>

I, Allison S. Hart, declare:

1. I am an attorney-at-law, duly admitted to practice law in the State of California and before this Court. I am a member of Lavely & Singer Professional Corporation, counsel of record for Plaintiff/Consolidated Defendant Tyler Armes ("Plaintiff"), and I am lead trial counsel for Plaintiff in this action. I have personal knowledge of the following facts, and, if called as a witness, could and would competently testify thereto.

2. Attached hereto as Exhibit 1 are true and correct copies of excerpts from the transcript of the deposition of Mr. Armes taken in this action on February 2, 2022.

3. Attached hereto as Exhibit 2 are true and correct copies of the Errata Pages to the transcript of the deposition of Mr. Armes, correcting errors in the transcript to his deposition taken on February 2, 2022.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 14th day of March, 2022, at Los Angeles, California.

_____
ALLISON S. HART

# EXHIBIT 1

Confidential

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TYLER ARMES,                    )
                                )
          Plaintiff,            ) CASE NO.
                                ) 2:20-cv-03212-
                                ) ODW(SKx)
vs.                             )
                                ) CONSOLIDATED WITH:
                                ) 2:20-cv-10205
AUSTIN RICHARD POST,            )
publicly known as POST          )
MALONE, an individual,          )
et al.,                         )
                                )
          Defendants.           )
_____ )

**CONFIDENTIAL PROCEEDING**

REMOTE DEPOSITION OF TYLER ARMES

WEDNESDAY, FEBRUARY 2, 2022

9:57 A.M.

REPORTED BY:  KATHERINE FERGUSON, CSR NO. 12332

JOB NO. 205992

Confidential

Page 2

February 2, 2022

9:57 a.m.

Deposition of TYLER ARMES, held remotely, before Katherine Ferguson, Certified Shorthand Reporter.

Confidential

Page 3

APPEARANCES:


  FOR PLAINTIFF:

      LAVELY & SINGER

      BY:  ALLISON HART, ESQ.

           2049 Century Park East

           Los Angeles, CA 90067



  FOR DEFENDANT:

      MITCHELL SILBERBERG & KNUPP LLP

      BY:  CHRISTINE LEPERA, ESQ.

           437 Madison Avenue

           New York, NY 10022


  ALSO PRESENT:

      Gabriella Ismaj - MSK

      Brent Jordan - Videographer

Confidential

Page 22

Q    Did they ultimately get utilized in the training process?

A    That's correct.

Q    How long were you training on the upright bass?

A    Maybe a few months.

Q    One teacher?  Multiple teachers?

A    One teacher in that training, yeah.  I think I came to the conclusion that the genre of music I was writing and producing, that it didn't really have a home.  And at one point I certainly was more interested in jazz music, and as I got older into my late teens it was much more pop music focused, rock focussed, hip-hop focussed, so I felt like it wasn't time ultimately.

Q    Okay.  So would you say it's fair to say that your primary instrument starting in your late teens to present is the electric bass?

A    Yep.  Yes, it is.

Q    And you mentioned the band, I think you mentioned Motown, but you didn't mention the name of the band.

A    The band is called Down With Webster.

Q    And when was that formed?

A    That was formed May 1998 for my grade A

Confidential

Page 23

talent show.

Q   And how long did -- it's continuing to date, correct?

A   We don't tour anymore.  We put out our last record through Universal I believe a year and a half ago or two years ago.  I think we have five albums out in total through Universal.  And that band was signed April 16th, 2009 and toured through 2016 roughly.

Q   So would you say it is no longer in operation?

A   Yes, correct.

Q   Okay.

A   It's no longer in operation.

Q   As of 2016-ish?

A   Yep.  Correct.

Q   And was your role in that band bass playing?

A   In that band my role was bass, keyboards, producer, songwriter, bandleader and I did, like, all the show running, like running all the different equipment for the show, which is part of bandleader, musical director.

Q   So there was no separate keyboard player, you played both?

Confidential

Page 26

couldn't.  I don't claim to be able to read music the kind of way you have to do to be a gigging musician or a jazz musician.

Q   Okay.  So depending on the complexity of the --

A   Depending on the complexity, yes, correct.

Q   All right.  And you mentioned that you're a producer -- let me ask you about -- so Down With Webster, no pun intended, was down as of 2016 and you started and worked in another band; is that right?

A   Yeah, me and the core members from Down With Webster started a new band called Honors, H-O-N-O-R-S.

Q   Okay.  And that was about the same time?

A   So that would have been -- it was like a transition between the two, so I would say that some of the beginning music for Honors would have started to have been written probably 2016, 2017, to the best of my knowledge.

Q   Is that band still active?

A   That band decided to call it a day and stopped touring on a phone call that I had with them, and let's make sure I get my date right here --

Q   Approximation is fine.

A   Approximation is fine.  It would have been

Confidential

Page 27

very early 2019 after a grueling tour that we were on.  We got on the phone and said let's take a break from this.

Q   Pre COVID?

