**O**

# United States District Court
# Central District of California

TYLER ARMES,

               Plaintiff,

     v.

AUSTIN RICHARD POST p/k/a POST MALONE, et al.,

               Defendants.

Case № 2:20-cv-03212-ODW (PJWx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [82]**

## I.    INTRODUCTION

Plaintiff Tyler Armes brought suit against Defendants Austin Richard Post, publicly known as Post Malone ("Post"); Adam King Feeney, publicly known as Frank Dukes ("Dukes"); and Universal Music Group, Inc., seeking a declaration and an accounting regarding his rights in the hit song *Circles*, which Armes alleges he co-wrote with Post. Post countersued in the Southern District of New York for a declaration that Armes has no rights in *Circles*; that case has been consolidated with this one. Post and Dukes (hereinafter, "Defendants") now move for summary judgment in their favor on both Armes' First Amended Complaint and Post Malone's Consolidated Complaint. (Mot. Summ. J. ("Motion" or "Mot."), ECF No. 82.)

On April 11, 2022, the Court heard oral argument from counsel for each side. Having carefully considered the arguments raised at the hearing, along with all the

papers filed in connection with the Motion, the Court **GRANTS** the Motion **IN PART** and **DENIES** the Motion **IN PART**, for the reasons that follow.

## II.    KEY ALLEGATIONS

Plaintiff Armes is a professional musician whose credits include his work as bandleader, writer, and producer for the multi-platinum band Down With Webster. (First Am. Compl. ("FAC"), ECF No. 24 ¶ 2.)   Defendant Post is a well-known rapper, singer, and songwriter, and Defendant Dukes is one of Post's musical collaborators.  (*See* FAC ¶¶ 1, 3, 15–16.)

Armes's key allegations are as follows.

On a number of occasions, Post's manager, Dre London ("Dre"), encouraged Armes to collaborate with Post.  (*Id.* ¶ 12.)  In early August 2018, at Dre's invitation, Armes attended a private concert in Toronto, Canada where Post was performing.  (*Id.* ¶ 13.)  The following evening, Dre invited Armes to go to Dukes's Toronto studio with Post and Dukes to write music together.  (*Id.* ¶¶ 13–14.)  On August 8, 2018, from 2:00 a.m. to 9:00 a.m., Armes, Post, and Dukes worked together in the studio, with Armes on bass and keyboard, Post on drums, and Dukes on guitar and keyboards (the "April 8 Session").  (*Id.* ¶¶ 15–16.)  Working from a keyboard and a bass, Armes co-wrote the chords and the distinctive bassline that would ultimately become part of *Circles*.  (FAC ¶ 16.)  Armes also co-wrote, with Post, the lead guitar line that would ultimately be heard in the introduction to the commercial release of *Circles*.  (*Id.*)

By the end of the April 8 Session, the three had reduced their collaboration to a recording (the "Session File") on Dukes's laptop, which contained a bassline, a looping chord progression, drums, some lead guitar lines, and several fragments of vocal lines, both with and without lyrics.  (*See id.* ¶ 18; Decl. Tyler Armes ("Armes Decl.") Ex. 1 ("iPhone Recording"), ECF No. 84-2.)  At the end of the April 8 Session, around 9:00 a.m., the three listened to a playback of the Session File, and Post and Dukes expressed enthusiasm about the results.  (FAC ¶ 18; iPhone Recording at timestamp 7:34.)  About a year later, after contributions and modifications from

Post's lyrics and other collaborators, the musical material in the Session File debuted as *Circles*, Post's fourth number one song on the US Billboard Hot 100. (*See* FAC ¶ 21; Armes Decl. ¶ 19, ECF No. 84-2.)  With the exception of the lyrics and some of the vocal melodic content, the musical content of *Circles* is identical to the musical content in the Session File.  (Armes Decl. ¶ 19; *compare* iPhone Recording *with* Armes Decl. Ex. 2 ("*Circles* Commercial Release"), ECF No. 84-2.)  Along with Post and Dukes, the credited writers of *Circles* are non-parties Billy Walsh, Louis Bell, and Kaan Gunesberk.  (FAC ¶ 24.)

When Post first premiered *Circles* on social media, Armes immediately reached out to Dre to ask him to speak with Post about giving Armes co-writer credit and publishing royalties for his role in creating *Circles*.  (*Id.* ¶ 22.)  Dre responded by texting, "Just showed Posty the message [¶] He said he remembers [¶] U played a tune on the bass then he played more of it after."  (*Id.* ¶ 23.)  Later, Post offered a five percent share of the publishing royalties for *Circles*, and Armes tried to negotiate for a larger percentage, without success.  (*Id.* ¶ 25.)  To date, Defendants have refused to credit Armes as a co-writer of *Circles*.  (*Id.* ¶ 23.)

Defendants, for their part, do not dispute the basic facts underpinning these allegations.  (*See generally* SUF, SGD.)  They do not dispute that Armes is a musician; that Dre introduced Armes to Post; that Armes, Post, and Dukes spent a night in Post's studio in August 2018; that the results of that studio session led to the release of *Circles* about a year later; and Armes is not credited as a co-writer of *Circles*.  What they dispute is the extent to which Armes participated in the August 8 Session as a musical collaborator.

### III.   PROCEDURAL BACKGROUND

The morning of April 7, 2020, Armes filed a Complaint in the Central District of California against Post, Dukes, and Universal Music Group, asserting four causes of action for: (1) Declaratory Judgment that Armes is: (a) a joint author of the *Circles* musical composition ("*Circles* Composition"), (b) a joint author of the *Circles* sound

recording ("*Circles* Recording"), (c) entitled to co-writer and co-producer credits for both copyrights, and (d) entitled to prospective and retroactive royalties with respect to his interests in those copyrights, in a percentage to be proven at trial; (2) Accounting of all revenues derived from Defendants' exploitation of the *Circles* Composition and *Circles* Recording; and (3) Constructive Trust over the proceeds from the exploitation of the *Circles* Composition and *Circles* Recording pending the final disposition of this action.  (*See* Compl., ECF No. 1.)

