```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    (WESTERN DIVISION - LOS ANGELES)



TYLER ARMES,                  ) CASE NO: 2:20-cv-03212-ODW-SK
                              )
              Plaintiff,      )              CIVIL
                              )
       vs.                    )     Los Angeles, California
                              )
AUSTIN RICHARD POST, ET AL,   )  Wednesday, March 15, 2023
                              )
              Defendants.     )   (11:48 a.m. to 12:52 p.m.)
```

                        PRETRIAL CONFERENCE

              BEFORE THE HONORABLE OTIS D. WRIGHT, II,
                    UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:            ALLISON S. HART, ESQ.
                          MAX D. FABRICANT, ESQ.
                          Lavely & Singer
                          2049 Century Park East, Suite 2400
                          Los Angeles, CA 90067

For Defendants:           CHRISTINE LEPERA, ESQ.
                          JEFFREY M. MOVIT, ESQ.
                          GABRIELLA NOURAFCHAN ISMAJ, ESQ.
                          Mitchell Silberberg & Knupp
                          437 Madison Ave., 25th Floor
                          New York, NY 10022

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Sheila English

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    **Los Angeles, California; Wednesday, March 15, 2023; 11:48 a.m.**

2                 --oOo--

3         **THE CLERK:**  Calling Item 1, CV 20-3212, <u>Tyler Armes</u>

4 <u>versus Austin Richard Post, et al</u>.

5         Counsel, may I have your appearances please, starting

6 with the Plaintiffs.

7         **MS. HART:**  Good morning, Your Honor.  Allison Hart

8 for the plaintiff, Tyler Armes.  Also present with me is my

9 client, Tyler Armes, and my associate, Max Fabricant.

10         **THE COURT:**  Okay.  Good morning to you-all.

11         **MS. LEPERA:**  Good morning, Your Honor.  Christine

12 Lepera; Mitchell, Silberberg and Knupp, on behalf of Defendants

13 Austin Post and Adam Feeney; and I have with me my partners,

14 Jeff Movit and Gabbi Ismaj.

15         **THE COURT:**  Good morning to you-all.

16         **MR. MOVIT:**  Good morning, Your Honor.

17         **MS. LEPERA:**  Thank you, Your Honor.

18         **THE COURT:**  All right.  So we've -- we've gotten the

19 technical problems cleaned up to everyone's satisfaction so

20 we'll be able to play whatever you-all deem as pertinent.

21         **MS. LEPERA:**  Your Honor, I had a question with

22 respect to that; and obviously we are moving forward with the

23 instrumentation from that --

24         **THE COURT:**  Okay.

25         **MS. LEPERA:**  -- from the various witnesses'

3

1    perspective.  And we can do this as it goes -- as they play but

2    one of the questions that I had and I guess objection that I

3    would have is if one of the witnesses were to play an

4    instrument that they did not play that night.

5            **THE COURT:**  Why would I allow that to happen?

6            **MS. LEPERA:**  Because -- well, I'm raising it now and

7    I don't think you will but the witness, Mr. Armes, did bring in

8    a guitar to test and he did not play a guitar by his own

9    testimony that evening.  So I would object to that.

10           **THE COURT:**  And if he brought in a Maserati I would

11   permit --

12           **MS. LEPERA:**  Okay, well good.  Thank you.

13           **THE COURT:**  Okay, all right.  But this good.  We need

14   to iron out now whatever difficulties you-all foresee so we can

15   get that taken care of.  It'll help you prepare in your

16   last-minute preparations for how you're going to try the case,

17   et cetera, and what you're going to need.

18           What I envision -- and what I envisioned when this

19   topic of playing I guess portions or I don't know what you-all

20   envisioned were contributions made by various people at various

21   times, that I thought that there was going to be an attempt to

22   replicate that all-night session.  And then of course when the

23   times comes it is certainly possible to play the commercially

24   released version of *Circles*, you know, in its finished product.

25   And if what you want is for the jury to make some sort of

1  comparison, they'll be able to do that but I want them to

2  compare real events.  If you had a keyboard during that

3  session, great, fire up your keyboard but don't bring in Boston

4  Pops if they weren't there doing that all-night session, okay?

5  I guess the Boston Pops is the wrong reference for this crowd.

6  Okay, I'm sorry.

7       Yes?  Anything?

8  **(No audible response)**

9       Then let's talk -- okay, then let's talk about other

10 issues because I want to end up I believe with just a

11 discussion of the witnesses.  But if there are other problems

12 that we need to iron out, let's talk about that.

13      **MS. LEPERA:**  Allison, do you mind if I go or do you

14 have something?

15      **THE COURT:**  It doesn't matter.  We're going to get to

16 everyone.

17      **MS. LEPERA:**  Okay, thank you, Your Honor.

18      So I have a question with respect to one of the

19 witnesses on Plaintiff's Witness List, a gentleman by the name

20 of Cory Litwin, and I don't know whether or not Ms. Hart still

21 intends to seek to call him.

22      My issue with that, Your Honor, is that he is

23 identified as a witness to testify about some unspecified

24 custom and practices in the music industry.  There has been no

25 expert disclosure from him as such and so we've objected to him

1   because that is the subject of expert testimony clearly and

2   can't come in through the back door as a lay witness.  I

3   haven't heard whether she still intends to call him with

4   respect to that issue but I object to it to the extent she

5   does.

6           **THE COURT:**  Oh it's something that I had a checkmark

7   next to.  I couldn't quite figure out what this had to do with

8   co-authorship and us resolving the issue of co-authorship so I

9   was hoping that we would get this clarified and now it appears

10  to be the time.

11          **MS. HART:**  Yes, Your Honor.

12          With respect to Mr. Litwin, we may not call him.  We

13  may call him depending on whether -- there is another issue

14  that Mr. Litwin is involved in involving Mr. Armes' publishing

15  agreement with Warner Chappell and an artist called Murda Beatz

16  and Mr. Litwin was involved in that negotiation.

17          And they -- I believe that Defense intends to try to

18  show that Mr. Armes misrepresented his involvement in the

19  *Circles* composition in order to obtain that publishing

20  agreement.  And Mr. Litwin is prepared to testify that that

21  agreement was in progress before the song was ever released and

22  before we knew anything about the song being released.  So

23  that's if --

24          **THE COURT:**  Wait a minute.  Let me make sure I

25  understand this.

```
 1              Mr. Armes' motivation for initiating this lawsuit is
 2   to help him get a separate recording deal?
 3         MS. HART:  I think that's a theory that Defendants
 4   had.  That's based on questions that were asked during his
 5   deposition, I believe that may be a theory.  And they've
 6   identified a copy of his publishing contract with Warner
 7   Chappell as an exhibit.  We've objected to it, we don't believe
 8   it's relevant at all.  But to the extent they do intend to get
 9   into that issue, Mr. Litwin is prepared to testify about the
10   sequence of events relating to that agreement.
11         THE COURT:  I've got some things I have to do in
12   mid-April.  We're not going to be in trial in this case in
13   mid-April.  I'm not going to go down those kinds of rabbit
14   holes.  If this were a criminal case, maybe we would care about
15   his motivations, et cetera, but we don't -- I could not care
16   less and we're not going to go into that.
17              You talk about something that's going to confuse the
18   jury as they're trying to figure out what is the relevance of
19   this in terms of whether or not these folks agreed that there
20   was going to be co-authorship, or if, as a matter of law,
21   there's co-authorship.  We need to stay focused because this is
22   -- okay.
23         MS. HART:  I agree, Your Honor.
24         THE COURT:  No, no, wait, wait.
25         MS. HART:  Just so you know, I agree with you.
```

1       **THE COURT:**  No, we're not going to leave the subject.