A   Pre COVID.  Certainly pre COVID.  Early 2019.

Q   Okay.  So since then, what have you been occupied in --

Let me ask you this:  Do you have any other profession or have you had any other profession or occupation in your adult life other than as a musician?

A   No.  Everything I've done is in music.

Q   That's how you've made your living?

A   Certainly, yeah.

Q   Okay.  And your brother, Ryan Armes, who you said was your manager, has he been your manager throughout your adult life up to the point in time you signed, not an official written agreement yet, with Mr. Litwin?

A   Kind of a two-part question.  Can you try again?

Q   Has he been your manager, your brother, Ryan Armes --

A   My brother quit the job --

Confidential

Page 35

whether it's a tour, whether it's a record, whether it's one other person, frankly a solo career, have you had any other call them primary music professional gigs during the period of time up through Honors disbanding?

A    No.

Q    Okay.  And in connection with Down With Webster and with Honors, you were songwriter; is that right?

A    Songwriter, producer, bandleader.

Q    Okay.  And did that include lyrics?

A    All the time.

Q    Okay.  So lyrics and music both?

A    Yes.

Q    Okay.  And was this in collaboration with the other band members or were you primary?

A    Sorry, your mic cut out when you leaned over there.

Q    Sure.

So were you primary songwriter/producer on the bands', both Down With Webster and Honors, music or was it a joint effort with the others in the band?

A    Does primary mean only?

Q    No, it means principal.

A    My guess if we were to look through the

Confidential

publishing catalog of both bands that I would be the majority writer on the catalog, but it was certainly a collaborative process in both bands, not a one-man show.

Q   Right.

And did you enter into agreements or what's called split agreements with the other band members to have a share of revenue in connection with those songs?

A   Absolutely, yeah.  A lot of the songs, at different parts in our career, we had different processes for how we would split things.  Certain times they were done evenly and other times they were done based on involvement when we were much younger.  It really changed as we got older.  We had, you know, publishing offers but never signed one.

Q   So the split agreements on all these various compositions for both of the bands were varying; is that fair?

A   The split agreements at different times of my life were varying, sure.

Q   Okay.  Even though you were the majority for essentially most of them, majority songwriter?

A   Yes.  Yeah.

Q   Okay.  And ultimately were these

Confidential

Page 50

some of the language it says keyboard and guitar and then some of the paragraphs it said keyboard.  It's keyboard and guitar.

Q   Let's start with the first phrase.  "Armes and Dukes co-wrote the chords."

And now you're saying on the keyboard it should be slash guitar?

A   Because sometimes when we were looking at the chords it was on the guitar as the instrument of reference and sometimes it was in front of a keyboard.

Q   Okay.  So now in the studio, and we'll get into more specifics, as I said, the chronology and the timeframe.

In the studio, what instruments did you ever have in your hand?

A   Did I?

Q   Correct.

A   A bass.

Q   Yes.

A   A keyboard.

Q   And how many -- was there only one bass that you used?

A   Yes.

Q   Was it yours?

Confidential

Page 53

Q   Okay.  And so when you're standing next to each other -- and I want to understand the difference between your addition of the word "guitar," the "keyboard/guitar," right -- yeah, right, you say that you co-wrote the chords on the keyboard/guitar.

So what came first?

A   My -- my addition was on a keyboard.  Frank was playing both.  Like I said, I only played keyboard and a bass.  I never played the guitar.  But Frank was using both instruments as vehicles for him to write.

Q   At the same time?

A   No, certainly not.

Q   Okay.  So what was the chronology of how -- when you say "chords," you mean chords for the intro, the entire song, and I'm not talking about what ultimately became released; what chords are you talking about?

A   The same loop that basically makes up the entirety of the whole song.

Q   As in the commercial release?

A   Yeah.

Q   Okay.  So those chords that you say ultimately are in the release of Circles --

A   To the best of my recollection, to answer

Confidential

Page 56

And what is the next chord after the 4?

A    After the 4?

Q    Yeah.

A    Well, the progression changes a couple of different times.

Q    Very first iteration of any progression, chord progression, what's the chord after --

A    Oh, the 5 chord.  I didn't know I was getting a music theory test right now.  I didn't understand the context of your question.

Q    No problem.  It's all about music theory, isn't it?

A    Yeah, the best place to go from 5 is 1.

Q    And how common is a 1-4-5 progression?

A    Extremely.

Q    Thank you.  Okay.

And this -- now, the next part of the keyboard coming in on the creation of chords, in your paragraph 16, you're both standing over the keyboard together with the chords precisely?

A    I mean, the process of creating a chord progression involves adding new chords, deleting chords, trying things a different way, moving things around a little bit.  Specifically, my involvement at the keyboards was making the F major into an F minor

Confidential

Page 57

in the way that it turned around.

Q    Okay.

A    Because it had a Beetles tonality to it.  I love the Beetles.  It's something that I like to do. And when I listened to the 1-4 originally, it reminded me of Imagine because of the suspended chord that was being played.  So it already had something that was Beetlesesque to me.