Later that same day, Post commenced a parallel action in the Southern District of New York, *Post v. Armes*, No. 1:20-CV-02877-ALC (S.D.N.Y.), seeking declaratory judgment that Armes is a co-author of neither the *Circles* Composition nor the *Circles* Recording.

On May 13, 2020, Armes filed the operative FAC, and Defendants, including Defendant Universal Music Group, moved to dismiss.  (FAC; Mot. Dismiss FAC, ECF No. 28.)  The Court granted the motion in part and denied it in part, dismissing Armes's claims to authorship of and ownership in the *Circles* Recording, on the grounds that Armes failed to allege facts showing that he (1) made an independently copyrightable contribution to the *Circles* Recording, and (2) superintended the creation of the *Circles* Recording by exercising control over it.  (Order Dismissing FAC 12–13, ECF No. 32.)  Although the Court provided leave to amend, Armes did not amend, instead stipulating to dismiss his claim of authorship in the *Circles* Recording, including dismissal of Universal Music Group as a party, and proceeding with his claim of authorship in the *Circles* Composition only.  (Stip. Dismiss, ECF No. 34; Min. Order, ECF No. 35.)

The parties stipulated to transfer the venue of Post's Southern District of New York case to the Central District of California, and, on December 15, 2020, upon further stipulation of the parties, this Court consolidated the two cases. (Min. Order, ECF No. 45.)

Defendants now move for summary judgment. Their motion is two-pronged. First, they seek summary judgment in their favor on Armes's FAC and dismissal of Armes's FAC. Second, they seek summary judgment in their favor on their own Consolidated Complaint. (*See* Mot.; Consol. Compl., ECF No. 1 in 2:20-cv-10205-ODW (SKx).) The Motion is fully briefed. (Opp'n, ECF No. 84; Reply, ECF No. 86.)

## IV.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" where the resolution of that fact "might affect the outcome of the suit under the governing law," and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, and the moving party may meet this burden with arguments or evidence or both. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Franciscan Ceramics*, 818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted). Provided the moving party has satisfied its burden, the court should grant summary judgment against a party who fails to present evidence establishing an essential element of its claim or defense when

that party will ultimately bear the burden of proof on that claim or defense at trial.  *See Celotex*, 477 U.S. at 322.

In ruling on summary judgment motions, courts draw all reasonable inferences in the light most favorable to the nonmoving party, refraining from making credibility determinations or weighing conflicting evidence.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hous. Rts. Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1183 (C.D. Cal. 2004).  However, "uncorroborated and self-serving" testimony will not create a genuine issue of material fact.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).  "Conclusory" or "speculative" testimony is likewise "insufficient to raise genuine issues of fact and defeat summary judgment."  *See Sterling*, 404 F. Supp. 2d at 1183.  The nonmoving party must provide more than a "scintilla" of contradictory evidence to avoid summary judgment.  *Anderson*, 477 U.S. at 251–52; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## V.   DISCUSSION

The Copyright Act protects fixed original works of authorship, 17 U.S.C. § 102, by granting to "copyright owners the 'exclusive rights' to display, perform, reproduce, or distribute copies of a copyrighted work, to authorize others to do those things, and to prepare derivative works based upon the copyrighted work," *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017) (quoting 17 U.S.C. § 106).  "The copyright, in other words, gives the owner 'the right to control the work' . . . ."  *Id.* (quoting *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006)).

The issue this case presents is whether the *Circles* Composition is a joint work authored in part by Armes.  Under the Copyright Act, a joint work is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."   17 U.S.C. § 101; *see Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000).  "The authors of a joint work are co-owners of the copyright in that work."  17 U.S.C. § 201(a); *Richlin v.*

*Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) (discussing history of federal copyright law's treatment of joint works). "Even if a person's contribution is minor, once he is accorded joint authorship status, he enjoys all benefits of joint authorship." *Richlin*, 531 F.3d at 968.

"[I]n the Ninth Circuit, a 'joint work' has four elements: (1) a copyrightable work, (2) two or more authors, (3) the authors intend for their contributions to be merged into inseparable or interdependent parts of a unitary whole, and (4) each author made an independently copyrightable contribution to the work." *Yellowcake, Inc. v. Morena Music, Inc.*, 522 F. Supp. 3d 747, 762–63 (E.D. Cal. 2021) (citing *Aalmuhammed*, 202 F.3d at 1231). "[T]o be an author, one must supply more than mere direction or ideas; one must translate an idea into a fixed tangible expression entitled to copyright protection." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989) (cleaned up). In determining whether individuals are joint authors of a work in the absence of a contract defining the parties' relationship, courts consider: (1) whether the purported author "superintend[ed]" the work by exercising control; (2) whether the putative co-authors made objective manifestations of a shared intent to be co-authors; and (3) whether the audience appeal of the work turns on both contributions and the share of each in its success cannot be appraised. *Yellowcake*, 522 F. Supp. 3d at 763 (quoting *Aalmuhammed*, 202 F.3d at 1234). Courts are to apply these factors flexibly; the test for joint authorship "cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much." *Aalmuhammed,* 202 F.3d at 1235.

## A.    Compositions and Sound Recordings

Armes initially sought a declaration of rights in both the *Circles* Composition and the *Circles* Recording. He has since dismissed his claim to rights in the *Circles* Recording, and the case is now limited to whether he has rights in the *Circles* Composition. Copyright law recognizes musical compositions and sound recordings as distinct classes of intellectual property, and a typical commercial-release song

comprises these two independently copyrightable components.  *See Williams v. Gaye*, 895 F.3d 1106, 1121 (9th Cir. 2018) ("[S]ound recordings and musical compositions are separate works with their own distinct copyrights.").