2   While we're on this subject, I want you-all to think about

3   something.

4       This -- this case involves material that isn't within

5   everyone's understanding.  And you may want to give some

6   thought as to whether or not you want to pre-instruct the jury

7   to let them know, ladies and gentlemen, this is not an

8   automobile intersectional collision, this is different, and it

9   has its own special rules and they need -- I think.  I think

10  they need to be let in on the rules upfront so that they know

11  what they're listening to because if they're listening to

12  things ... For example, you start -- you get on a long tangent

13  about right of control, et cetera, and you really start, you

14  know, unwrapping that, and I know they've got to wonder, what

15  on earth is this all about?  Yet, it is something they need to

16  be paying close attention to.  It is for this reason that I'm

17  suggesting it.  Sometimes I normally just ask, is this

18  something you want to do but I'm strongly suggesting that you

19  think about pre-instructing the jury on the law, the applicable

20  law.

21      **MS. HART:**  I think that's a good idea.

22      **MS. LEPERA:**  I do as well, Your Honor.

23      **MS. HART:**  To keep their attention on the issues that

24  are important.

25      **THE COURT:**  Yes.  You guys agree -- agree on the --

8

1    Not those instructions, okay, "Your duties as jur -- no.  The

2    substantive areas, particularly with respect to co-authorship.

3    That's the part that we need to let them in on before they have

4    to -- okay.

5             **MS. LEPERA:**  Yes.

6             **THE COURT:**  I'm sorry.  I cut you off.

7             Back to your point.  I'm not going to -- all right.

8    Make sure I put this ...

9             Your concern that they may wish to take a certain

10   tactic in the case and you want to make sure that you can meet

11   that --

12            **MS. HART:**  We don't need to call Mr. Litwin if they

13   don't raise the issue of the Warner Publishing Agreement.

14            **THE COURT:**  Well, I don't know if they intend to do

15   that or not.  The real question is -- and the only role I play

16   here is the issue of, is it relevant?  It may come in.  If it's

17   not relevant --

18            **MS. HART:**  We don't believe it's relevant --

19            **THE COURT:**  Well, someone is going to have to show me

20   that it is or it's not coming in.

21            **MS. HART:**  I agree, Your Honor.

22            **THE COURT:**  Okay.

23            **MS. LEPERA:**  Thank you, Your Honor.  May I?

24            **THE COURT:**  Absolutely.

25            **MS. LEPERA:**  Yeah.  Absolutely.

1          So Mr. Litwin was identified as someone doing custom

2   and practice in the music industry.  I understand that's off

3   the table now.  Great.  This is the first time hearing of the

4   Warner issue.

5          The Warner issue is not about some motivation to

6   bring the lawsuit or anything which she just said a minute ago.

7   The Warner document reflects -- which is a question of intent

8   in this case -- whether he intended to be a participant in the

9   *Circles* composition, which is the final, or in some earlier

10  version that we went over obviously and the Court's familiar

11  with that.  Because the question of whether a work is one work

12  or it's a series of works -- with the latter being

13  derivative -- is what the authors intended.  So it's reflective

14  of his doing a deal with Warner to show he had an interest in

15  the *Circles* composition, the final.

16          **THE COURT:**  Do that again?

17          **MS. LEPERA:**  Well no, it's a question for the jury

18  whether or not they intended to create one work or two

19  different works.

20          **THE COURT:**  I don't understand that.

21          **MS. LEPERA:**  With respect to the issue of the -- as

22  the Court's familiar, there was a claim brought in this case,

23  there's a single claim for declaratory judgment that he is the

24  coauthor of the *Circles* composition on the final recording.

25  And obviously we went through that with respect to summary

10

1    judgment and the Court agreed he did not demonstrate the

2    Yamahamad (phonetic) factor so he cannot be an author of the

3    *Circles* composition.

4         The question of the night of August 8th has been

5    viewed as a potentially separate work that was incorporated and

6    that the *Circles* composition could be derivative.

7         **THE COURT:**  Okay.

8         **MS. LEPERA:**  Under the law -- and it all goes back to

9    the author's intent -- whether Mr. Armes, Mr. Malone,

10   Mr. Feeney intended this to be a separate work or one work.

11   That is critical for a determination of that issue.  It's their

12   intent.  So all of the issues with respect to intent would come

13   forth to be discussed by the witnesses as what was their

14   intent, what were they creating, what were they creating it

15   for, what was the purpose for it?  So even though we're not at

16   summary judgment on that issue, it's still relevant fact issue

17   for trial.  And so it's strictly a question of evidencing their

18   intent as to what that represented that night.

19        **THE COURT:**  No, not being privy to any of that or

20   being really having no information regarding any of these

21   witnesses, much less what they anticipate testifying regarding,

22   if you told me who the witnesses were and who they were aligned

23   with, would I be able to very closely approximate what their

24   testimony is going to be in terms of intent?

25        **MS. LEPERA:**  That's a question, Your Honor, that I --

11

1          **THE COURT:**  No, no, no, don't dance --

2          **MS. LEPERA:**  -- I don't know.

3          **THE COURT:**  -- don't dance --

4          **MS. LEPERA:**  -- I don't know.

5          **THE COURT:**  -- don't dance, answer me.

6          **MS. LEPERA:**  I don't think so.

7          **THE COURT:**  Seriously?

8          **MS. LEPERA:**  Because the intent of Mr. --

9          **THE COURT:**  Let me explain something, let me explain

10   something.  This is for the benefit of all the lawyers.

11          During the course of the trial and certainly when we

12   sit down to really settle the jury instructions, we are not

13   going to have the luxury of me, for example, saying, "Michael,

14   would you go research this issue for me real quick?"  It's

15   going to be a matter of what I know, what the attorneys are

16   able to convince me of, and my opinion of which attorney is

17   more likely to be more credible based upon our pretrial

18   dealings.

19          **MS. LEPERA:**  Yes, Your Honor, I understand.

20          **THE COURT:**  So when you're attempting -- attempt

21   during the pretrial dealings to blow as much smoke up my skirts

22   as possible, when it comes to showtime, when it's important,

23   you've got little or no credibility so --

24          **MS. LEPERA:**  May I respond and explain what I meant

25   by that, Your Honor?

1          **THE COURT:**  Well if you want but it doesn't really

2    matter because I've jettisoned it.

3          **MS. LEPERA:**  If you -- you're saying to me that you

4    can pretty much predict what all the witnesses are going to say

5    with respect to their intent as to what they created.

6          **THE COURT:**  Come on.  Wait a minute, wait a minute.

7          **MS. LEPERA:**  I understand.