Q    So is it your testimony it's an F minor?

A    It's an F major and then -- it's an F major and then it goes to the F minor.

Q    When?

A    I'd have to look at some sheet music and listen to the song to tell you exactly when.  I don't have that in front of me at the moment.

Q    What sheet music would you have to look at?

A    Whoever wrote sheet music for the song.

Q    How do you know it's accurate?  Who wrote sheet music for the song?  I'm asking you.  You wrote it.

A    So what are you asking me?

Q    Where is the F minor?

A    Are you asking me in terms of --

MS. HART:  Asked and answered.

BY MS. LEPERA:

Page 59

exactly the same.

Q    But you don't know whether the F minor chord did?

A    The F minor chord is certainly in the demo that I have on my nine-minute voice note and it's certainly in the final recording as well.

Q    But you can't tell me where?

A    At the end of certain measures.

Q    There's obviously an intro, there's verses, there's choruses.

A    I'll have to pull the song up and I'll happily point it out to you when it happens.

Q    But sitting here you can't remember?

A    No.

Q    Okay.  So just so I'm clear, the chords we talked about relative to the first paragraph -- first sentence in paragraph 16 is a 1 and a 4 and a 5 --

A    Uh-huh.

Q    -- a passing B flat and then you say --

A    A B, not a B flat.

Q    A B.

     You didn't say B flat?

A    No.

Q    B.  Okay.

     Major or minor?

Confidential

Page 63

correct?

A    Correct.

Q    Now let's focus on the actual bassline. And I understand what you're saying.  You're saying that there's a, let's call it a secondary --

A    Dun dun dun dun dun dun dun dun dun, yes.

Q    Call that the secondary bassline.

What are you -- what are you calling bassline in paragraph 16?

A    The same loop that plays throughout the entire song that's not that secondary bassline.

Q    Okay.  And can you tell me, sitting here today, what those pitches are?

A    Sure.  It would be a lot easier if I had a bass in front of me, but sure, I could.

Q    Okay.  And when I say pitches, I mean the actual --

A    B, C, D, C, B, C, B, C, B, C, F, F, F, F, F, F, F, G, G.  And that was in key.  You're welcome.

Q    I actually was talking, so I think we stepped over each other which I would ask us not to do.

A    Sorry.  Sure thing.

Q    Sure.  Go ahead.

A    Um, C, C, D, C, B, B, B, D, C, F, F, F, F,

Confidential

Page 64

F, F, F, G, G.  I think I got one eighth note wrong because I'm air jazzing it for you, but that's the gist of it.  If you gave me a bass guitar in my hand, I could certainly do it more accurately.

Q   Okay.  Well, the court reporter has the notes down.

MS. LEPERA:  So did you got them down, Ms. Ferguson?

THE REPORTER:  I got them.

BY MS. LEPERA:

Q   Now, that was written on a bass?

A   Correct.

Q   Whose bass?

A   The bass that was in the studio.  Don't know whose bass it is.

Q   Okay.  And there was only one bass?

A   Can't confirm.

Q   Was anybody playing -- were people playing -- were two bases being played at the same time at any point?

A   No, not that I'm aware of.

Q   Okay.  And with respect to the final sound recording of Circles as released, who is playing the bass?

A   Well, I can't confirm that because I wasn't

Confidential

Page 73

Frank could do with his hands on the effects chains,
but no, I was not touching Frank's computer.

Q   Right.

And the bass part that ultimately you gave
me the pitches, and I'm not going to ask you to do
the rhythms, maybe you did it in the rhythm or not,
but the bass part that ultimately ended and landed in
the commercial release of Circles you say here you
co-wrote and had significant input into; is that
right?

A   Yes.

Q   Okay.  Now, there's one bass instrument in
the room, right?

A   Uh-huh.

Q   Okay.  And --

A   I'm the first person playing the bass that
night.

Q   You're the first person playing the bass
that night?

A   Certainly.

Q   I want to back up into the sequencing a
little bit now of structure, right.

What comes first, chords, bassline --

A   In this instance, bassline and drums.

Q   Bassline and drums.

Confidential

Page 74

So the chords, the first phrase in 16 here about co-writing the chords hadn't even happened yet?

A    No.  What you've chosen to do here is to jump into this halfway through by citing paragraphs. We haven't started from the beginning here technically speaking, right?

Q    Well, the only thing I skipped is paragraph 15.  In this particular document, I have not -- if you want to read through it, we can look at 1 through 14.  None of it talks about the music creation.  I didn't skip anything.

A    No, I'm not saying you skipped things in this document.  I'm just talking about, you know --

Q    All right.  That's fair.

A    -- the process of that night.

Q    Tell me in a narrative, and I know you've got ultimately here, in paragraph 15, from 2 a.m. to 9 a.m., the general statement about working together, Armes on bass, Post on drums and Dukes playing guitar and keyboards, if you want to give me a narrative of the sequencing, that's fine, if your counsel's okay with that, tell me in your own words.

A    I prefer to answer questions.