Musical compositions are protected under 17 U.S.C. § 102(a)(2), which protects "musical works."  *See Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248–49 (C.D. Cal. 2002).  The musical composition is intellectual property consisting of the underlying musical material: the notes, rhythms, chord progressions, melodies, harmonies, basslines, instrumental lines, and lyrics that comprise the substantive musical content of the song.  *See id.* at 1249 ("A musical composition's copyright protects the generic sound that would necessarily result from any performance of the piece.").  Generally, the initial copyright in a musical composition vests in the songwriters, lyricists, and other musical artists who authored the musical composition.  *See U.S. Auto Parts Network, Inc. v. Parts Geek, Inc.*, 692 F.3d 1009, 1015 (9th Cir. 2012) ("[C]opyright ownership 'vests initially in the author or authors of the work,' which is generally the creator of the copyrighted work." (first quoting 17 U.S.C. § 201; and then citing *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 737 (1989)).

The sound recording is intellectual property that exists separate and apart from the musical composition.  It is "the aggregation of sounds captured in the recording," whereas "the song or tangible medium of expression embodied in the recording is the musical composition."  *See Newton*, 204 F. Supp. 2d at 1249.  To understand the difference between a musical composition and a sound recording, consider Ludwig van Beethoven's iconic *Moonlight Sonata*.  The *Moonlight Sonata* itself is a musical composition authored by Beethoven in 1801.  It is a piece of intellectual property, a collection of melodies, harmonies, and rhythms, and it is part of the public domain, meaning that any individual may perform, arrange, adapt, or otherwise exploit the musical composition, including by copying the sheet music.  *See Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496, 497 (7th Cir. 2014) ("Once the copyright on a work expires, the work becomes a part of the public domain and can be copied and sold

without need to obtain a license from the holder of the expired copyright."). Over time, thousands of pianists have recorded their own performances of the *Moonlight Sonata* using the public domain musical composition as the underlying musical material. Generally speaking, each pianist owns the copyright in the recording of his or her own performance and has the right to control how that recording is used and where it is played. *See Erickson v. Blake*, 839 F. Supp. 2d 1132, 1135 n.3 (D. Or. 2012) ("[A] copyright in a sound recording only protects against a direct duplication of that recording." (citing 17 U.S.C. § 114(b))). Each individual copyright in each individual sound recording of the *Moonlight Sonata* is a separate piece of intellectual property and is distinct from the intellectual property embodied in the underlying composition. The composition remains in the public domain regardless of how musicians and others might exploit it in making sound recordings. *Cf. Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 645 (9th Cir. 2020) (explaining how and why a co-owner of a copyright may not act independently to limit other co-owners' independent rights to exploit the work).

The rights of a copyright in a sound recording do not extend to the musical composition, and vice versa. *Newton*, 204 F. Supp. 2d at 1249. A defendant infringes copyright in a musical composition by copying or distributing the composition in some way—that is, by performing the composition, broadcasting a performance of it, arranging it, or by making a photocopy of the sheet music on which the composition is notated and embodied. *See* 17 U.S.C. § 106(1), (2), (4), (5); *see ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 688–89 (9th Cir. 2000) (discussing history of copyright protection of musical compositions). By contrast, a defendant infringes copyright in a sound recording by copying the recording in some way—that is, by making physical or digital copies of the recording, broadcasting the recording, or distributing copies of the recording. *See* 17 U.S.C. § 106(1), (3), (5), (6); *see also Griffin v. J-Recs.*, 398 F. Supp. 2d 1137, 1142 (E.D. Wash. 2005) ("[T]he exclusive right of reproduction is

limited to the right to duplicate the sounds in a form 'that directly or indirectly recaptures the actual sounds fixed in the recording.'" (citing 17 U.S.C. § 114(b))).

Moreover, and of particular relevance here, although in some cases the fixing of a sound recording simultaneously establishes a copyright in the musical composition embodied in the sound recording, *see Griffin*, 398 F. Supp. 2d at 1142, the fixing of a final commercial-release sound recording is <u>not</u> a condition precedent to establishing a copyright in the musical composition, because there are other ways to fix a musical composition than embodying it in a finalized sound recording, such as by transcribing it to sheet music, *see ABKCO Music*, 217 F.3d at 688 ("[W]hen Congress first extended copyright protection to original musical compositions . . . [it] merely protected the copying of the sheet music."), or, as arose here, reducing a composition to a playable file on a computer program.

Given the fundamental difference between a musical composition and a sound recording, Defendants are incorrect to assert that the Court's reasons for dismissing Armes's Recording-based claims also generally support summary judgment and dismissal of Armes's Composition-based claims. (Defs.' Mem. P & A ("Mem.") 1–2, ECF No. 82-1.) For example, the Court previously observed that, as alleged, Armes did not superintend sufficient control over the post-August 8 Session recording and engineering process to establish any authorship in the *Circles* Recording. (Order Dismissing FAC 12–13.) But this conclusion does not automatically apply to the *Circles* Composition, because the Composition, or some form of it, was indeed complete as of the close of the August 8 Session. That the Recording was not complete as of the end of that session, and that Armes thereafter had no control over the Recording, does not mean that the same is true of the Composition. *See Newton*, 204 F. Supp. 2d at 1249.

With these points clarified, the Court turns to the parties' burdens.

**B.    The Parties' Burdens**

Although Defendants seek summary judgment on two different pleadings, the parties' burdens with respect to the two pleadings are, on this Motion, substantially the same.    Armes's pleading seeks a determination that Armes *does* have joint authorship rights in the *Circles* Composition.   (FAC 12 ("Prayer for Relief") ¶ 1.) Post's pleading seeks a determination that Armes *does not* have joint authorship rights in the *Circles* Composition.   (*See* Consol. Compl.)   Defendants can meet their initial burden as to both of these pleadings by proffering arguments or evidence demonstrating that Armes cannot establish joint authorship in the Composition.   *See Celotex*, 477 U.S. at 323.   This would be sufficient to make the initial showing that Armes' joint authorship claim is without merit, and it would also make Post's prima facie case for his own Consolidated Complaint, which alleges the nonexistence of joint authorship.

If Defendants are successful, then the burden shifts to Armes to introduce evidence demonstrating that there is a genuine and material factual dispute about whether Armes is a joint author of the *Circles* Composition.   If Armes meets this burden, he defeats Defendants' Motion, because he shows that there is a triable issue regarding his own joint authorship claim and a triable issue regarding Post's no-joint-authorship claim.