8          **THE COURT:**  I did practice law.

9          **MS. LEPERA:**  I understand.  I'm simply trying to make

10   an issue with respect to the intent on whether it's one work or

11   two works.  That is a relevant query for what they intended.

12   And Mr. --

13          **THE COURT:**  Yeah but it's --

14          **MS. LEPERA:**  Our position is Mr. Armes, all

15   throughout this case, has made it clear that his intent was

16   that it would be one work, not two.  So I don't believe it's

17   automatically to assume that his intent --

18          **THE COURT:**  Don't you get what my intent was with

19   respect to this?

20          **MS. LEPERA:**  Yes, of course.

21          **THE COURT:**  No, it's irrelevant.

22          **MS. LEPERA:**  Well in terms of this question.

23          **THE COURT:**  Who else was in that recording session

24   and what was their intent and just how controlling was that?

25          **MS. LEPERA:**  Just three.

1          **THE COURT:**  Doesn't this kind of get down to, all

2     right, someone does, you know, does a little rift and, you

3     know, what do you guys think?  And they go ...

4          **MS. LEPERA:**  It does to down to that, Your Honor.

5     That's clearly one of the relevant things.

6          **THE COURT:**  Yeah.

7          **MS. LEPERA:**  A hundred percent.

8          **THE COURT:**  And what else do you have?  We don't have

9     any writings, do we?

10          **MS. LEPERA:**  There's not a single performance of

11     Mr. Armes.

12          **THE COURT:**  And no one has said anything during the

13     course of this evening.

14          **MS. LEPERA:**  Correct.

15          **THE COURT:**  So what we've got now are some people who

16     probably weren't there that are affiliated with one side or the

17     other who are going to come in and talk about, "This is what

18     the parties' intent was."  And you're telling me you have no

19     idea what these people are going to say.

20          **MS. LEPERA:**  There's no witness on the list who's

21     going to come in that wasn't from the night.

22          **THE COURT:**  All right.  And they're all affiliated

23     with one or the other.  They're being called by one side or the

24     other.

25          **MS. LEPERA:**  No one who was present except those

14

1  three when these facts transpired.

2          THE COURT:  Okay.

3          MS. LEPERA:  Other than an engineer who no one

4  apparently can -- he was on his list but he's not there.

5          THE COURT:  Yeah.

6          MS. LEPERA:  So nobody's --

7          THE COURT:  What I'm trying to say this.  Is it --

8  well, you know what?  We'll let them -- no, we'll let --

9          MS. LEPERA:  I'm sorry if I was not making myself

10 clear.  I didn't mean to --

11         THE COURT:  No, we'll let them decide who to believe

12 and whether or not there's any motives to testify one way or

13 the other so we'll let them decide that.

14         The question that I have is, is there going to be an

15 undue consumption of time?  How many people are we talking

16 about?

17         MS. LEPERA:  So Mr. Armes.

18         THE COURT:  Oh yeah, of course, yeah.

19         MS. LEPERA:  And then I don't know who Ms. -- if

20 she's not calling Mr. Litwin, I don't know who else she's

21 calling.

22         THE COURT:  I'm just talking about on this issue

23 about the intent of it being -- Mr. Armes being a co-author.

24 It's just that issue that I'm talking about now.

25         MS. LEPERA:  Do you have anyone else on that issue?

15

1          **MS. HART:**  On the issue of intent, the witnesses are

2    Mr. Armes --

3          **THE COURT:**  The principals, yeah.

4          **MS. HART:**  -- the principals, yeah.  Those are the

5    only three individuals who were in the room when the

6    composition was created.

7          **THE COURT:**  Sure.  That makes sense.

8          **MS. LEPERA:**  Yeah.  I agree with that.

9          **THE COURT:**  Okay, good.  Because we seem to be

10   dragging out people that had nothing to do with this particular

11   issue to testify regarding collateral issues.  And I just want

12   to know, is this one of them?  Are we just going to like --

13   like Mr. Litwin.  I don't really understand what that's all

14   about --

15          **MS. LEPERA:**  Me either.

16          **THE COURT:**  -- in dispute, standards and --

17          **MS. HART:**  That's only -- that's only to respond if

18   they -- if Your Honor allows them to go down this rabbit trail

19   of the Warner Publishing Agreement.

20          **MS. LEPERA:**  With all respect, it's not a rabbit

21   trail and it's simply one question to Mr. Armes.

22          **THE COURT:**  I have a suggestion and I can guarantee

23   you that a lawyer as young as that one over there can tell you.

24          When we get together like this and we have disputes,

25   all comments are directed this way.  Everybody knows that,

1  don't they?  I know that young lawyer knows it.  It's not like

2  Judge Judy.  That damn program has just been the bane of the

3  orderly running of every courtroom, real courtroom in America.

4  Everyone thinks that, you know, you just you have these

5  catfights during the middle of a session.  You don't do that.

6  And disparaging remarks, personal attacks are just never, ever

7  called for in writing or in person.  So let's lift it a bit,

8  all right?  But everything is directed toward me.  Yell at me,

9  okay?

10       All right.  But it is good that we reach some sort of

11  an understanding with respect to the witnesses and who's going

12  to be testifying.

13       Now, yes, I've got notes with respect to some of

14  these.  I don't know who these people are.  Can I read my

15  writing.

16       Kaan or Kain (pronunciation), K-a-a-n.

17       **MS. LEPERA:**  Oh, those have withdrawn, Your Honor.

18       **THE COURT:**  Oh, good.

19       **MS. LEPERA:**  They are the three writers --

20       **THE COURT:**  Yes.

21       **MS. LEPERA:**  -- who wrote the rest of the *Circles*

22  composition after that night.

23       **THE COURT:**  Okay, good, thank you.  All right.

24  Because you don't have an unreasonable witness list.  We can go

25  through everyone on your list that passes this morning's muster

17

```
 1   and we'll still be fine.  I need to be able to give the
 2   citizens that we drag in off the streets kicking and screaming
 3   a reasonable estimate of how long we're going to disrupt their
 4   lives, that's all, and I do that through the witness list.
 5             You've made some estimates.
 6             Judith Finell.
 7             MS. HART:  We've withdrawn Ms. Finell.
 8             THE COURT:  Okay.  So we're not going to have
 9   experts.
10             MS. HART:  There will be no expert testimony,
11   correct.
12             THE COURT:  Okey-doke.  I think I know the answer to
13   this but I wasn't in the room that night.
14             What were the instruments in the room that night?
15             Sit down.  Sit, sit, sit, sit, sit.
16             MS. HART:  Your Honor, there was a bass guitar.
17             THE COURT:  Okay.
18             MS. HART:  A -- what was that? -- rhythm guitar, if
19   I'm not mistaken, a keyboard and a drum kit.
20             THE COURT:  And a drum kit?
21             MS. HART:  Yes, Your Honor.
22             THE COURT:  Okay.  And were they all being utilized
23   in terms of the composition?
24             MS. HART:  Yes, Your Honor.
25             THE COURT:  Okay.  And you intend to bring all of
```

1  those into court?

2       **MS. HART:**  Not the drums.