Q    Okay.  Well, I don't want to do it in a choppy fashion if it doesn't work for you.  So what

Confidential

Page 75

I'm trying to understand is you say the bassline came before the chords.  So let's at least --

A    Yes, but you're speaking in very fine terminology which, you know, anyone who writes songs knows when you say "the bassline," "the chords," these things aren't final the moment they're brought into session.  They're played with, they're molded, they come -- they're revisited 30 minutes later, they're revisited 90 minutes later and changed.  It's a work in progress and much of what's done is verbal.  It's talking about things using English and sometimes using melody which I'm sure you know because this is your job.

Q    So all I'm asking you, the best you can recollect, what was the process of the formation, in your words, of the song in terms of where did it start; did it start with absolutely nothing having to do with the song at all and you all were just playing around?

A    Yeah, there was a whole bunch of playing around.

Q    All right.  Let's skip that because it has nothing to do with the ultimate --

A    But it does have something to do with it. It has a lot to do with it, Christine.  Let me tell

Confidential

Page 76

you, from being a music producer and understanding Frank's language and what Frank does, it's apples and oranges to start a session from the conception of three guys jamming like a rock band versus Frank pulling up files he's prepared for Post that are already beats that are done.  It's very different.

So my inclusion in this jam session is entirely important for how we get to start Circles, because without me there we revert back to him playing beats that he had made previously which is how he usually works with Post.  I'm the live musician who plays in bands, so we made a band track together by jamming as a band.

Q  I don't mean to interrupt you and I don't mean to get into a debate with you which is entirely not appropriate.

A  Fair enough.

Q  There's a very big difference, and your lawyer will tell you, between jamming and a copyright ownership with something that's fixed and a tangible meaning of expression.  I don't want to get into the debate with you.  It's not my place.

A  I will save that for trial.

Q  There's a very significant legal difference.  At the end of the day, I'm just trying

Confidential

Page 77

to understand, all I meant by your playing ultimately when you get to the point where you're talking about the stuff in 16, that's what I want to know what comes first.  The chords we talked about earlier, the actual efforts at a bassline for Circles, and then we'll get to the guitar part.

So a minute ago, correct me if I'm wrong, you said bass efforts came first before the chords.

A   When we were jamming initially over the drum groove, that is, the groove of Circles, yes, it was bass and drums first.

Q   Okay.  And so in your sense of it, there's -- there's no chord structure to that bass part?

A   The only chord structure is that of what's been playing on the bass.  There's no guitar chord structure, no.

Q   Got it.  We're on the same page.  Now, let's get back to that bass part.  Do you have any --

Let me ask you this:  You tape or recorded on your iPhone at the end of the night --

A   Yeah.

Q   -- right?

A   Correct.

Q   You guys were talking --

BY MS. LEPERA:

Q   There's no context in it.

Were you in charge of putting files in that mix or not?

MS. HART:  Objection, vague and ambiguous, it assumes that there was one person in charge.

MS. LEPERA:  I'm asking him whether he was in charge.

THE WITNESS:  It was a collaboration.

BY MS. LEPERA:

Q   The question is:  When that mix was created, did you use your fingers on that laptop to create that mix?

A   That's a different question, Christine.

Q   Well, that's what in charge means.

A   No, it doesn't.

Q   Well, unless you're telling him push that button.  Let's go back to the question.

Did you touch the laptop with any of the files to say which files go in that mixes -- in that mix you recorded?

MS. HART:  Objection, compound, vague and ambiguous.  Touching a laptop is a different --

MS. LEPERA:  Don't give a speaking objection and tell him what to think about the

Confidential

Page 84

A    You weren't there.

Q    You don't understand.  She'll have to explain it to you at some point, if she chooses.

MS. HART:  Just ask a question.

BY MS. LEPERA:

Q    So the bottom line is that you did not instruct Mr. Dukes to include any particular digital file, and I'll call it the mix of that evening that you taped?

MS. HART:  Asked and answered.

THE WITNESS:  If I heard a take that I thought was the best take that I liked, I'm sure I vocalized that to Mr. Dukes because we were collaborating together.

BY MS. LEPERA:

Q    Different.

Can I have an answer to my question?

MS. HART:  He has answered your question.

THE WITNESS:  I don't see how it's different.  I'm sorry.

BY MS. LEPERA:

Q    Very different.  I'm not asking you whether you didn't hear something you might have told him.

I'm asking you, did you instruct Mr. Dukes to include any digital file in that mix?

Confidential

Page 93

you an example and you can tell me if I'm right; does that work for you?

BY MS. LEPERA:

Q   No.  It's a very simple question.

A   Well, apparently it's not.

Q   Do you know what instruction means?  I'm telling you to do this.  That's an instruction.

A   Yes, I recall --

Q   Let me --

A   -- during in the session where they were --

MS. HART:  Let him answer the question, Christine.

BY MS. LEPERA:

Q   I don't want to go through the moment of the session.  We're talking about what's ending up in your playback on your phone, any of those files that exist in that, did you instruct him to put any of those files --

A   Yes, technically, sure.  Yes.