*1.    Defendants' burden*

Defendants' initial showing consists of four components: originality, shared intent, fixation, and control.

*Originality.* Originality refers to the requirement that a work—or, as applicable here, a contribution to a joint work—contain sufficient originality of expression to gain copyright protection.   17 U.S.C. § 102(a); *see Newton*, 204 F. Supp. 2d at 1254 ("Copyright protection extends only to those components of the work that are original and non-trivial.").   Here, Defendants argue Armes's contributions to *Circles* were not sufficiently original.   Defendants point to Armes's own deposition, in which he

testified that (1) he did not write any of the lyrics for *Circles*; (2) although he co-wrote the chord progression for Circles, the progression is the extremely common I-IV-V chord progression and is therefore not sufficiently original; (3) although he co-wrote the bass line for Circles, the bass line is also based on the same extremely common progression and is therefore not sufficiently original; and (4) although he wrote part of the lead guitar melody which eventually became the introduction to the commercial release version of *Circles*, he merely sang his contributions as an add-on to Post's own contributions, and his contribution is therefore not sufficiently original.   (Defs.' Statement of Uncontroverted Facts ("SUF") 27–35, ECF No. 83-1 (citing Decl. David A. Steinberg Ex. B ("Armes Dep."), ECF No. 82-2).)  In presenting this evidence and argument, Defendants meet their initial burden of showing a lack of originality.

*Shared intent.*   Shared intent refers to the statutory requirement for joint authorship that the authors prepare the work "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." *Yellowcake*, 522 F. Supp. 3d at 762 (first citing 17 U.S.C. § 101; and then citing *Aalmuhammed*, 202 F.3d at 1231).  Here, Defendants argue that they and the non-party songwriters neither had nor objectively manifested a shared intent to create a joint work with Armes.   Their argument also rests primarily on Armes's own deposition testimony.   Armes admitted that during the August 8 Session, Post and Dukes never expressly acknowledged that the three were writing a song together or that Armes would be a joint author.  (SUF 37–38 (citing Armes Dep.).)  Moreover, neither Post nor Dukes nor any of the other acknowledged co-writers of *Circles* ever followed up with Armes after the August 8 Session, either to ask for his input or for any other reason.  (SUF 39–41 (citing Armes Dep.).)  Additional declarations from the acknowledged co-writers of *Circles* confirm that these individuals never knew about Armes's contributions to the composition, nor did they ever intend for Armes to be a co-author.  (SUF 48–49 (citing Decls. of Gunesberk, Walsh, and Bell).)  Defendants also point out that in the song credits for *Circles*, which can be found on Post

Malone's website, Armes is not listed as a co-writer.  (SUF 52–53.)  In presenting this evidence and argument, Defendants meet their initial burden of showing a lack of a shared intent to create a work.

*Fixation.*  Fixation refers to the statutory rule providing that in order to gain copyright protection a work must be fixed in a tangible medium expression.  17 U.S.C. § 102(a).  Copyright vests in an author when the work is fixed directly by the author or "by or under the authority of the author."  17 U.S.C. § 101.  Here, Defendants argue that, during the process of composing *Circles*, Armes himself did not fix any musical material into a tangible medium of expression.  (Mem. 12.)  In support of this argument, they submit Armes's own deposition testimony, in which Armes explains that during the April 8 Session the three musicians recorded their musical material on a Session File on Dukes's laptop.  (SUF 11–16 (citing Armes Dep.).)  Armes conceded in deposition that the Session File consists entirely of musical material performed by Post and Dukes on their respective instruments; the Session File does not contain a recording of any of Armes's playing.  (SUF 16 (citing Armes Dep.).)  In presenting this evidence and argument, Defendants meet their initial burden of showing Armes did not fix the *Circles* Composition.

*Control.*  Control refers to the requirement that putative co-authors "superintended" the work by exercising control over its creation.  *Yellowcake*, 522 F. Supp. 3d at 763 (quoting *Aalmuhammed*, 202 F.3d at 1234).  Here, Defendants argue Armes did not exercise control over the creation of the *Circles* Composition.  In support of this argument, Defendants point again to Armes's own deposition testimony indicating that Dukes had sole control over the laptop the three used to record and mix their musical ideas.  (SUF 12–15 (citing Armes Dep.).)  They also present the declarations of the non-party songwriters describing their roles in the *Circles* Composition following the August 8 Session, and they point out that Armes had no control over these songwriters' contributions or anything else that took place after the August 8 Session.  (SUF 27, 44–47 (citing Armes Dep., and Decls. of

Gunesberg, Walsh, and Bell).)  In presenting this evidence and argument, Defendants meet their initial burden of showing Armes did not superintend control over the *Circles* Composition.

Based on the foregoing, the Court finds that Defendants meet their initial burden of demonstrating with evidence and arguments that Armes will not be able to establish the requirements of originality, shared intent, fixation, and control, and accordingly will not be able to establish joint authorship in the *Circles* Composition. The burden shifts to Armes to demonstrate that there is sufficient evidence to render triable each issue that would otherwise be dispositive of the case in Defendants' favor.

2.    *Armes's burden*

With the focus squarely on the *Circles* Composition, the next salient observation is that there are in fact two compositions at issue, and the parties argue past each other somewhat because each side is generally staking its claim in a different composition.

First, there is the musical composition embodied in the Session File, which was complete by the end of the August 8 Session.  Armes acknowledges this composition in asserting that "the composition of the final version of the music for 'Circles' was completed on August 8, 2018," at the conclusion of the parties' jam session, (Pl.'s Statement of Genuine Disputes ("SGD") 110, ECF No. 84-1), and Defendants acknowledge this composition by acknowledging the existence of a "Rough Mix" that existed as a result of the August 8 Session, (SUF 19).   The Court refers to this composition herein as the Session Composition.   Second, there is the musical composition embodied in the commercial release of *Circles*, which was not complete until over a year later and which bore the musical contributions of several additional lyricists and other musical collaborators.  Both parties acknowledge this composition in agreeing that "Armes had no involvement whatsoever in the creation of the Circles Composition following the August 8 Session."  (SUF 40.)  The Court refers to this composition herein as the Commercial Release Composition.