3       **THE COURT:**  Okay.

4       **MS. HART:**  And we did not bring a keyboard to

5  soundcheck today; however, my client did play on the keyboard

6  with Mr. Duke so we may -- we may bring one as well.

7       **THE COURT:**  Okay.  So your client actually used a

8  keyboard in offering ideas.

9       **MS. HART:**  Yes.

10      **THE COURT:**  Okay, that's legit.  All right.

11      And both guitarists were also being utilized?

12      **MS. HART:**  Yes, Your Honor.

13      **THE COURT:**  Okay.  All right.  Then we're good.

14      Now, problems?

15      **MS. LEPERA:**  Well, Your Honor, with respect to that

16  issue, Mr. Armes did not play the guitar that night.

17      **THE COURT:**  I didn't ask that.  I just want to know

18  whether or not these instruments were being utilized before you

19  drag them in and put them in front of the jury.

20      **MS. LEPERA:**  There was a couple of other things that

21  were there that night which we're not dragging in, which is a

22  full organ that was in one of the rooms.  There is a lead

23  guitar, a rhythmic guitar, bass guitar and keyboard and drum

24  kit, as Ms. Hart said.  The only addition was a large organ but

25  obviously we're not bringing that.

1          **THE COURT:**  Were you actually utilizing the organ?

2          **MS. LEPERA:**  There was an organ in the live room,

3    yes.

4          **THE COURT:**  No kidding, okay, all right.

5          So what do you intend to do?  Well, all right.

6          Tell me this.  Have you given any thought to how

7    we're going to identify this stuff?  Because in terms of the

8    soundcheck, et cetera, it's got two purposes.  One, we would

9    like to have some sort of a mechanism in place for the jury

10   while deliberating to be able to play this.  And we don't want

11   to do it in the fashion that we have to do with testimonial

12   evidence.  If they want to hear John Doe's re-re-re-redirect,

13   they don't get to do that.  They hear John Doe's testimony from

14   start to finish.  And that means coming into court and the

15   recorder or the reporter just reading the whole thing.

16          Apparently, we're going to be able to avoid that here

17   because we will have the audio as an exhibit and this is my

18   hope and expectation, is that Exhibit 1 may be broken down into

19   subsets that at midnight, this was the state of the draft.  At

20   2:30 in the morning, this is what we had; and at 3:45, it had

21   morphed or progressed into this; and these will all be, in my

22   mind -- but this doesn't count; you-all do what you want --

23   these will be Exhibits 1-A, 1-B, 1-C, 1-D, all right?  So that

24   we can actually focus not only the deliberating jurors on a

25   particular subset of the exhibits but also it'll be helpful the

20

1   Ninth Circuit if it gets that far.  But you can do it any way

2   you want, I just simply want each segment, audio segment, to be

3   separately identified.  That will be helpful.  How you do it, I

4   don't really care.

5          I am kind of curious as to how this thing is going to

6   unfold, if there's going to be some sort of a comparison

7   between *Circles* and what came out of that all-night jam

8   session.

9          **MS. HART:**  Your Honor, if I could as a question?

10         I mean one of the disputed -- well actually two of

11  the disputed exhibits.  We identified as our Exhibit 1, the

12  voice memo recording that my client made at the end of the

13  writing session that he was involved in as Exhibit 1.  And then

14  we also have as an exhibit the commercial release version and

15  Defendants have objected to each of those.

16         **THE COURT:**  Why?  What's the basis for the objection?

17         **MS. LEPERA:**  Well, the objection for the iPhone

18  recording preserved for appellate purposes.  I expect fully

19  that it's going to come in, Your Honor, but that it is full of

20  voice speaking, it is not reflective of an actual music session

21  itself because it's on his iPhone so it's hearsay.  So those

22  are my objections to it but I fully expect it's going to come

23  in and I do understand that this is where the comparison point

24  will come.

25         So to answer Your Honor's question, actually, of how

1   we're going to do this, is with respect to that, to identify

2   how that was stacked and how that was created by the Defendants

3   who are performing on that.  Even though it's underneath the

4   recording that Mr. Armes made, it's not what they made and even

5   though they're speaking over it.  So subject to those problems

6   from an evidentiary perspective, we are going to present

7   evidence that shows how that was created and who created it.

8           To answer Your Honor's question, each instrument in

9   there, by whom, and how.  And they were all performing -- and

10  there's no dispute on this issue -- Mr. Armes is not on that at

11  all, it's just simply the performances of Mr. Feeney and

12  Mr. Post with respect to both the drums, the two guitars, the

13  bass, and the keyboards.  All performances recorded on that

14  were played by the Defendants, not by Mr. Armes.  But

15  nonetheless, for the creation of those aspects, we will have

16  our clients explain.

17          **THE COURT:**  Okay.  The mere fact, it's the cellphone

18  recording that has got the people talking over it, et cetera?

19          **MS. LEPERA:**  Correct.

20          **THE COURT:**  All right.  Now that's going to go to

21  just how persuasive this particular piece of evidence is going

22  to be because that's --

23          **MS. LEPERA:**  I understand, Your Honor.

24          **THE COURT:**  -- that's messy.

25          **MS. LEPERA:**  I understand.  And I also object to it

22

1   on the ground that it was improperly recorded without

2   permission because there are sound recording copyrights

3   contained on that that belong actually to third parties, not

4   even necessarily my clients.  Mr. Post has a contract with

5   Universal so all recordings of his belong to Universal and he

6   has that in his possession.  It was done essentially a

7   reproduction infringement; but nonetheless, I'm just preserving

8   this issue.

9            **THE COURT:**  Okay.  And that isn't something that

10  we're litigating here, nor is Universal a party.

11           **MS. LEPERA:**  No, no, I understand that.

12           **THE COURT:**  We're not going to worry about that,

13  that's -- my only concern -- and it shouldn't be my concern but

14  if you play something messy, that's when you're trying to

15  convey an arrangement of notes and sounds, et cetera, and

16  you've got this -- people talking in the background, you know,

17  like in a bar, for example, it just it defeats the purpose and

18  it makes you communicating your point so much more difficult so

19  that's all.  But in terms of whether or not it's admissible or

20  not, it doesn't really address that.

21           If you choose to introduce it, then it'll be required

22  that there be some sort of an explanation given to the jury as

23  to what they're hearing and who this is talking in the

24  background and what that's all about and is that something

25  they're supposed to be paying attention to, et cetera, but --

23

1        **MS. HART:** And Your Honor, and so it's clear, there's

2  only speaking at the end after the music has finished.

3        **THE COURT:** Oh, never mind.

4        **MS. LEPERA:** Well they're speaking over -- again,

5  were speaking over it with respect to some of the music at the

6  end. So you can hear some of the music at the same time as you

7  hear voices but there is some music without voices, that's

8  correct.

9        **THE COURT:** All right. Well, you know what the real

10  point of this exercise is. I don't know whether or not this

11  talking is going to interfere with the jury's ability to

12  ascertain whether or not this was the birth of a beautiful

13  musical idea that was ultimately incorporated into something

14  else, I don't know but that's you guys' problem.

15        What other problems do you envision? You can talk to

16  me?