Q   Which ones?

A   I mean, certainly the intro guitar part, the tape that made it in that phone recording of mine, I definitely told him that that's the one I liked the most, so that's me instructing him to put it in.

Confidential

Page 97

what he wrote or what was embodied in the --

MS. LEPERA:  Don't coach.

MS. HART:  I'm not coaching.  It's a vague question.

MS. LEPERA:  I didn't ask play, wrote, I didn't ask what was in the recording.  Don't coach him.  I said what he played.  Really simple, what did he play.

MS. HART:  What did he play when?  Vague and ambiguous as to time.

MS. LEPERA:  That night obviously.

THE WITNESS:  Well, there's a lot of stuff we played that night.  We played a lot of music that night.

BY MS. LEPERA:

Q   No, no.  I'm following up on your question, Mr. Armes.

A   What's that?

Q   You said you played parts of the bassline.

A   Certainly.

Q   Which parts?

A   Very big implications on the rhythmic version that still is on the master recording today.  I'll happily display them on a bass when I have to.

Q   No, no.  No, no, no.  You're going to, if

Confidential

Page 98

you can, just as you were able to give me the pitches on the actual bass part, I want you to give me the pitches of the one you played.

A    It's rhythmic stuff that I would start with first and foremost.

Q    Well, you have to have a note.

A    Of course there's a note.

Q    What's the note?

A    C to F.

Q    What else?

A    C, C -- so it's basically C, F to G was my original bassline.  It was a 1-4-5.

Q    A 1-4-5 playing the root note of that chord; is that what you did?

A    What do you mean playing the root note? The root notes are the root notes of the 1, 4 and 5. The root note is C, and then there would be F, and then it would be G.

Q    Right.

A    The sequence of what that bassline sounds like, if you give me a bass, I'll happily show you.

Q    I don't need it anymore.  Thank you.

A    Well, you do because I haven't sung you the part yet.

Q    Pardon me?

Confidential

Page 99

A    You do need me to show you on a bass because I haven't sung you my bass part yet.

Q    What you've told me that what you played on the bass --

A    Yes.

Q    -- B note?

A    The C -- yeah, the bassline -- the original bassline that I was playing with Post contains the note C, F and G.

Q    Correct.

A    Correct.

Q    Right.

And no other notes?

A    Not that I can recall in terms of the ones that I'm talking about, no.  To show you the rhythm of it, I would need to have an instrument in my hand to do that.

Q    Well, guess what.  Maybe we can do something easier.

MS. LEPERA:  Let's pull up as Armes -- we have to go back to this document in the interrogatories.  Gabby, let's pull up Ferrara's expert report.

MS. ISMAJ:  One second.

(Exhibit 2 was marked for identification.)

Confidential

Page 104

Q    And you played those notes.  But we don't have your performance in any --

A    There were so many notes played throughout the night, Christine, because we're playing a lot of parts over the course of a lot of hours.  But those were the key changes, yes, that I was playing.

Q    1-4-5?

A    Uh-huh.

Q    Let me ask you to be clear for the record.

You had your iPhone, you obviously recorded this thing at the end.

A    Yeah.

Q    Did you record yourself playing any bass part?

A    No.

Q    Do you have any other source of a recording of demonstrating what you performed on the bass at any point during this night?

A    We've given you all of the recordings that we have.  You have them.

Q    You gave me one.

A    That's it.  That's the recording that --

Q    That's not what I'm asking.  You're not on that.

I'm asking you whether you have any

Confidential

Page 108

that you "co-wrote and had significant input in the bassline," right, I asked you if there was a distinction between co-writing and having significant input.  You told me, correct me if I'm wrong, that there was no difference in this in that when you use "significant input" it meant "co-write."

A   Well, this says "input," not significant input.  So this is different.

Q   Okay.  So there we go.  So now you're saying --

A   You're taking the word "significant" out of it.

Q   Out.  Okay.

So when you say you had input in the guitar parts in the song, you did not co-write them?

A   No, I did co-write them.

Q   Okay.

A   I did co-write them.

Q   All of them?

A   The one that we're talking about in this paragraph is a specific guitar part.

Q   No, it says "including."

A   No.  Where?

Q   After the word "song," comma.

A   Well, the guitar parts include some of the

Confidential

Page 109

chord changes that I was involved in like the F major to F minor chord.  So technically speaking, yes, the answer is yes.

Q   The answer is yes what?  You wrote all the guitar parts?

A   Well, it's just your language "wrote all the guitar parts" --

Q   All right.  Co-wrote.

A   Co-wrote, yes.  That works much better.

Q   Okay.

A   There's only two guitar parts going on in the song.  There's one playing the chord progression and there's one playing this little melody that Post sings along that gets repeated a few times.

Q   Got it.

A   I had input on both of those and co-wrote both of those.

Q   So everything we talked about earlier today about the chord progressions is all you're talking about, right, for the guitar parts?