14

Armed with this distinction, the Court next notes that Post's Consolidated Complaint seeks a declaration with respect to the Commercial Release Composition only. In the Consolidated Complaint, Post defines "*Circles* Composition" as the musical composition contained in the *Circles* track on his album "Hollywood's Bleeding," (*see* Consol. Compl. ¶ 4) and he requests declaratory judgment with respect to this Composition in particular, (*id.* ¶¶ 18–25). By contrast, Armes's FAC is sufficiently broadly drafted so as to place both the Commercial Release Composition and the Session Composition at issue. (*See* FAC ¶ 34 (generally demanding "prospective and retroactive royalties and other money owed with respect to his interest in" *Circles*)).

For the reasons that follow, Armes fails in his burden with respect to his authorship in the Commercial Release Composition, but he meets his burden on each issue raised with respect to his authorship in the Session Composition. Defendants are therefore entitled to summary judgment in Post's favor on his Consolidated Complaint and partial summary judgment on Armes's FAC.

      a.    *Defendants get judgment in their favor as a matter of law on Armes's joint authorship in the Commercial Release Composition.*

First, as a matter of law, by admitting that he "had no involvement whatsoever in the creation of the Circles Composition following the August 8 Session," (SUF 40), Armes concedes that he has not and indeed cannot meet his burden with respect to fixation of and control over the Commercial Release Composition. The product of the parties' efforts during the August 8 Session is the Session File, in which the Session Composition was fixed. The Session File contains an eight-minute recording in which the fundamental chord progression and bassline play on a loop while guitars and vocals provide melodic content over the loop. (*See* iPhone Recording.) The Session File, and the Session Composition embodied therein, is not the same as the final release of *Circles*; later, the non-party songwriters made significant additional contributions, including the majority of the lyrics and the re-structuring of the Session

Composition into a radio-length song—the Commercial Release Composition —with a standard structure consisting of verses, choruses, and a bridge.  No one, including Armes, disputes that Armes had nothing to do with any of this post-August 8 Session work.  This defeats Armes's claim to joint authorship of the Commercial Release Composition.  Because Armes was not involved for the several months following the August 8 Session when Post and others continued to fix aspects of the *Circles* Composition, the fixation could not have possibly been done under Armes's authority.  The same is true of control: Armes had no control over what went into the *Circles* Composition following the August 8 Session.

To the extent this case is about joint authorship in the Commercial Release Composition, this case is analogous to *Aalmuhammed v. Lee*.  In *Aalmuhammed*, the plaintiff was hired by actor Denzel Washington to provide consultation and advice, on-set and elsewhere, regarding Washington's portrayal of Malcolm X in the motion picture of the same name.   202 F.3d at 1230.   The plaintiff argued that his contributions, which included revisions to the script, made it into the motion picture and that he was therefore a joint author.  *Id.*  The Ninth Circuit disagreed, noting that control over the final version of the motion picture was superintended by the film's director and the film studio, not by the plaintiff.  *Id.* at 1235 ("Aalmuhammed did not at any time have superintendence of the work. Warner Brothers and Spike Lee controlled it.").  The same is true here.  Although Armes made contributions to an early version of the *Circles* Composition (that is, to the Session Composition), he ultimately did not have superintendence of the Commercial Release Composition.  Post and his other collaborators modified and edited the Session Composition with no input from Armes.  Thus, even if Armes did make copyrightable contributions to the Session Composition, he cannot establish joint authorship in the Commercial Release Composition.

Yet, no one disputes that *something* was fixed by the end of the August 8 Session.  (*See* SUF 19 (acknowledging that a rough mix was fixed on Dukes's laptop

by the end of the August 8 Session).)  The iPhone Recording Armes submits with his Opposition demonstrates as much.  The recording[1] is of the three musicians listening back to the approximately eight-minute Session File at the end of their jam session. (*See* iPhone Recording.)  This recording demonstrates that some quantum of original musical expression was fixed on Dukes's laptop by the end of the evening.  For the reasons discussed in the following four subsections, there are genuine factual disputes about whether this laptop recording, which contains the Session Composition, (1) contains original material by Armes, (2) is the product of the three musicians' mutual intent to write a song, and (3) & (4) was fixed under Armes's authority and superintendence.  The fact that the Session Composition then went to others who added to and modified the musical content of the Session Composition to prepare it for commercial release does not invalidate the genuine factual disputes concerning Armes's participation in the creation of the Session Composition.

The way forward, therefore, appears to be for the Court to view the Session Composition as its own separate, standalone, copyrightable intellectual property, in which Post and Dukes undisputedly have authorship and in which Armes may have authorship.  The Session Composition was a fixed original expression that Post then handed off to the non-party songwriters, who, in adding lyrical material and restructuring the Session Composition for commercial release, created a derivative work, the Commercial Release Composition, using the Session Composition as source material.  *See* 17 U.S.C. § 101 (including musical arrangements in definition of derivative work).[2]

---

[1] Defendants assert, and Armes admits, that Armes's iPhone recording was made in secret and without authorization from Post or Dukes. (SUF 24.)  This observation, even if true, does not appear to affect the outcome of this Motion.