17        **MR. MOVIT:** Your Honor?

18        **THE COURT:** Yes.

19        **MR. MOVIT:** I was just asking my colleague --

20        **MS. LEPERA:** I'm doing (indiscern.) our list.

21        **MR. MOVIT:** Thank you, Your Honor.

22        In the order on the motions in limine, your order

23  Your Honor had held that there was to be no settlement

24  negotiation evidence presented.

25        **THE COURT:** Never.

1          **MR. MOVIT:**  Which we agree with completely, Your

2    Honor.

3          **THE COURT:**  This young kid over here knows that.

4    That's sacred.  It doesn't deserve a motion in limine.

5          **MR. MOVIT:**  Well the Plaintiff's Exhibit List,

6    Exhibits 4 through 7 are settlement negotiation text messages.

7          **THE COURT:**  Seriously?

8          **MR. MOVIT:**  Yes, Your Honor.  They were after the --

9          **THE COURT:**  Set fire to them.

10         **MR. MOVIT:**  Yes, Your Honor.  Thank you, Your Honor.

11         **THE COURT:**  Sometimes I see stuff and I go, you know,

12   this is what happens when you, like you get the very, very,

13   very youngest people in the firm say, "Here, go do this."  It

14   doesn't require any brain work.  Well, wrong.

15         Okay.  Any other issues like that?

16         **MR. MOVIT:**  Yes, Your Honor.  There's also an exhibit

17   -- there are several of their exhibits that are problematic.

18         There's a series of demand letters which Mr. Armes'

19   former counsel sent to the Defendants and we've seen no

20   probative value to them.  The assertions in them are obviously

21   hearsay.

22         **THE COURT:**  Normally I don't have to spend a great

23   deal of time going through exhibits individually but it looks

24   like it's going to be necessary.  It looks like some kid put

25   together the exhibits, which is wonderful experience if they

25

1   have some supervision but it should not end up in the

2   courtroom.

3        **MR. MOVIT:**  I agree, Your Honor.

4        **THE COURT:**  All right.  Here's what we're going to

5   do.

6        **MS. HART:**  Your Honor, if I could just respond.

7        We disagree with his interpretation and I think when

8   the witness is testifying, we'll be able to show ... I mean, I

9   disagree, number one, that the text messages that were referred

10  to all include settlement discussions.

11       **THE COURT:**  I'm not certain he said all but there

12  should --

13       **MS. HART:**  And the letters that he's referring to go

14  to our affirmative defense --

15       **THE COURT:**  There's another rule.

16       **MS. HART:**  Yes, Your Honor.

17       **THE COURT:**  You know what it is, don't you?

18       **MS. HART:**  I know, I apologize.

19       **THE COURT:**  Okay, listen.

20       This kind of evidence is out.  It serves no purpose.

21  It doesn't address anything unless you say, ahh, there's

22  consciousness or an awareness that these people knew that they

23  were wrong.  Okay.

24       **MS. HART:**  Actually it goes to their latches and

25  waiver affirmative defenses, the fact the demand letters were

26

```
 1   sent as soon as the song was released.  They have affirmative

 2   defenses of latches and waiver and so --

 3           THE COURT:  Okay.

 4           MS. HART:  -- this is only to show that as soon as

 5   the song was released --

 6           THE COURT:  Okay.

 7           MS. HART:  -- and we found out it was included on

 8   Defendants' album, we reached out and made demands.  We

 9   asserted a claim.  That's all it's there for.

10           THE COURT:  All right.  That sort of stuff is

11   presented to the Court, not to a jury, okay?  So if you want to

12   move to strike certain affirmative defenses, then great.  You

13   know those things handle it -- and they can be handled in short

14   order.

15           MS. HART:  Understood, Your Honor.

16           THE COURT:  Short order, okay?  But that isn't

17   something for the jury.

18           MS. HART:  Understood.

19           THE COURT:  I'll deal with that.  Okay.

20           MS. LEPERA:  And just with response to that, Your

21   Honor, our defenses are not based on --

22           THE COURT:  What?  You think I absorbed all that and

23   I'm internalizing it --

24           MS. LEPERA:  I'll save it for later.

25           THE COURT:  -- and I'm going to think about it all
```

27

1    night long?  Am I going, you know, that --

2              **MS. LEPERA:**  I'll save it for later.  Yes.

3              **THE COURT:**  Okay.

4              **MS. LEPERA:**  Understood.

5              **THE COURT:**  All right.  I just want to resolve

6    problems to the extent that we can foresee some coming up.

7              Are there -- well, we don't have an awful lot of

8    witnesses so I don't anticipate that we've got problems of that

9    nature.

10             Sometime -- well recently we've had issues with

11   experts having to travel from afar and we've indicated that

12   they can simply appear via Zoom.  I'm just open for that

13   because -- and I'll do that in this case if you've got some

14   witnesses that are out of state and if that's what you would

15   like to do, we can have them testify remotely.

16             If anyone has got medical or dental appointments that

17   are right now scheduled to take place during the course of this

18   trial, keep those appointments and we'll work around it, okay?

19             If there's anything that you foresee coming up -- we

20   normally don't have this problem with the lawyers, we have this

21   problem with jurors after they're seated, maybe after the first

22   day of trial then, you know, "I'm in final exams" and, you

23   know, if there's a problem, let us know, we'll make it happen.

24             One other thing -- there are two things, they're

25   related.  I'm going to deal with them backwards.

1          I would imagine we're going to have alternates and

2  then the question is always, who are the alternates?  There are

3  some who adhere to the practice that, well, the last two seated

4  or the last three seated will be the alternates.

5          Huh?

6      (Conferring with Clerk)

7          Okay, it's really not often, it's really -- okay.

8          How many do we want to start off with?

9          **MS. HART:**  I'm sorry.  How many jurors?

10          **THE COURT:**  Yeah.

11          **MS. HART:**  Do we have 12 jurors or eight jurors here?

12  Eight, okay.

13          **THE CLERK:**  Six or eight.

14          **MS. HART:**  Six or eight, okay.  I think we're fine

15  with six jurors.

16          **MS. LEPERA:**  I would suggest eight, just in case

17  something happens.

18          **THE COURT:**  Seven.  All right, good.  Because

19  something will happen.  Guaranteed, something will happen so

20  we'll do seven.

21          I know the estimate that you-all originally gave but

22  you were also estimating spending an hour and a half, two hours

23  on each of three witnesses that were going to testify regarding

24  the same thing and I know that's all going to change.  I am

25  going to assume that we will be done by Friday.  What do you

29

1    think?

2          MS. LEPERA:  That's my assumption as well.  It would

3    be very helpful, Your Honor, if it's okay to just actually run

4    through the witnesses because I'm clear on who I'm bringing and

5    I would love to be clear on who they're bringing, if they're

6    withdrawing anyone else.

7          THE COURT:  See, this is a good point because this is

8    what I'm going to ask you to do, each of you to do anyway.

9    It's just a matter of courtesy.

10         MS. LEPERA:  Right.

11         THE COURT:  You know, just indicate -- at the end of

12   the day, indicate who it is that you plan on putting on the

13   next day.  It's the right -- it's the professional thing to do

14   and it also makes for a much smoother trial if someone gets an

15   opportunity to actually prepare for an examination of a

16   witness.  It doesn't look like this is your first trial so

17   exchange that information at the end of every day.