A   Well, we're about to talk about the second guitar part right now.

Q   I know that.  Other than that.

A   There's no other guitar parts to talk about.

Confidential

Page 114

want.

A    That's how I wrote it by singing it to Post sitting beside him in a chair.

Q    You wrote it singing it?

A    Yeah.

Q    What -- you don't have any phone recording or any documentation or file, digital file that shows you singing it, right?

MS. HART:  Asked and answered.

THE WITNESS:  No.

BY MS. LEPERA:

Q    Thank you.  Okay.

So can you tell me without singing it what the actual notes are at least, or no?

A    Yeah, if I had a piano in front of me, for sure.  I don't claim to have perfect pitch, so I can't just automatically visually see a staff in my head and know what the right pitch is.

Q    There's nothing wrong with saying you can't do it.

A    So why can't we play the recording then?

Q    How about this, can you tell me how many notes it is?

A    Yeah, for sure.

Q    How many?

Confidential

Page 115

A    Post wrote the initial melody of the intro melody, 1, 2, 3, 4.  He wrote the four notes and then on the second time around, the phrase, when it extends, is what I sang to him to play.

Q    The end of play?

A    So the line repeats twice.  Can we play it?

Q    I'm just -- say what you said again.  I just didn't hear you.

A    So the four notes that Post wrote on the guitar was a very reverb of guitar, ba ba ba da, da da da da, right, those four notes, all of the notes that precede that in the melody rhythmically and melodically is what I sang to him.  Da da da da, da da, da da, da da, da da.  Those notes.

Q    Okay.  Hold on.  I want to look at something.  Just one more second.  We'll probably play it.

Just so I'm clear, though, there's a lead guitar and a rhythm guitar, right?

A    Yeah, the rhythm guitar is playing the chords, the lead's playing this melody that he ended up doubling with his voice and became like a hook of the song.

Q    Are you saying the lead guitar is the one you're contributing to?

A    It's the only guitar melody in the song. That's the one.

Q    But you said there was something that came before it.

A    No.

Q    No, in the -- okay.  Let's do this.  Let's take out -- let's play -- I guess we can play from Ferrara's report, we can play Track 1.  I think it's on there.  Otherwise we can get the actual --

MS. ISMAJ:  I have it.

(Exhibit 6 was marked for identification.)

MS. LEPERA:  Maybe it's not.  No, I don't think it is.  It may not be there.

THE WITNESS:  It's the counter melody to the guitar chords heard in the intro.

BY MS. LEPERA:

Q    I know what it is.

A    I know you must know what it is.

Q    I know exactly what it is.  What I'm trying to ascertain is, you said a minute ago, which is you doing something at the end and him doing something.

A    It's this melodic state --

MS. HART:  I think you misheard his testimony.  He didn't say at the end.  I think he said in the song.  You should have the court reporter

Confidential

Page 118

(Whereupon, Audio Track 1 was played.)

MS. LEPERA:  Okay, stop.

BY MS. LEPERA:

Q    Underneath his four notes --

A    It's not underneath it.  It's one continuous part.  It's all using guitar bends and slides.  It's not a layer.

Q    Spontaneously played.  How's that?

A    It's one guitar part.

MS. LEPERA:  Go back.

MS. ISMAJ:  Play it again?

MS. LEPERA:  Please.

(Whereupon, Audio Track 1 was played.)

BY MS. LEPERA:

Q    So it comes a little bit after.  I hear you.  I understand what you're saying.

And Post is playing that, right?

A    Correct.

Q    You you're saying you told him to play that or suggested to play it?

A    I sang the melody to him on how to include and resolve the melody nicely and he did it exactly as I sang it and there it is on the master recording, yes.

Q    Okie-dokie.  So it's not those four notes

Confidential

Page 151

same way all the other 50 concerts I went to that year. Couldn't tell you. Post put on a show, did a good show, but --

Q Conversations that you had prior to that night with Dre London, can you remember any?

A I can remember lots.

Q Okay. How many times did you meet with him in person prior to that night, if any?

A No. Multiple. I mean, in terms of a coordinated meeting with just myself and Dre or myself, Dre and my manager in terms of business, at least two. But I -- Dre is someone who runs in concentric circles with me -- well, used to socially, so I would see Dre at certain music events or certain places and always extremely friendly.

Q Okay. And can you -- what were the two meetings about, if you remember?

A Dre wanted to comanage me/my band Honors with my brother Ryan. He was really interested in the band.

Q Okay. And that was the content of the meeting?

A Yeah, the content of the meeting was, you know, listening to the music, Dre getting very excited about the music, Dre making plans for what he

Confidential

Page 152

thought the future could hold for the band, for the band potentially being on tour with Post, being Post's opening band, being Post's backing band.  It was probably an hour meeting at his house, his old house.

Q    Is that the same -- is that the same substance for both meetings, sum and substance?

A    As far as I can remember, yes.

Q    And obviously neither of those things transpired, right?

A    Either of what things transpired?