[2] Defendants' assertion that the Circles Composition was not complete as of the end of the August 8 Session does not alter the analysis, especially given that Defendants acknowledge the existence of the Session File as what they call the "Rough Mix."  (*See* SUF 19, 20.)  Copyright vests in fixed original works of expression automatically, regardless of whether the author(s) deem the work to be a draft or final version.  *Garcia v. Google, Inc.*, 786 F.3d 733, 753 (9th Cir. 2015) (Kozinski, C.J.,

To be clear, a declaration of joint authorship in the Session Composition is fundamentally different relief than a declaration of joint authorship in the Commercial Release Composition. A declaration of joint authorship in the Session Composition would not imply joint authorship in the Commercial Release Composition because "[j]oint authorship in a prior work is insufficient to make one a joint author of a derivative work." *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 522 (9th Cir. 1990). Such a declaration would, however, be a significant win for Armes; joint authorship in the Session Composition would entitle him to profits and proceeds from exploitation of the Session Composition. *Yellowcake*, 522 F. Supp. 3d at 763 ("[C]o-authors must account to other co-authors for any profits earned from licensing or using the copyright." (citing *Ashton-Tate*, 916 F.2d at 522)). This includes certain proceeds from the exploitation of the Commercial Release Composition because the Commercial Release Composition is derivative of the Session Composition. Thus, a win for Armes under this approach would entitle him to profits generated from the use of the Session Composition in the creation of the Commercial Release Composition. (*Cf.* FAC ¶ 34 ("Plaintiff is entitled to prospective and retroactive royalties and other money owed with respect to his interest in the Song.").) In other words, Armes would be entitled to a percentage of the profits Post and Dukes have received and continue to receive as authors of the *Circles* Composition.[3]

Following the April 8 Session, Armes had no control over the final version of the *Circles* Composition (the Commercial Release Composition) and nothing to do with its fixation, and therefore, Post is entitled to judgment as a matter of law on Armes's authorship in the Commercial Release Composition. As discussed, Post, in his Consolidated Complaint, indicates that he seeks a declaration regarding rights in the Commercial Release Composition in particular. (*See* Consol. Compl. ¶¶ 4, 18–

---

dissenting) ("[U]nder our copyright law, the creators of original, copyrightable material automatically acquire a copyright interest in the material as soon as it is fixed.").

[3] The legal principles and methods for calculating and allocating these profits are not currently articulated in the record of this case.

25.)  The Court can therefore proceed to rule on the Motion to the extent Defendants seek a ruling on Post's Consolidated Complaint.  The Court **GRANTS** Defendants' Motion **IN PART** by granting Post judgment in favor of his Consolidated Complaint and the narrow relief sought therein, which relates solely to the Commercial Release Composition.[4]  The Court further **GRANTS** the Motion **IN PART** by granting Post judgment in his favor as against Armes's FAC to the extent Armes claims joint authorship in the Commercial Release Composition.

The remaining question is whether Defendants are also entitled to judgment as a matter of law on Armes's claim in the FAC to joint authorship in the Session Composition.  The Court now focuses on joint authorship of the Session Composition, ultimately concluding that Armes may go to trial on this issue.

>  b.  *Whether Armes in fact contributed musical material to the Session Composition, including the bass line, the chord progression, and the lead guitar line, and whether those contributions were sufficiently original, is in genuine dispute.*

First, whether Armes in fact contributed musical material to the Session Composition, and whether those contributions were sufficiently original, are genuinely disputed issues of material fact.  Armes's declaration and deposition testimony substantiate his claim that he made the following contributions to the Session Composition, and in each case, Defendants do not dispute the fundamental assertion that Armes in fact co-wrote the material:

- Armes made contributions to the *Circles* chord progression, including the shift from F major to F minor[5] that functions as a variation on the basic chord progression and appears intermittently throughout the Session

---

[4] To be clear, this does not mean that Post is entitled to a declaration on each and every matter as presented and requested in his Consolidated Complaint.  The Court will make this determination if and when it becomes appropriate to issue a final judgment.

[5] As a technical note, for the purposes of this Order and for clarity, all musical references have been transposed to C Major.

Composition.  (SGD 99–102.)  Defendants do not submit any evidence that logically contradicts Armes's assertions about his contributions to the chord progression.

- Armes co-wrote the bassline, versions of which are found throughout the Session Composition.   (SGD 88–91.)   While Defendants object to Armes's assertions to this effect, Defendants submit no evidence that controverts Armes's own testimony that he co-wrote this bass line.  The fact that Armes is not the person playing the bass in the Session File does not logically controvert Armes's statements on this matter because the person who records musical content to a session file is not necessarily the same person who devised or composed the musical content being recorded.

- Armes supplied the latter part of the lead guitar line, which can be heard in several places on the Session Composition and at the very beginning of the introduction in the Commercial Release Composition.  (SGD 93–98 (similarly objected to by Defendants, but not controverted by evidence).)

Moreover, when Armes contacted Dre immediately upon hearing a preview of the commercial release of *Circles* to assert his authorship in the song, Dre responded that Post "remember[ed]" that Armes "played a tune on the bass," and then Post "played more of it after."  (SGD 117; Armes Decl. Ex. 4 ("Dre Texts")., ECF No. 84-2.)  ) The trier of fact could examine this piece of evidence along with the other evidence discussed above and find that Armes did indeed make musical contributions to the Session Composition.

The next substantive question is whether Armes's contribution to the Session Composition is sufficiently original.  Armes's contribution to the bass line and to the lead guitar line are sufficiently original such that the Court can *not* conclude as a matter of law that Armes's contributions are wholly unoriginal contributions unworthy of copyright protection.

Joint authorship requires that the putative author make an original contribution to the work at issue. *Ashton-Tate*, 916 F.2d at 521 ("A collaborator's contribution will not produce a joint work, and a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright."); *cf. Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000) ("The essence of copyrightability is originality of artistic, creative expression."). With regard to musical compositions, copyright protection does not "extend to common or trite musical elements or commonplace elements that are firmly rooted in the genre's tradition. These building blocks belong in the public domain and cannot be exclusively appropriated by any particular author." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (citations and internal quotation marks omitted); *see Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003) ("[E]xpressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law.")