18         All right.  Let's go through them.  I happen to have

19   the witness list up.  Let me -- I'll just go through the

20   witnesses, the witnesses as they appear on the witness list.

21   And if they've been withdrawn, great, all right.

22         Now, naturally Mr. Armes is certainly going to be a

23   witness.

24         What is this Dre London?

25         MS. LEPERA:  That on the Defense side, Your Honor, or

30

1  on the Plaintiff's side?

2          **THE COURT:**  Well it says -- apparently it's the --

3  hang on a sec.  Yeah, this is on the Plaintiff's Witness List

4  but what's interesting is that the Plaintiffs indicate that

5  they're going to be cross-examining Mr. London.

6          **MS. HART:**  He's a witness who is associated with the

7  Defendants.  I actually don't think we're going to call him in

8  our case in chief.

9          **THE COURT:**  Okay, okay, all right.

10          And of course Mr. Post.  Okay.

11          All right.  Adam King, a/k/a Dukes.  People for sure.

12  Matter of fact, I don't see how we need anybody else at trial

13  but these people but whatever.

14          All right.  Ryan Armes?

15          **MS. HART:**  Yes, Your Honor.  Ryan Armes is a witness.

16          **THE COURT:**  He's going to testify regarding London's

17  -- Mr. London's efforts to sign the Plaintiff as a client.

18          **MS. HART:**  Which led into him being invited to

19  cowrite a song with Post Malone.

20          **THE COURT:**  What do you mean "led into"?  Did

21  Mr. Malone --

22          **MS. HART:**  Mr. -- Dre London is the one who invited

23  Mr. Armes to attend the writing session on August 8, 2018.

24          **THE COURT:**  Ooh.

25          **MS. HART:**  He's one of Post Malone's managers.

31

1          THE COURT:  Okay.  I guess everyone's going to be

2   wondering about that.

3          Okay.  Ryan Armes.

4          MS. LEPERA:  For the record, Your Honor, whenever

5   you're --

6          THE COURT:  Yeah, just -- thank you, I appreciate

7   that.

8          MS. LEPERA:  Sure.

9          THE COURT:  Okay.  Shoot.

10          MS. LEPERA:  So we don't agree with the

11   characterization of Mr. Armes but I'm not going to object to

12   him as a witness other than he's also on the witness list with

13   respect to communications in regards to settlement.  We're

14   going to block all that so I don't have to worry about that.

15   But I just wanted to make sure for the record that the

16   characterization that Mr. London, Post's manager, through

17   Mr. Ryan Armes invited Tyler Armes to write with Post is not

18   accurate.

19          THE COURT:  Okay.  Okay.

20          MS. LEPERA:  Thank you, Your Honor.

21          THE COURT:  But that's the only thing that made this

22   relevant but okay.

23          All right.  Cory Litwin.  We have already decided

24   that we're not going to go there, right?  Doesn't have

25   anything --

1          **MS. HART:**  So long as they don't get into the issue

2     about the Warner Chappell Publishing Agreement, no, we don't

3     intend to call him.

4          **THE COURT:**  Okay.

5          **MS. LEPERA:**  And we reserve the right to cross-

6     examine Mr. Armes about that but it's very limited and it

7     has --

8          **THE COURT:**  Why do you have to reserve a right to

9     cross examine a witness?

10         **MS. LEPERA:**  On that document.

11         **THE COURT:**  Cross examine.

12         **MS. LEPERA:**  Yes.

13         **THE COURT:**  And you know what that's limited to.

14         **MS. LEPERA:**  I'm sorry, Your Honor?

15         **THE COURT:**  That'll be limited to the Direct.  But

16    there won't be any direct examination about some extraneous

17    document.

18         **MS. LEPERA:**  No but there will be a direct

19    examination about his intent with respect to what he is a

20    coauthor of.  So on cross examination, I can test that, I'm

21    hoping, with Your Honor's permission.

22         **THE COURT:**  Do that again?

23         **MS. LEPERA:**  On direct examination, Mr. Armes will be

24    questioned about his intent to be a coauthor of something.

25         **THE COURT:**  Yes.

1          **MS. LEPERA:**  And our position is his intent was to be

2   a coauthor only of the *Circles* final composition -- and that's

3   all this is about -- and this session is part of that.

4          In that document, it refers to one work and it's the

5   final *Circles* composition which just goes to contradict his

6   intent.

7          **THE COURT:**  Well no.  You just said that that was his

8   intent, that he was going to be there to --

9          **MS. LEPERA:**  Well I'm talking about -- yes, Your

10  Honor, but what he said -- what he's going --

11         **THE COURT:**  And I find that strange that he's been

12  invited to the session and they're talking about planking out

13  some notes to try to put some melody together for this song.

14  And you're saying that Mr. Armes in attending this thing,

15  intended to be a coauthor of the final product.

16         **MS. LEPERA:**  Correct.  That's what he sued over, Your

17  Honor, that's exactly right.

18         **THE COURT:**  I know that's what he sued over but we're

19  trying to -- but you said that this is his intent when he

20  accepted the invitation to show up to the session, his intent

21  was to be a coauthor of the final product.

22         **MS. LEPERA:**  His intent was to be -- yes, a song that

23  was written, yes, one song.  And that's what he's been saying

24  all along, invited to write a song, one song, one tune.

25         **THE COURT:**  Okay.

1           **MS. LEPERA:**  Thank you.

2           **THE COURT:**  All right.  Judith Finell.  She's gone.

3           Defendants' witness list:  Mr. Post, Frank Dukes,

4   yes, and Mr. Armes.  And we already talked about the three that

5   have been withdrawn:  Gunesberk, Walsh and Bell.  Dr. Lawrence

6   Ferrara.

7           **MS. LEPERA:**  He's the expert on the music.  He's

8   withdrawn as well because Ms. Finell is withdrawn.

9           **THE COURT:**  Okay.  So you-all feel that this is so

10  commonplace that no experts are necessary.  Cool.  Okay.  I

11  like that.  Short and sweet.  You guys actually put some

12  thought to this, okay?

13          Now, are any other problems?

14          **MS. LEPERA:**  Just a quick follow up on that, Your

15  Honor?

16          **THE COURT:**  Yes.

17          **MS. LEPERA:**  Just to follow up on the witnesses, just

18  again for courtesy, cooperation and clarity.

19          As I understand from Ms. Hart, she intends to call

20  only one of my clients in her case in chief and I wanted to

21  just confirm that for the order and ask Your Honor -- which I

22  think we have an understanding -- that he will be on the stand

23  only once and that's Mr. Post.  So if she's going to still call

24  him in her case in chief is the question I'm asking.

25          **THE COURT:**  I'd rather ask it a different way because

35

1    I don't want to interfere with any trial attorney's trial

2    strategy and that's exactly what this is so ...