Q    Him managing the band or --

A    He did help in some ways.  I remember after those meetings he was working alongside my brother to provide some services, whether it was, like, introducing them to certain marketing companies or YouTube promos or, like, giving him what he called like his secret weapon who was somebody who was really good at doing advertisements for single releases, but there was never anything that developed in terms of a working agreement or moving forward on the basis of let's do business together.

Q    In other words, you never paid him for anything?

A    Correct.

Confidential

Page 156

conversations pertaining to working with my band.

Q    Business.  Right.

Anything business related in the music industry between you and him?

A    Uh-huh.

Q    Now let's talk about what happened that day before you go to the studio, to the best of your recollection.

What transpired?

A    Okay.  Do you want to -- can you be more specific?

Q    Well, yeah.  I mean, how did it come about, how did it come about that you met, how did it come about that you engaged in communication that evening, and then we'll discuss what the communication was.

A    Sure.  That night, Dre told me to meet him at the back door of the nightclub.

Q    Nightclub meaning?

A    The venue where Black Label Society was playing, the band.

Q    Yes.

A    So Dre got me in the back door.

Q    Back stage?

A    Back stage.  Actually, we watched the show side stage.  The VIP at that venue is on the left

Confidential

Page 157

wing of the stage, so Dre had a little private section. We watched the concert. I wasn't familiar with the band, but it was a good concert, a lot of loud guitars. And Post was certainly having a great time because I think it might be his favorite band. I recall him saying that to people and he had a huge smile on his face the whole time. But what next?

Q   Okay. So you show?

A   Uh-huh.

Q   Stayed until the end of the show?

A   We had to wait a long time after the show because Post was very excited to meet the band mates. So all of us went back stage to the Green Room where the guys in the band were. I believe that one of them gave Post like a tunic. They wore tunics on stage, like kilts. I think I remember seeing that.

Q   Okay.

A   It was just before that that Dre, for the first time, would have said to me, like, Hey man, like hang around, we're going to go back to the studio after, we're going to go to Frank's, I want to finally get you hooked up with him. Let's go.

Q   Okay. So in this Green Room, et cetera, Mr. Dukes is nowhere around, right?

A   No. I didn't know Mr. Dukes was there

Confidential

Page 164

BY MS. LEPERA:

Q    Songwriting.

A    The first time that I had a conversation with Post was when Dre said to Post, Hey, we're going to go make some music tonight.

Q    Let me ask you that since I've asked you every conversation you've had with Mr. Malone up until this moment before the studio.

A    Yeah.

Q    When was that?

A    That was in the Green Room with me, Dre and Post while Dre was trying to get Post out of the Green Room.

Q    The night before or the night --

A    The night after he met the band.  He was like Postie, we're going to get time in the studio, he's an awesome musician, it's going to be fire, something along those lines.

Q    And this is what Dre says?

A    This is what Dre said, yeah.

Q    Okay.  And that's it?

A    Yep.  It's Dre telling Post, like, this is the guy I've been telling you about, he's fire, he's going to go back to the studio.

Q    Okay.  And that's the full extent of that

conversation --

A    Yeah.  Post remarks, like, Awesome, man, let's write a tune, awesome, fuck yeah, that kind of thing.

Q    Okay.  Anything beyond that?

A    No, not that I remember.

Q    Okay.  Now -- so is there anything else that you can now remember that either Mr. Malone or Mr. Feeney said regarding any composition or songwriting before you enter the studio?

A    No.

Q    Okay.  Mr. Dukes didn't say I'm writing a song with you or anything like that?

A    No, nor would he.

Q    Excuse me?

A    I said nor would he.

Q    How do you know what he would say or not say?

A    It's not something someone would say to somebody, I'm writing a song with you.

Q    I guess you know what everybody says.

Now we move into the studio and we're in the room where there's just, as you put it, musicians?

A    No.

Confidential

Page 170

rights or agreement with respect to Circles?

A   Never spoken about.

Q   Including in the studio that night?

A   Including in the studio that night.

Q   Okay.  And after -- after the studio, when you were done and you were -- did you leave at the same time or did they leave later?

A   No, we all got ready.  They got obviously -- I think they got in cars to head to the airport and I would have gotten an Uber to head to my house.

Q   Okay.  And did you leave with any communications as to contacts, phone; in other words, did you have their phone, did they have your phone, anything like that?

A   At that point I had Dre as a contact, so I didn't feel like it was necessary to ask the other guys for theirs.  When you're dealing with, like, an ultra celebrity like Post, which I have dealt with in the past, it's generally frowned upon to, like, push them for those kind of contacts because they're often pretty sacred about who they give their number to in case it gets leaked and could cause a big headache to them, so I felt no impetus to get connected with them on the phone.  I have Dre's contact and he manages

Confidential

them.

Q   Okay.  So the answer is nobody exchanged anything with you --

A   Not that I can remember, no.

Q   You didn't give them -- did they ask for your information?

A   Did they ask for my information?

Q   Correct.

A   Not that I can remember.

Q   Contact information, okay.