As for the *Circles* chord progression, Defendants argue that, according to Armes's own deposition testimony, the progression is a simple I-IV-V chord progression, and that, because that progression is extremely commonplace and unoriginal, Armes's contribution to the chord progression is insufficiently original. But, having listened to the Session Composition as captured on the iPhone Recording with special attention to the chord progression throughout, the Court makes two observations. First, the chord progression is not an exact loop throughout, and instead contains variations; the existence of these variations, and where the collaborators chose to place them, cannot be disregarded as unoriginal. Second, and foreshadowing the Court's discussion below regarding Armes's contribution to the lead guitar line, isolating the chord progression and disregarding it as unoriginal misses the fact that the collaborators not only chose *this* chord progression, but chose a particular melody and a particular vocal line to be played simultaneously with the chord progression at any given time. These decisions all went into the creation of the Session

Composition, and a reasonable juror could conclude that all three collaborators took part in these decisions and that the combination of these decisions created something that is not stock or commonplace, despite the fact that it may contain stock or otherwise uncopyrightable building blocks.  *Satava*, 323 F.3d at 811.  Thus, the Court cannot conclude that at this phase that, as a matter of law, the chord progression lacks sufficient originality.

Defendants further argue that, because the I-IV-V progression is commonplace and unoriginal, so too is the associated bassline.  But the bassline in question consists of much more than three unadorned bass notes outlining a I-IV-V progression.  Loosely speaking, the roman numeral progression I-IV-V refers to the first, fourth, and fifth notes in a major scale, and in C Major would refer to the notes C, F, and G.  Here, however, the bassline in question is much more complex than a simple, repeated, three-note, C-F-G loop.  Instead, it is a significantly adorned and adapted setting of the chord progression in question.  Therefore, the Court cannot simply assume or accept that the bassline is insufficiently original.  The undisputed evidence indicates that Armes did in fact contribute to the chord progression and bassline, leaving open the possibility that Armes made a material contribution to this bassline.  That being the case, the Court cannot conclude that, as a matter of law, Armes did not make an original contribution to the Session Composition.

The same conclusion applies to the lead guitar line, and perhaps even more clearly so.  As the evidence suggests, Post composed the four-note gesture (G-A-G-E) that repeats three times, and Armes then composed "the turnaround phrasing that conclude[s] the guitar melody."  (*See* SUF 95 (citing Armes Dep. 118:21-23 ("I sang the melody to him on how to include and resolve the melody nicely and he did it exactly as I sang it and there it is on the master recording.")).)  The Court cannot conclude that, as a matter of law, Armes's contribution to this line was minimal to the point of unoriginal.  Armes's three-bar contribution consists of a specific musical contour set to a particular rhythm.  Moreover, and just as importantly in the musical

context, the decision to include *this* three-bar fragment out of all the possible three-bar fragments after Post's particular five-bar fragment is a creative decision unto itself with a cognizable amount of originality.  In making his contribution, Armes not only wrote a short three-bar fragment; he wrote a three-bar fragment that picks up where the previous five bars left off and brings Post's musical gesture to a resolution.  Thus, even if Armes's contribution—as its own standalone three-bar phrase—might not qualify as original, the same three-bar phrase coupled with Armes's idea to include it after Post's contribution could be sufficiently original.  *See Satava*, 323 F.3d at 811 ("[A] combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship."); *cf. Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element.  Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection."), *overruled on other grounds by Skidmore*, 952 F.3d 1051.  The originality exhibited by the compilation of component musical parts cannot be ignored and contributes to the finding that the originality of Armes's contributions is an issue which does not resolve in Defendants' favor based on the papers alone.  The issue must be tried.

> c.   *Whether the Session Composition was fixed by or under Armes's authority is a genuinely disputed issue.*

Next, Armes demonstrates a genuine and material factual dispute as to fixation. As discussed above, under the Copyright Act, a work is "fixed" when it is embodied "in a copy or phonorecord, by or under the authority of the author."  Armes's key evidence in this regard is his deposition testimony and declaration which indicate that during the recording process, Armes, Post, and Dukes discussed and "mutually agreed on which takes of the song should be included" in the Session File on Dukes's laptop. (SGD 104; *see generally* SGD 85–108; Armes Decl. ¶ 16.)  For example, the three

agreed that *Circles* sounded better stripped down to just bass, guitar, and drums as the prominent sounds, and Dukes adjusted the session on the laptop to reflect this decision.  (*See* SGD 105.)  The evidence indicates that Dukes controlled the laptop; the evidence does *not* indicate that, as a matter of law, this control of the laptop functioned as a general veto power over musical ideas Armes might have suggested during the session.  Instead, Armes's evidence suggests that the three musicians jointly controlled the flow of the jam session and jointly decided what musical material would be included in the Session File. *(See generally* SGD 85–108.)  This, in turn, would be sufficient to establish that the fixation occurred under the authority of all three musicians, including Armes.  *Cf. Del Rio v. Virgin Am., Inc.*, No. CV 18-1063-GW (SKx), 2018 WL 5099720, at *5 (C.D. Cal. June 28, 2018) (noting that the "under authority" requirement for fixation is an issue that "seldom rise[s] to the fore").  Armes accordingly demonstrates that the fixation requirement remains in genuine dispute.

> d.   *Whether Armes, Post, and Dukes objectively manifested an intent to jointly create a musical composition is in genuinely dispute.*

Next, Armes demonstrates that whether he, Post, and Dukes had a shared intent to jointly create the Session Composition, and objectively manifested that intent, are genuinely disputed issues of fact.  Courts making this determination have looked to statements and admissions of the putative co-authors at or around the time the work was created, *Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120, 1124 (C.D. Cal. 2001), the testimony of the parties regarding their intent at the time the work was created, *Stillwater Ltd. v. Basilotta*, No. 2:16-cv-01895-SK, 2020 WL 4355306, at *7 (C.D. Cal. Feb. 5, 2020), the extent to which, and the means by which, the parties collaborated in making the work, *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 993–94 (C.D. Cal. 2015), whether one party paid the other, *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 874 (C.D. Cal. 2013), whether any  putative co-author "attempt[ed] to constrain an intended co-author's use of [the] collaborative

work," *id.*, and "other objective evidence of intent," *Richlin*, 531 F.3d at 969.  Here, ample evidence supports Armes's position on this matter, including the following:

- In a greenroom following Post's performance, the day before the August 8 Session, Dre informed Post that Armes was "an awesome musician" and that he was going back to the studio with Post to work with him.  (Armes Decl. ¶ 6.)  Post responded, "Awesome, man, let's write a tune, awesome, f*** yeah."  (*Id.*)

- Armes himself is a renowned professional musician.  He is best known for his work with the band Down With Webster, having produced and written the band's top five Canadian singles.  The song "Over," written and produced by Armes through his band Honors, was the #1 Global Viral Track on Spotify in January 2017.  Armes has a music publishing deal with Warner Chappel Music and has worked with many well-known names in the music industry.  (SGD 54–68.)  The trier of fact could reasonably construe these facts as supporting the conclusion that three professional musicians entered the studio with the intent of writing a song together.