3           But your concern is a fair concern.  I don't like

4    seeing witnesses being called to court multiple times but I am

5    assuming that the parties are going to be here anyway.  So if a

6    party is going to be called upon to leave the table and come up

7    here more than once that's not a big deal.  I'm not going to

8    worry about that so ...

9           **MS. HART:**  Your Honor, and if I may also add?

10          The parties have previously discussed and agreed that

11   when witnesses are called, they may be called for all purposes

12   to avoid witnesses having to come back and forth multiple

13   times.

14          **THE COURT:**  That sounds fair.

15          **MS. HART:**  So we're fine with that, I agree with

16   that.

17          **MS. LEPERA:**  Yes.  No, I think we were okay with

18   that.  My only question is whether or not -- and it was because

19   she did indicate to me -- it wasn't revealing her trial

20   strategy but she wanted him in her case in chief so we

21   discussed that.  And I'm happy to have him be called in her

22   case in chief.  I just for the order, I'm just trying to figure

23   out -- and he will be here but he's also probably our first

24   witness so if Mr. Armes, Ryan Armes is coming to testify after

25   him or before him I suppose is the question.  I was really

36

1  talking about a little bit of the order of proof but we can

2  talk about it at night I suppose as well.

3       **THE COURT:**  Yes, you can.  All right.

4       **MS. LEPERA:**  And Dre London is on our list as well,

5  Your Honor.  He's testifying for the Defense.

6       **THE COURT:**  Okay.  I did think of something but it's

7  gone.

8       All right.  Oh, did you -- by the way, did you hand

9  them that sheet?

10      **THE CLERK:**  Yes.

11      **THE COURT:**  All right.  I know what I was thinking

12  about was on that sheet so I'm not going to worry about it.

13      Okay.  I think that's it.  I think that covers

14  everything that we need to cover in advance.

15      One of the things that probably did not get covered

16  is I plan to have a jury before noon.  If you have questions

17  that you would like to be asked on voir dire, you know the

18  drill.  Give it to me in writing.  If it makes sense, I'll ask

19  them.  I'm going to stick to it this time.  You're not going to

20  get a chance to play, okay?

21      **MS. HART:**  And Your Honor, the parties did previously

22  submit proposed voir dire questions before the initial date set

23  for the pretrial conference last --

24      **THE COURT:**  I know I did see one and I assumed that

25  there were two.  Okay, good.  And if they're good questions --

37

1    or if now, you would like to amend them, that's fine too.

2         **MS. LEPERA:**  Thank you.  We would make it a little

3    more streamlined.  Obviously a lot has changed.

4         **THE COURT:**  Yes.

5         **MS. LEPERA:**  Thank you, Your Honor.  We'll do that

6    tomorrow.  Is that all right?

7         **THE COURT:**  Absolutely, that's fine.

8         **MS. LEPERA:**  Okay.

9         **THE COURT:**  You can do it the morning of.

10        **MS. LEPERA:**  Okay.

11        **THE COURT:**  I'd prefer you didn't --

12        **MS. LEPERA:**  No, we won't.  It gives us a little

13   breathing room.

14        And to that very point, we actually have a very

15   outdated pretrial order.  We would like to -- it's over a year

16   old and there's errors in it and changes and the exhibit list

17   is old.  Would we be -- would it be acceptable if we got

18   together and gave you just a current version?

19        **THE COURT:**  That would be good.

20        **MS. LEPERA:**  We'll do that tomorrow as well.

21        **THE COURT:**  That would be good.

22        **MS. LEPERA:**  Sure.

23        **THE COURT:**  Okay.  Is there anything else that we

24   need to discuss in advance?

25        Now we will -- well, I'll let you know.

38

1          When we're in trial, we're here when the doors open

2   to the building and we don't expect you to be here but we'll be

3   here beginning at 7:00 o'clock every morning.  The better

4   practice when we're involved in a jury trial, is for the

5   attorneys to show up before the jury shows up so that we can

6   resolve anything that we need to resolve outside their presence

7   so that -- I don't know if any of you have ever been on jury

8   duty but to show up ready to do it, reluctantly but, you know,

9   after the kicking and screaming doesn't work and you have to

10  just give in, you actually want to feel that you're there for

11  something and not there while the court and the lawyers are in

12  the courtroom discussing Lord knows what and you're sitting

13  outside on a hard bench or maybe in the jury deliberation room

14  for hours.  Even though I know we're going to be working, we're

15  not going to be goofing off, it's just no way to treat them.

16  So when they're here, I don't want to waste their time.  If we

17  have things that we have to talk about -- and there are going

18  to be such things -- we're going to talk about those things on

19  our time.  I'll stay here well into the evening if necessary

20  after the court date and we, like I said, we will be here at

21  7:00 o'clock.  And you want to come in when the doors open,

22  great, come on and we will talk about these things before we

23  bring the jury out.  Because while they're here, I want there

24  to be the constant presentation of evidence.

25          Now, we don't have a long string of witnesses so I

39

1    don't foresee a problem here but it does irritate me,

2    particularly after I've told the lawyers this, I want there to

3    be a butt in that seat all the time.  Now, when we excuse one

4    witness, okay, that's going to be cold for about five seconds

5    because I'm looking at their -- there's people sitting over

6    here, right?  There's three individuals over there.  I want the

7    next witness in the little ante room out there.  I don't know,

8    I'm sure there's a name for that little witness-attorney

9    conference room and we've got two of them identical on both

10   sides, they're right here, practically in the courtroom.  I

11   want the witnesses there.  When you see this witness on

12   re-re-direct, I want someone to go get the next witness and

13   bring him in the courtroom, sit them down in that back chair.

14   I don't expect they're going to get tainted on re-re-recross so

15   I want them in the courtroom ready to go.  And as soon as that

16   witness steps down, I want the next witness to take his or her

17   place.  I want something to be going on all the time.

18           Now, outside of jury selection, if there is a

19   national emergency, you can ask for a sidebar.  If you can see

20   that we're getting ready to go off a cliff if we don't change

21   our direction, that's a sidebar.  But like I said, the policy

22   should be we're not wasting their time, we are presenting

23   evidence all the time.

24           Now, we're going to be taking breaks during the day.

25   And as far as I'm concerned, I'll figure a way to do it so that

40

1   we actually do give the person who's working hard a break but

2   we will address your concerns but I don't want to keep the jury

3   waiting.

4             Okay, that's enough.  Okay, that's good too.  All

5   right.  Excellent.

6             Any questions about anything?  Concerns?  You know,

7   let them know who day one's witnesses are.

8             **MS. HART:**  Will do.

9             **THE COURT:**  And if there's day two witnesses, let

10  them know.

11            **MS. HART:**  Will do.

12            **THE COURT:**  And likewise, okay?

13            **MS. LEPERA:**  Yes.

14            **THE COURT:**  All right.  Let's everybody be

15  professional and we're going to get in and get out of here.

16            By the way, they -- I'll tell you this too.

17            At the end of the trial I'm going to ask these people

18  if they're willing to stick around and talk to the lawyers

19  because lawyers do get a great deal out of talking to the real

20  audience.  You can put on mock trials and stuff in front of

21  people in your firm but that -- we can try to estimate what's

22  going to happen, how this piece of evidence is going to be

23  received, how they're going to react to testifying through an

24  interpreter, all of these things.  And I can guarantee every

25  doggone time, we get it wrong.  We get it wrong.  The legally

41

1   trained do not view what goes on in here the same way as people

2   right off the streets, they just don't.  So you might be

3   interested in their perspective on how you did this, that or

4   the other, mainly closings and openings and that sort of thing.