Did you have any conversations at all in departing?

A   I wished them well on the shows they were going to do.  We talked about how awesome the song was and how much fun it was and that was it, short and sweet.

Q   All right.  Let's move on to Exhibit 9.

MS. ISMAJ:  Okay.  So this is Exhibit 9.

MS. LEPERA:  There's that weird stuff that you're doing with the cursor, Gabby.  Get rid of that.  It looks like a redaction.

MS. ISMAJ:  I don't know what it is.  On my screen it looks normal.  Okay now?

MS. LEPERA:  Yeah.  Let's look at all the pages on here.  Scroll just so we can -- it's P00007

Confidential

Page 274

STATE OF CALIFORNIA        )

                           ) ss

COUNTY OF LOS ANGELES    )

    I, KATHERINE FERGUSON, Certified Shorthand

Reporter, for the State of California, do hereby

certify:

    That prior to being examined, the witness named

in the foregoing deposition, was by me duly sworn to

testify the truth, the whole truth and nothing but

the truth;

    That the testimony of the witness and all

objections made at the time of the examination were

recorded stenographically by me;

    That the foregoing transcript is a true record

of the testimony and all objections made at the time

of the examination.

    I hereby certify that I am not interested in the

event of the action.

    IN WITNESS WHEREOF, I have subscribed my name

this 7th day of February, 2022.


                _____

                    Katherine Ferguson

                    CSR No. 12332

# EXHIBIT 2

CONFIDENTIAL PROCEEDING

Page 275

ERRATA SHEET OF THE TRANSCRIPT OF:

Case Name:          Tyle Armes V Austin Richard Post,

                    et al.

Dep. Date:          February 2, 2022

Deponent:           Tyle Armes


                         CORRECTIONS:


| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 45 | 1 | Marro | Maro | incorrect transcription |
| 61 | 1 | chain | change | incorrect transcription |
| 63 | 18 | B. C. D. C. B. C. B. C. B. C. F. F. F. F. | C. C. D. C. C. B. B. B. D. C. C. C. F. F. F. F. F. | incorrect transcription |
| 71 | 13 | published | finished | incorrect transcription |
| 93 | 22 | tape | take | incorrect transcription |
| 189 | 21 | credit at minimal | credit and minimal pub | incorrect transcription |


_____
Signature of Deponent


SUBSCRIBED AND SWORN BEFORE ME

THIS _14th_ DAY OF _March_ , 2022.

_Susan Such_

(Notary Public)   MY COMMISSION EXPIRES: _Feb 7, 2023_

SUSAN SUCH
Notary Public · California
Los Angeles County
Commission # 2276822
My Comm. Expires Feb 7, 2023

Page 275

ERRATA SHEET OF THE TRANSCRIPT OF:

Case Name:        Tyle Armes V Austin Richard Post,

                  et al.

Dep. Date:        February 2, 2022

Deponent:         Tyle Armes


                         CORRECTIONS:


| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 22 | 25 | grade A | grade 8 | incorrect transcription |
| 34 | 5 | Clyde | Clive | incorrect transcription |
| 44 | 15 | Murta | Murda | incorrect transcription |
| 45 | 13 | Murta | Murda | incorrect transcription |
| 87 | 18 | take | tape | incorrect transcription |
| 112 | 6 | demo | memo | incorrect transcription |
| 130 | 7 | Mush | Much | incorrect transcription |
| 141 | 12 | regarding | responding | incorrect transcription |
| 162 | 19 | naked | named | incorrect transcription |

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS 14th DAY OF March , 2022.

_Susan Such_

(Notary Public)   MY COMMISSION EXPIRES: Feb 7, 2023

SUSAN SUCH
Notary Public - California
Los Angeles County
Commission # 2276822
My Comm. Expires Feb 7, 2023

CONFIDENTIAL PROCEEDING

Page 275

ERRATA SHEET OF THE TRANSCRIPT OF:

Case Name:          Tyle Armes V Austin Richard Post, et al.

Dep. Date:          February 2, 2022

Deponent:           Tyle Armes

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 233 | 7 | Murta | Murda | incorrect transcription |
| 233 | 9 | Correct | Incorrect | incorrect transcription |
| 241 | 23 | Murta's | Murda's | incorrect transcription |
| 246 | 24 | Marte | Marty | incorrect transcription |
| 247 | 3 | Marte | Marty | incorrect transcription |
| 16 | 7 | (inaudible) | Jaco Pastorius | incorrect transcription |
| 21 | 4 | Drop of Asturias | Jaco Pastorius | incorrect transcription |
| 22 | 25 | grade A | grade 8 | incorrect transcription |
| 24 | 24 | (inaudible) | an instrument or instruments | incorrect transcription |

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS _14th_ DAY OF _March_ _____, 2022.

_Susan Such_

(Notary Public)   MY COMMISSION EXPIRES: _Feb 7, 2023_

SUSAN SUCH
Notary Public · California
Los Angeles County
Commission # 2276822
My Comm. Expires Feb 7, 2023