- Prior to August 8, 2018, no music for any version of the *Circles* Composition had been written.  (SGD 82 (undisputed).)  The fact that what was created had no life of its own until Armes, Post, and Dukes convened could reasonably be construed as evidence that the parties intended to write a song that would be the product of their joint efforts.

- It is undisputed that the members of Post's entourage who were with him at the beginning of the August 8 Session all eventually left, leaving Armes, Post, and Dukes alone in the studio for several hours overnight, interrupted only occasionally by a sound engineer who entered when beckoned by Post.  (SUF 6, 15; SGD 81.)  The trier of fact could

reasonably find that by keeping Armes in the studio with them all night long, Post and Dukes manifested their intent to write a song with Armes.

- What existed at the end of the night was a single, unified, coherent musical composition. (*See* iPhone Recording.) The result of the August 8 Session was more than a series of fragmented or unrelated ideas; instead, it was a robust palette of cohesive musical ideas that would ultimately form most of the musical content of the Commercial Release Composition. The trier of fact could listen to the iPhone Recording and the parties' comments describing their composition as a complete musical creation and reasonably conclude that this evidence supports the parties' shared intent to write a song together.

- Armes substantiated his allegation about the text from Dre with evidence of undisputed authenticity. (Dre Texts.) Defendants submit nothing to controvert this evidence, such as a declaration from Post or Dukes. A reasonable juror could consider the fact that, a year after the August 8 Session, Post still remembered that Armes "played a tune on the bass" and Post "played more of it after" and find even more support for the parties' shared intent to write a song together.

In light of this evidence, the issue of the parties' shared intent to write a song together is a genuinely disputed factual issue.

    *e.*   *Whether Armes superintended control over the composition embodied in the Session File is in genuine dispute.*

Finally, Armes demonstrates a genuine dispute as to whether he superintended the creation of the Session Composition by an exercise of control. "Control may often be the most important factor." *Richlin*, 531 F.3d at 968. Courts may find mutual control where the work "relies on each author's contributions to make a unitary whole," *McMunigal v. Bloch*, No. C 10-02765 SI, 2010 WL 5399219, at *4 (N.D. Cal. Dec. 23, 2010), or where the collaborators exercised "creative control over separate

and indispensable elements of the completed product." *Morrill*, 157 F. Supp. 2d at 1124.   Conversely, courts may find a lack of mutual control when one party has veto power over another party's contributions, *Stiletto Television v. Hastings, Clayton & Tucker, Inc.*,, 392 F. Supp. 3d 1133, 1142 (C.D. Cal. 2019), or control over how the other party's contributions are used, *Moi v. Chihuly Studio, Inc.*, No. C17-0853RSL, 2019 WL 2548511, at *2 (W.D. Wash. June 20, 2019). *See also Stillwater*, 2020 WL 4355306, at *7 (framing issue of control as whether the putative co-author was the "inventive mastermind" of the work (internal quotation marks omitted)).

Most of the evidence and reasoning demonstrating a genuine dispute with regard to fixation is also applicable here.   While Dukes may have controlled the laptop, nothing suggests that he or Post possessed any special veto or decision-making power that Armes did not.   Armes's evidence, if credited, supports the finding that the three musicians shared equal control in the session, making nonhierarchical contributions to a "unitary whole." *McMunigal*, 2010 WL 5399219, at *4 Armes's creative control over the August 8 Session remains in genuine dispute.

With the Court's focus on the authorship of the Session Composition, *Aalmuhammed* becomes inapposite.   In *Aalmuhammed*, the plaintiff who coached and advised Denzel Washington had no control over the final product, which was the studio release of the motion picture *Malcolm X*.   202 F.3d at 1235.   Here, however, the "final product" is the Session Composition itself, and Armes was involved with the creation of the Session Composition up to the moment the parties completed their jam session, listened back to the Session Composition embodied in the Session File, and saved the file.   Nothing in the record precludes the possibility that Armes superintended control of the Session Composition up to that point.

As to the Session Composition, Armes shows a genuine dispute on each issue Defendants raised.  The Court **DENIES** the Motion **IN PART** by recognizing Armes's right to a trial on his claim to joint authorship in the Session Composition.[6]

## VI.    CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion.  (ECF No. 82.)  As a matter of law, Armes has no claim to authorship in the Commercial Release Composition.  But Armes demonstrates genuine disputes in regard to his authorship in the Session Composition, and he is entitled to a trial on that issue.

Finally, the Court **CONTINUES** the deadline for the parties to file their pretrial documents to **April 20, 2022**.  The parties should ensure that a courtesy copy trial binder is delivered to the First Street Courthouse by no later than **11:00 a.m. on April 21, 2022**.


**IT IS SO ORDERED.**


April 18, 2022

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

---

[6] Given the Court's approach, which focuses specifically on joint authorship of the Session Composition, Armes's expert musicologist declaration is of no relevance to this disposition. Armes's expert establishes no more and no less than that the musical content of the Session Composition is substantially the same as the musical content of the Commercial Release Composition.  For the purpose of this Motion, this fact appears undisputed, (*compare* iPhone Recording *with Circles* Commercial Release; SUF 20 ("Certain musical composition elements in the Rough Mix were later incorporated into the final Circles Composition completed a year later.")), and will be relevant only if Armes establishes joint authorship in the Session Composition, when it comes time to account for profits made from the derivative work (the Commercial Release Composition) as part of Armes's accounting and constructive trust claims.