5   So we will ask for that.

6          **MS. LEPERA:**  That's great.  Thank you.

7          **MS. HART:**  Thank you.

8          **THE COURT:**  It's up to them, naturally it's up to

9   them because I'm going to excuse them and then I'm going to ask

10  them to hang around for a second because I need to talk to you.

11         There's was one other thing that was related to that

12  but it doesn't really matter because we will be --

13         Oh.  Have you changed the policy now, Sheila, about

14  asking them to set the hours?  Okay.

15         Forever now we've let the jurors select the hours and

16  they have selected 8:00 or 8:30 to 2:00 or 2:30, no lunch.

17  They want to get started before rush-hour traffic and they want

18  to get out of here before rush-hour traffic and the lawyers are

19  kind of glad because they get a chance to sit down with the

20  next day's witness while the sun is still shining so it seems

21  to be a win-win all the way around.

22         And I don't think it's on this sheet but our break

23  for the day has actually some logic to it.  If we've got a

24  witness on the witness stand that's been testifying for like

25  quite some time and it's 2:00 o'clock and we're not going to be

42

1    able to wrap up that witness; or if we are, if we can wrap up

2    that witness in an hour, then we will keep going, we will keep

3    going until 3:00, whatever, whatever it is, so that we can get

4    it done and the witness does not have to come back to court the

5    next day.  And the converse is true.  If we really can wrap

6    somebody else up or can't wrap somebody else up and have to

7    bring them back the next day then we'll do that.  We just go

8    ahead and break a little early because we're not going to be

9    able to save much time anyway.  They're going to have to come

10   back tomorrow.  So if -- and we leave it up to them.  If they

11   want to leave, if the jury wants to leave, they've had enough

12   for the day and we're going to have to bring the witness back

13   anyway, then we'll shut it down and let it go.  A lot of this

14   is geared towards them and their lives.  They're the ones that

15   are really being inconvenienced.  All of us are going to be

16   here any damn way, okay.  But if they have grown weary, mainly

17   because the testimony has been tedious, then I'm going to let

18   them go which is something I want you-all to remember.

19          Keep an eye on them.  That is your audience.  Please

20   don't forget that.  And it's a television age and I am sick and

21   tired of hearing it but it is a reality.  NCIS.  It is a

22   reality.  This is not a criminal case -- I'm not saying that --

23   but they want to see stuff, they do.  They want to see stuff.

24   You've got to show them stuff.  It's got to be kind of graphic

25   or we often have audio tapes in here but just keep it in mind

43

1    that these people are visual and they're used to being

2    entertained and the testimony in here -- you know this.

3          You know this is not like a deposition.  This is not

4    let's unearth every single fact that we learned during

5    discovery and just give it to them.  No.  You unearthed a

6    couple of gems during the course of this discovery.  They want

7    the gems and they want this thing exciting and they want it to

8    move and they want to be able to wrap their arms around it and

9    they want to know exactly what they're listening to is actually

10   relevant and it's important to their decision.

11         So don't -- as they say in the newspaper business --

12   don't bury the lead.  Don't actually come up with some facts,

13   things that are actually relevant to your case and then pile a

14   bunch of crap on top of it so that the relevant stuff gets

15   hidden, particularly in a case where they don't really know

16   what questions (inaudible) are going to be asked of them at the

17   very end.  This helps us a little bit if we're going to pre-

18   instruct them and they know what they're supposed to be

19   listening for.  So that -- that's a good thing.  I think that's

20   an intelligent move by you-all.

21         All right.  As always, if something comes up, you

22   know, an emergency, by anyone, give Ms. English a call and

23   she'll fix it for you, okay?

24         **MS. HART:**  Your Honor, I do have question.

25         **THE COURT:**  yes.

44

1          **MS. HART:**  I did see -- relating to the jurors, I saw

2    somewhere that in certain cases you might allow the jurors to

3    ask questions.

4          **THE COURT:**  Oh.

5          **MS. HART:**  Is this a case where you would recommend

6    that or what is your practice?  Because we don't have an

7    objection.  I've had trials both ways and it can be helpful.

8          **THE COURT:**  It's just, to me, it's a matter of logic.

9    If you're trying to play hide the ball, if that is going to be

10   your trial strategy -- and sometimes it is, that's a legitimate

11   strategy -- you don't want them asking questions.

12          But here's the deal.  Even if that is your trial

13   strategy that you don't want the finder of fact to get an

14   answer to their question -- which seems absurd but sometimes

15   it's legit -- the way it works in here is, they write down

16   their question, they will hand their question to Ms. English,

17   Ms. English will hand it to me.  If it's a reasonably

18   intelligent question, if it's appropriate to be asked during

19   the course of the trial, I'll give it back to Ms. English, she

20   will see to it that a sufficient number of copies are made so

21   that you each have a copy of the question.  And this is --

22   ideally this needs to happen while the witness is still on the

23   stand.

24          If either of you wants to ask the question, have at

25   it.  And I will permit it even if you, for example, have

45

1   already done your re-re-recross and have said "nothing

2   further."  Right?  And then you start looking at this question,

3   yeah, you can come back.  You can come back.  You can ask the

4   question if you want.  If you don't want -- if neither of you

5   wants the question asked, it doesn't get asked.  I'm nothing

6   going to do it.

7           So if they have a question, you know what the

8   question is, you know what the answer is, you know whether or

9   not the answer is going to help or hurt your case.  It's up to

10  you.  If you want to ask it, you can ask it; if you don't want

11  to ask it, don't ask it.  I'm not going to ask it, okay?

12          But yes, I always think that's a good idea.  Can you

13  imagine having a court trial and the judge is completely

14  bewildered about something but can't ask for clarification.  Of

15  course you'd think that's malpractice stupidity.

16          Okay.  Enough said about that.

17          All right.  But you guys have answered the two things

18  that concerned me most, jury asking questions and

19  pre-instructing them so I think we're in good shape there.  And

20  of course, we can adjust on the fly so if anything comes up,

21  just let me know and we'll take care of it.

22          **MS. HART:**  Thank you.

23          **MS. LEPERA:**  We'll work on those pre-jury

24  instructions.

25          **THE COURT:**  Okay, good.

1            And by the way, thank you, congratulations for --

2    it's rare that we have a situation where there's barely a

3    handful of jury instructions in dispute.  I mean that's a sign

4    of real professionals so I appreciate that.

5            **MS. LEPERA:**  Thank you, Your Honor.

6            **THE COURT:**  And because of that, Michael is probably

7    going to bring you Krispy Kreme Donuts on the first day of

8    trial.

9            All right.  Adios.

10            **THE CLERK:**  This court is adjourned.

11        **(Proceeding adjourned at 12:52 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>March 18, 2023</u>

            Signed                                                Dated


*TONI HUDSON, TRANSCRIBER*